ACCEPTED
15-25-00027-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
4/17/2025 6:48 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00027-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
4/17/2025 6:48:12 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AT AUSTIN, TEXAS

---

**NICHOLAS KREINES, DAVID P. RYAN, LIBERTY MINERAL PARTNERS LLC, NAK RESOURCES INC., AND CGR OIL AND GAS, LLC**,

*Appellants*,

v.

**ES3 MINERALS, LLC**,

*Appellee.*

---

On Appeal from the 459th Judicial Court,
Travis County, Texas
Cause No. D-1-GN-24-006854

---

## BRIEF FOR APPELLANTS

---

JAMES F. PARKER
State Bar No. 24027591
GABRIELLE C. SMITH
State Bar No. 24093172
SYDNEY P. SADLER
State Bar No. 24117905
**LLOYD GOSSELINK
  ROCHELLE &TOWNSEND, P.C.**
816 Congress Ave., Suite 1900
Austin, Texas 78701
(512) 322-5800
(512) 472-0532 (fax)

**ATTORNEYS FOR APPELLANTS**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**Appellants:**

Nicholas Kreines, David P. Ryan,
Liberty Mineral Partners LLC,
NAK Resources Inc., and CGR
Oil & Gas, LLC

**Attorneys for Appellants:**

James F. Parker
Gabrielle C. Smith
Sydney P. Sadler
Lloyd Gosselink Rochelle
  & Townsend, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas  78701
Telephone: (512) 322-5800
Facsimile:  (512) 472-0532

**Appellee:**

ES3 Minerals, LLC

**Attorneys for Appellee:**

Michael D. Marin
Tori B. Bell
Boulette Golden & Marin  L.L.P.
2700 Via Fortuna, Suite 250
Austin, TX 78746
Telephone: (512) 732-8900
Facsimile:  (512) 551-9602

# TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES.......................................................................7

STATEMENT OF THE CASE...............................................................11

INTRODUCTION.......................................................................................13

STATEMENT REGARDING ORAL ARGUMENT ..............................15

ISSUES PRESENTED FOR REVIEW ......................................................16

STATEMENT OF JURISDICTION AND STANDARD OF REVIEW ....19

    A.    Jurisdiction....................................................................................19

    B.    Standard of Review. .....................................................................19

STATEMENT OF FACTS ..........................................................................21

    A.    ES3 is a mineral-interest broker. .........................................21

    B.    ES3 hires Ryan to convince mineral-interest owners to sell to ES3. ...........................................................23

    C.    ES3 taps Ryan's sales knowledge and experience to develop its software platform. ...........................................23

    D.    Ryan leaves ES3 in 2021 and is subsequently rehired. ...............................................................................24

    E.    ES3 hired Kreines to lead its efforts to sell the mineral interests that Ryan acquired. .................................24

    F.    ES3 requires its employees to sign non-competition agreements. .....................................................25

    G.    ES3 terminates Ryan for refusing to steal a consultant's intellectual property. ........................................26

    H.    Ryan starts LMP to act as a mineral broker and secures its first AMI deal.....................................................26

    I.    LMP hires an independent software designer to develop its own CRM platform to facilitate its business model. .............................................................27

    J.    LMP sells its first mineral interest outside an AMI.............................................................................28

K.     Kreines leaves ES3 in January 2024 to once more work as an independent landman. ....................................... 28

L.     ES3 and LMP have not competed with one another. ................................................................. 28

M.     The Travis County District Court issues the Temporary Injunction, which the Business Court modifies. .................................................................... 30

SUMMARY OF THE ARGUMENT ...................................................... 32

ARGUMENT & AUTHORITIES ........................................................... 36

A.     The Temporary Injunction does not meet the requirements of Rules 683 or 684. ........................................ 36

    1.     The Temporary Injunction does not set out the reasons why ES3's harm is irreparable as required by Rule 683. ............................................... 37

    2.     The Temporary Injunction does not meet the specificity requirement of Rule 683. ........................... 42

       a.     The Temporary Injunction does not define specific persons with whom Appellants cannot do business. .......................... 43

          i.     Appellants do not know with whom they cannot transact business from a simple reading of the Temporary Injunction ......................... 44

          ii.     Appellants cannot conduct their own investigation to ensure compliance with the Temporary Injunction because its limitations are confidential. ........................................ 46

       b.     By barring Appellants from doing business with unknown companies, the Temporary Injunction violates Rule 683. ................................................................. 47

3. The bond required by the Temporary Injunction is inadequate and contrary to the evidence. ....................................................51

    a. The trial court set a nominal bond that was unsupported by the evidence. ........................52

    b. The bond should have been set on the basis of lost revenue, but even a lost-profit standard would have resulted in a significantly higher bond amount. ...................53

    c. The nominal bond set by the trial court essentially eliminated the bond requirement altogether. ......................................54

B. The evidence does not support the issuance of a temporary injunction. ........................................................55

    1. There is no imminent and irreparable harm to ES3 ...........................................................................56

        a. ES3's injury was not "immediate." .....................57

        b. ES3 has not endured an injury requiring injunctive relief. ..................................58

        c. ES3's alleged damage to its relationship with buyers is speculative. ...........................................................60

    2. The trial court improperly granted the Temporary Injunction because there is no probable right of relief on ES3's claims. ......................61

        a. This industry relies on the most basic principles of economics and marketing. ...........................................................62

        b. ES3 identifies no trade secret that has been taken. ........................................................63

            i. Though there is overlap due to the nature of the industry, the two companies employ different business practices. ....................................64

ii. There are material differences in the pricing formula stemming from the differences in business practices. ...................................................66

iii. The two companies' software platforms are different.............................67

iv. The identities of ES3's buyers are not secret...............................................70

c. The evidence doesn't support ES3's allegation that Ryan and Kreines have breached an enforceable covenant not to compete. ........................................72

i. David Ryan has not breached the covenant not to compete. ...........................72

ii. The covenants are not supported by consideration. ........................................73

iii. The restrictions in the covenants not to compete are unreasonable..............75

A) The temporal restriction is unreasonable......................................75

B) The geographic restriction is unreasonable......................................76

C) Industry-wide restriction is invalid as a matter of Texas law.........76

3. The Temporary Injunction does not contain a geographic restriction, thereby barring Appellants from engaging in lawful activity...............77

CONCLUSION AND PRAYER ..............................................................79

CERTIFICATE OF SERVICE................................................................81

CERTIFICATE OF COMPLIANCE .......................................................82

INDEX OF APPENDICES ...................................................................83

# INDEX OF AUTHORITIES

**Cases**                                                      **Page**

*Amend v. Watson,*
333 S.W.3d 625 (Tex. App.—Dallas 2009, no pet.) ............................ 20

*Archon Design v. Naim,*
No. 03-23-00226-CV, 2023 Tex. App. LEXIS 6740
(Tex. App.—Austin Aug. 30, 2023, no pet.) ........................................ 56

*Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.,*
249 S.W.3d 380 (Tex. 2008) ................................................................ 37

*Butnaru v. Ford Motor Co.,*
84 S.W.3d 198 (Tex. 2002) ............................................. 17, 19, 20, 56

*Citation 2002 Inv. Llc, & Endeavor Energy Res., L.P. v.*
*Occidental Permian,*
662 S.W.3d 550 (Tex. App.—El Paso 2022) ........................................ 73

*Clark v. Hastings Equity Partners, LLC,*
651 S.W.3d 359
(Tex. App.—Houston [1st Dist.] 2022, no pet.) .......................... *passim*

*Computek Computer & Office Supplies, Inc. v. Walton,*
156 S.W.3d 217 (Tex. App.—Dallas 2005, no pet.) ................. 47, 48, 50

*Conlin v. Darrell Haun & Solarcraft, Inc.,*
419 S.W.3d 682
(Tex. App.—Houston [1st Dist.]2013, no pet.) .................................... 36

*DeSantis v. Wackenhut Corp.,*
793 S.W.2d 670 (Tex. 1990) ........................................... 17, 51, 52, 53

*Ex parte Chambers,*
898 S.W.2d 257 (Tex. 1995) ................................................................ 42

*Ex parte Hodges,*
625 S.W.2d 304 (Tex. 1981) ................................................................ 43

*Ex parte Jackman,*
663 S.W.2d 520 (Tex. App.—Dallas 1983, no writ) ............................ 42

*Franklin Savings Association v. Reese,*
756 S.W.2d 14 (Tex. App.—Austin 1988, no writ) ............................ 52

*Home Asset, Inc. v. MPT of Victory Lakes Fcer,*
No. 01-22-00441-CV, 2023 Tex. App. LEXIS 2890
(Tex. App.—Houston [1st Dist.] May 2, 2023, no pet.) .......... 37, 40, 41

*Huynh v. Blanchard,*
694 S.W.3d 648 (Tex. 2024) ................................................... 57

*Indep. Capital Mgmt., L.L.C. v. Collins,*
261 S.W.3d 792 (Tex. App.—Dallas 2008, no pet.) ............................ 20

*In re Krueger,*
No. 03-12-00838-CV, 2013 Tex. App. LEXIS 5984
(Tex. App.—Austin May 16, 2013, no pet.) ............................ 48, 49, 50

*In re Luther,*
620 S.W.3d 715 (Tex. 2021) ................................................. 43, 49, 50

*IPSecure, Inc. v. Carrales,*
No. 04-16-00005-CV, 2016 Tex. App. LEXIS 6288
(Tex. App.—San Antonio June 15, 2016, no pet.) .................. 16, 34, 37

*Kennedy v. Gulf Coast Cancer & Diagnostic Ctr.,*
326 S.W.3d 352
(Tex. App.—Houston [1st Dist.] 2010, no pet.) ................................. 40

*Kotz v. Imperial Capital Bank,*
319 S.W.3d 54 (Tex. App.—San Antonio 2010, no pet.) ............... 39, 40

*Lagos v. Plano Econ. Dev. Bd.,*
378 S.W.3d 647 (Tex. App.—Dallas 2012, no pet.) ............................ 18

*Marsh USA Inc. v. Cook,*
354 S.W.3d 764 (Tex. 2011) ................................................. 72, 74, 77

*Parker v. Schlumberger Tech. Corp.*,
   475 S.W.3d 914
   (Tex. App.—Houston [1st Dist.] 2015, no pet.) .................................. 79

*Paul v. Roy F. & JoAnn Cole Mitte Found.*,
   No. 03-21-00502-CV, 2023 Tex. App. LEXIS 772
   (Tex. App.—Austin Feb. 8, 2023, pet. denied)................................... 45

*Peat Marwick Main & Co. v. Haas*,
   818 S.W.2d 381 (Tex. 1991) ....................................................... 76, 77

*Qwest Commc'ns Corp. v. AT&T Corp.*,
   24 S.W.3d 334 (Tex. 2000). ........................................................ 36, 52

*Stewart & Stevenson Servs. v. Serv-Tech, Inc.*,
   879 S.W.2d 89
   (Tex. App.—Houston [14th Dist.] 1994, writ denied) ....................... 74

*Tarr v. Lantana Sw. Homeowners' Ass'n*,
   No. 03-14-00714-CV, 2016 Tex. App. LEXIS 13372
   (Tex. App.—Austin Dec. 16, 2016, no pet.) ...................................... 45

*Taylor Hous. Auth. v. Shorts*,
   549 S.W.3d 865 (Tex. App.—Austin 2018, no pet.) ........................... 20

*Tex. Dep't of Pub. Safety v. Salazar*,
   304 S.W.3d 896 (Tex. App.—Austin 2009, no pet.) ........................... 56

*Totus Grp., LLC v. Pruitt Family Living Tr.*,
   No. 05-23-01222-CV, 2025 Tex. App. LEXIS 907
   (Tex. App.—Dallas Feb. 14, 2025, no pet. h.)................................... 20

*Tuma v. Kerr Co.*,
   336 S.W.3d 277 (Tex. App.—San Antonio 2010, no pet.)................... 37

*Van Huis v. Marine Ventures, Ltd.*,
   672 S.W.3d 22 (Tex. 2023) ........................................................ 54, 55

*Whinstone US Inc. v. Rhodium 30MW, LLC*,
   691 S.W.3d 47 (Tex. App.—Austin 2024, no pet.)........................ 42, 45

*Whitlow v. Polley,*
  670 S.W.2d 318 (Tex. App.—Tyler 1984, no writ)...............................54

**Statutes**

Tex. Bus. & Com. Code § 15.50 ........................................................ 74, 78

Tex. Gov't Code § 25A.004................................................................55

Tex. Gov't Code § 25A.006.............................................................31, 84

**Rules**

Tex. R. Civ. P. 355 ..........................................................................31

Tex. R. Civ. P. 683 ................................................................... *passim*

Tex. R. Civ. P. 684 ................................................................... *passim*

## STATEMENT OF THE CASE

*Nature of the Case:*   This is a trade-secrets, breach-of-fiduciary-duty, breach-of-contract and fraudulent-transfer case brought by mineral-interest broker ES3 Minerals, LLC ("ES3") against former ES3 employees David P. Ryan ("Ryan") and Nicholas Kreines ("Kreines") and the mineral-interest companies established by them. ES3 alleges that Ryan and Kreines stole ES3's trade secrets, proprietary software, and other confidential information, used that information to solicit ES3's buyers and employees and in doing so breached the covenants to not compete entered into by Ryan and Kreines as a condition of their employment with ES3. ES3 sought to enjoin Ryan, Kreines, and their mineral-interest company Liberty Mineral Partners LLC ("LMP") from entering or negotiating any transaction with ES3's buyers, from encouraging ES3's buyers to discontinue or limit their relationships with ES3, and from soliciting ES3's employees for employment or encouraging them to terminate their relationships with ES3.

*Trial Court:*   District Court for the 455th Judicial District, Travis County, Texas, Judge Laurie Eiserloh presiding.

Removed to the Texas Business Court for the Third District at Austin on December 23, 2024 (2d. Suppl. CR 1–9.)

*Course of Proceedings:*   ES3 filed its Verified Original Petition and Application for Injunctive Relief on September 18, 2024 (CR 5–108.). The temporary injunction hearing was held on October 29–30, 2024.

After removal, Appellants filed a Motion to Dissolve the Temporary Injunction, which the Business Court heard on February 27, 2025.

11

*Disposition in Trial Court:*   The trial court granted the temporary injunction on November 26, 2024, but did not serve the parties or file the Temporary Injunction Order until December 19, 2024 (CR 869–870.)

On February 27, 2025, the Business Court heard Appellants' Motion to Dissolve the Temporary Injunction along with Appellee's Motion to Modify the Temporary Injunction. (2d. Suppl. CR 10–189, 190–209.) The Business Court issued its Order Modifying Temporary Injunction on April 7, 2025. (2d. Suppl. CR 307–33.)

The Court granted Appellants' Motion for Appellate Review under Rule 29.6 on April 11, 2025, and agreed to review the April 7, 2025 Modified Temporary Injunction issued by the Business Court alongside the original Temporary Injunction issued in November 2024.

# INTRODUCTION

Along with a hundred others, ES3 and LMP are mineral-interest brokers in West Texas. The business is simple; the broker buys mineral interests from current owners and then resells them to buyers who plan to repackage them for sale as securitized instruments or develop for extraction.

Ryan and Kreines are former ES3 employees. Ryan worked to acquire mineral interests; Kreines worked on the divestiture side. Both signed covenants not to compete.

When ES3 terminated Ryan in August 2023, he started LMP. In January 2024, Kreines left ES3 to join Ryan. Over the next nine months, LMP operated successfully without competing with ES3 to acquire any mineral interest.

Because of that lack of competition, ES3 did not learn of LMP's existence until September 2024. When it did, it sued to enforce the covenants not to compete. It also alleged theft of confidential information and trade secrets and a breach of Kreines's fiduciary duty. The trial court issued a Temporary Injunction in November 2024.

Recognizing that LMP was not competing with ES3 to buy mineral interests, the Temporary Injunction does not limit Appellants' acquisition of

13

mineral interests. The Temporary Injunction only restricts Appellants from selling mineral interests to entities that have done business with ES3.

Each mineral interest is different. LMP doesn't compete with ES3 to sell a mineral interest that it owns and ES3 does not. So, if the Temporary Injunction's restriction seems nonsensical, that's because it is. And the district court was unable to set forth the reasons why a temporary injunction should be issued, notwithstanding the requirements of Rule 683.

After Appellants removed the case to the Texas Business Court, that court modified the Temporary Injunction's restrictions, which are still insufficiently specific to meet the requirements of Rule 683. The modification also doesn't state the reasons for the Temporary Injunction.

Two courts have now looked at this injunction. Neither could set forth the reasons for its issuance. That's because the evidentiary record does not support the issuance of an injunction. ES3 identified no imminent harm from LMP's sales of mineral interests that ES3 doesn't own. To the extent ES3 has a harm, it has an adequate remedy at law. Neither the district court nor the Business Court could explain why the Temporary Injunction should be issued because it shouldn't have been, and this Court should reverse that decision.

## STATEMENT REGARDING ORAL ARGUMENT

The temporary injunction issued by the trial court does not meet the requirements of Texas Rule of Civil Procedure 683, in ways that limits the trial court's ability to enforce its own order. That noncompliance with Rule 683 derives largely from the fact that the evidence adduced at the temporary-injunction hearing did not support the issuance of an injunction in the first place.

After the district court issued the Temporary Injunction, Appellants removed the case to the Texas Business Court, which modified the Injunction. The Business Court's modification carries over most of the same fatally defective language. Any further attempt to modify the Temporary Injunction to meet the requirements of Rule 683 would be equally fruitless inasmuch as the Injunction is not supported by the record evidence.

To elucidate the difficulty the Business Court will have in enforcing the Temporary Injunction resulting from its lack of specificity, and to explain the lack of evidentiary basis for the Injunction, Appellants respectfully ask the Court to set this appeal for oral argument.

## ISSUES PRESENTED FOR REVIEW

1.      Rule 683 requires an order granting a temporary injunction "be specific in terms" and "describe in reasonable detail . . . the act or acts sought to be restrained." Tex. R. Civ. P. 683.  The Temporary Injunction in this case, however, does not definitively identify the persons or entities with whom Appellants are enjoined from transacting business.   Instead, to determine whether a potential business partner is off-limits, Appellants need to investigate whether it is a "contact and or decision maker who is/was associated with" a confidential list of off-limits people/entities.

> ***Issue Presented:***   Whether a temporary injunction that requires Appellants investigate third parties' employment records to ensure compliance meets the specificity requirements of Rule 683.

2.      Rule 683 also requires that "every order granting an injunction . . . shall set forth the reasons for its issuance."   "And, when setting forth the reasons for granting a temporary injunction, the trial court must set forth specific reasons, not merely make conclusory statements." *IPSecure, Inc. v. Carrales*, No. 04-16-00005-CV, 2016 Tex. App. LEXIS 6288, at *56 (Tex. App.—San Antonio June 15, 2016, no pet.).  The Temporary Injunction in this case, however, recites without further explanation "[a]ny

suit for money damages would not be an adequate remedy at law to protect Plaintiff's rights."  (CR 997–98, ¶ 17.)

**_Issue Presented:_**   Whether a mere recital of the temporary-injunction elements sufficiently sets forth the reasons for the injunction's issuance as required by Rule 683.

3.   Rule 684 requires an order granting a temporary injunction to fix a bond in an amount sufficient to compensate the defendant in the event the injunction is ultimately dissolved.  *See* Tex. R. Civ. P. 684; *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990).  In this case, in which ES3 acknowledges that the amount in dispute is more than $5 Million and the evidence showed an injunction would immediately impair contracts worth $3.6 Million, the trial court set a nominal bond of $25,000.

**_Issue Presented:_**   Whether a nominal bond provides security as required by Rule 684.

4.   A party seeking a temporary injunction must show that it will suffer an imminent and irreparable harm if the injunction is not granted.  *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).  The only evidence of any harm to ES3 from Appellants' actions was in the "vibes" ES3's president claims to have gotten from his customers.

**_Issue Presented:_**   Whether a change in the "vibes" in the marketplace is sufficient to demonstrate an imminent and irreparable harm.

5.     An injunction should not be so broad as to enjoin a defendant from lawful activities. *Lagos v. Plano Econ. Dev. Bd.*, 378 S.W.3d 647, 650 (Tex. App.—Dallas 2012, no pet.).  The Temporary Injunction, however, exceeds the restrictions in the covenant not to compete by extending the restrictions beyond Texas and past two years after an employee's termination.

> ***Issue Presented:***  Whether a temporary injunction granted on a covenant not to compete may restrain conduct that does not violate the covenant's restrictions.

## STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

### A.  Jurisdiction.

The Court has jurisdiction under Texas Civil Practice and Remedies Code Section 51.014(a)(4), which provides that a party may appeal from an interlocutory order of a district court that grants a temporary injunction. Prior to transfer, the Eighth Court of Appeals granted an extension of time for Appellants to file their notice of appeal, and Appellants timely perfected their appeal on December 20, 2024.

This case was originally appealed to the Third Court of Appeals at Austin, Texas, which has jurisdiction over cases brought from Travis County, Texas.  The case was then transferred to the Eighth Court of Appeals at El Paso, Texas for docket equalization purposes pursuant to Texas Government Code Section 73.001.  After the underlying lawsuit was removed to the Business Court, this appeal was transferred to this Court under Texas Rule of Appellate Procedure 27a(c).

### B.  Standard of Review.

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru*, 84 S.W.3d at 204.  A temporary injunction is an extraordinary remedy and will not issue as a matter of right.  *Id*.  To obtain a temporary injunction, the

applicant must plead and prove that it (1) has a cause of action against the opposing parties; (2) has a probable right on final trial to the relief sought, and (3) faces probable, imminent, and irreparable injury in the interim. *Id.*; *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 877–78 (Tex. App.—Austin 2018, no pet.).

The decision to grant or deny a temporary injunction is reviewed for abuse of discretion. *Butnaru*, 84 S.W.3d at 211. The reviewing court views "the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor." *Amend v. Watson*, 333 S.W.3d 625, 627 (Tex. App.—Dallas 2009, no pet.).

However, "[t]he requirements of Rule 683 are mandatory and must be strictly followed." *Totus Grp., LLC v. Pruitt Family Living Tr.*, No. 05-23-01222-CV, 2025 Tex. App. LEXIS 907, at *12 (Tex. App.—Dallas Feb. 14, 2025, no pet. h.). Accordingly, "[a] trial court abuses its discretion by issuing a temporary injunction order that does not comply with the requirements of Rule 683." *Indep. Capital Mgmt., L.L.C. v. Collins*, 261 S.W.3d 792, 795 (Tex. App.—Dallas 2008, no pet.).

## STATEMENT OF FACTS

### A.   ES3 is a mineral-interest broker.

ES3 is a mineral-interest broker/aggregator. (CR 376.) That is to say that ES3 buys mineral interests from owners and resells them to buyers who may repackage them for sale as securitized instruments or develop for extraction themselves. (CR 381; III RR 8:7–22.) The closing of the two transactions—from mineral-interest owner to broker and from broker to end buyer—are typically closed at the same time so that the broker does not need to put its own capital at risk. (III RR 13:15–25.)

The basics of mineral-interest brokerage are simple. The identity of mineral-interest owners can be ascertained from public records. (III RR 26:25–27:11.) The broker then cold-calls the mineral-interest owner to solicit a sale. (III RR 27:12–23, 56:1–5.) It's straight sales—prior industry knowledge is neither needed nor even particularly desirable. (CR 386–87; II RR 46:19–47:1, 50:9–15.) Instead, it is a strong sales background and capability that is essential to success in the acquisition of mineral interests. (CR 386–87; III RR 21:12–22:6.)

Once the broker buys a mineral interest, it resells the mineral interest to private end-buyers and to publicly traded end-buyers. (III RR 19:18–

20:23.) The identities of these end-buyers is no secret; it is reflected in the real-property records of each county. (III RR 22:23–24:7.)

But more importantly, the buyers do not want their identities to be secret. The buyers are in the business of buying mineral interests, and they accordingly want the world of mineral sellers and brokers to know that they are open for business and willing to buy mineral interests. (III RR 24:8–20.) Accordingly, the mineral-interest buyers actively advertise themselves to brokers through industry publications, conferences, and networking. (III RR 24:12–17; 88:21–89:10.)

ES3 is one of approximately 100 broker/aggregators buying and selling mineral interests in Texas. (III RR 22:12–22.) It has a roughly proportionate share of the market in mineral interests as reflected in the public records of the acquisitions by two end-buyers: Hatch Resources and Mesa Resources. Since ES3's inception, ES3 has sold five mineral interests to Hatch. (III RR 86:23–87:13.) Over that same period, Hatch has acquired 295 mineral interests from other broker/aggregators during that time. (III RR 86:23–87:13.) Over the same period, Mesa has acquired approximately 200 mineral interests, only five of which were purchased from ES3. (III RR 87:14–88:6.)

**B. ES3 hires Ryan to convince mineral-interest owners to sell to ES3.**

ES3 hired Ryan initially as a "Producer" based on Ryan's two decades of sales experience. (III RR 54:22–55:6, 55:22–25.) Owing to Ryan's success in that position, ES3 promoted him to Vice President of Acquisitions. (II RR 54:22–55:6.) Ryan led ES3's efforts to convince mineral-interest owners to sell to ES3 in his role as Vice President of Acquisitions. (II RR 55:3–19.) Ryan's efforts to acquire mineral interests on behalf of ES3 were limited exclusively to the Permian Basin. (III RR 59:13–18.)

**C. ES3 taps Ryan's sales knowledge and experience to develop its software platform.**

In the course of his work for ES3, Ryan took a central role in developing ES3's software platform, which it calls "Rainmaker." (III RR 56:23–58:2.) When Ryan started at ES3, ES3 simply used spreadsheets to organize its sales leads. Its sales staff had to manually look up telephone numbers and other contact information to contact potential sellers. (III RR 57:14–17.)

Ryan changed that.

Ryan explained how customer-relationship-management ("CRM") platforms provide the type of functionality needed to facilitate sales. (III RR 56:23–57:7.) Using his sales experience in other industries, Ryan

23

explained how much data could be captured and the value of using that data in sales. (III RR 57:17–24.) ES3 took Ryan's suggestions to heart and incorporated his ideas into the development of Rainmaker. (III RR 57:25–58:2.)

## D. Ryan leaves ES3 in 2021 and is subsequently rehired.

In 2021, Ryan resigned his employment with ES3, explaining that he was tired of the minerals-brokerage business and wanted to go into the semiconductor industry. (II RR 57:14–25.) Ryan departed on good terms, with ES3 "leav[ing] the door open" to rehiring him. (II RR 57:23–25.) A month later, ES3 did exactly that—it rehired Ryan to his previous position. (II RR 58:1–15.) Ryan did not sign a new noncompetition agreement when he was rehired.

## E. ES3 hired Kreines to lead its efforts to sell the mineral interests that Ryan acquired.

ES3 recruited Kreines in 2019 to lead its Business Development Department. (CR 392.) Kreines has been a landman in Texas since 2010, and used his existing contacts to market the mineral interests that Ryan and his team acquired for ES3 to sell to end-buyers. (III RR 84:25–85:20.)

Over the course of his career as a landman, Kreines has developed a large body of industry contacts. (III RR 78:13–25.) As ES3's founder and

24

president, Trey Stanton, explained it, Kreines was "an extrovert" who "was not afraid to go into a group of people and introduce" Stanton. (II RR 78:12–79:15.) Stanton quickly realized that it "would be nice to have [Kreines] by my side and kind of, you know, fostering and building continued relationships on the—on behalf of ES3." (II RR 79:12–15.)

Kreines used those contacts to develop ES3's business. From his first North American Prospect Expo ("NAPE") conference with Stanton, Kreines connected Stanton to his network. (III RR 85:18–20.)

## F. ES3 requires its employees to sign non-competition agreements.

At the outset of Ryan's and Kreines's employment, ES3 required them to sign a noncompetition agreement. (CR 382, 418–29.) ES3 did not require Ryan and Kreines to sign the noncompetition agreement owing to their positions in the company; ES3 requires all of its employees to sign the same agreement irrespective of their title or job duties. (CR 382 at ¶ 26.)

Kreines expressed reluctance to sign the noncompetition agreement. He had just moved his family to Austin to join ES3, and did not want to be unreasonably restrained from working as a landman in the future. (III RR 86:2–14.) Stanton assured him that the covenant not to compete wouldn't prevent him from getting a job after he left ES3. (III RR 86:1–10.)

Expressing the same conclusion, ES3's general counsel told Kreines that he thought the covenant not to compete was "garbage and not enforceable." (III RR 86:11–14.)

## G. ES3 terminates Ryan for refusing to steal a consultant's intellectual property.

In August 2023, ES3 hired a third-party consultant, Topaz Consulting, to develop training materials for its sales personnel. (II RR 59:17–60:8.) ES3 undertook to transcribe Topaz's training materials "and make it basically our own." (II RR 60:1–61:5.)

When Stanton explained his intention to copy all of Topaz's training materials and rewrite it as ES3's own without Topaz's consent, Ryan refused. (III RR 60:19–61:12.) A few days later, ES3 fired Ryan. (III RR 62:7–10.)

## H. Ryan starts LMP to act as a mineral broker and secures its first AMI deal.

After his termination, Ryan started LMP and began trying to acquire mineral rights. (III RR 63:3–20.) To do so, Ryan scoured county tax records to identify mineral interests that may be for sale. (III RR 63:6–16.)

At the same time, word of Ryan's departure circulated around the industry. One industry player—Mesa Resources—reached out to Ryan over LinkedIn and negotiated an "area of mutual interest" ("AMI") deal with him

whereby LMP would act as a broker for Mesa's acquisition of mineral interests. (III RR 63:6–20, 64:6–25.) While LMP was eager to enter into an AMI agreement, ES3 eschews such arrangements. (III RR 64:12–15.)

## I. LMP hires an independent software designer to develop its own CRM platform to facilitate its business model.

Having its first AMI agreement in place, LMP hired a software designer to develop a platform to support its AMI deals in December 2023. (III RR 53:10–20, 69:6–25, 70:4–8.) LMP provided a basic outline of what it wanted and the designer developed a platform to manage LMP's brokerage business. (III RR 70:9–24.) While LMP's software platform is tailored to its AMI-centric business, such CRM platforms are common in the industry. (III RR 30:10–31:20.)

The differences in the companies' software systems also derives from their different philosophies when it comes to pricing. ES3 prices its mineral interests for sale to buyers based on a multiple-of-cash-flow analysis. (III RR 15:9–16:16.) ES3's multiple-of-cash-flow analysis is a basic valuation model that is common in the industry. (III RR 16:6–16.) In contrast, LMP bases its pricing mainly off its agreements with its AMI counterparties. (III RR 66:10–18.)

ES3 acknowledges that LMP's software does not share the same code as ES3's software. (II RR 100:13–23.) And because LMP's business is different, the interfaces are different. (II RR 100:13–23.)

## J. LMP sells its first mineral interest outside an AMI.

In late 2023, Mesa for the first time refused to buy a mineral interest that LMP had purchased. (III RR 72:22–73:7.) At Kreines's suggestion, LMP contacted Hatch Resources to gauge its willingness to acquire the mineral interest. (III RR 73:8–10.) After a negotiation between LMP and Hatch, Hatch purchased the mineral interest from LMP. (III RR 72:22–73:7.)

## K. Kreines leaves ES3 in January 2024 to once more work as an independent landman.

In January 2024, Kreines resigned his employment to resume working as an independent landman through his company, NAK Resources. (II RR 73:23–75:6; III RR 83:24–84:6.) As an independent landman, Kreines has worked with LMP since shortly after his resignation from ES3. (III RR 84:1–9.)

## L. ES3 and LMP have not competed with one another.

As discussed above, the mineral-brokerage business involves two separate, though related, transactions: the acquisition of the mineral

interest from its owner and the resale of that interest to an end-buyer. On neither side has LMP competed with ES3.

On the acquisition side, LMP and ES3 have never competed against one another to acquire a mineral interest. (III RR 65:16–21.) As noted above, the acquisition of mineral interests involves nothing more than a series of cold calls and sheer luck. (III RR 27:12–23.) So it's perhaps not surprising that LMP and ES3 would not be cold-calling the same mineral-interest owners.

Acquiring mineral interests, however, is critical to the broker's business. Without mineral interests, the broker has nothing to resell.

When it does obtain a mineral interest, ES3 turns around and immediately resells the mineral interest to an end-buyer and simultaneously closes the two transactions. (II RR 51:11–23.) Hence, ES3 does not sit on an inventory of mineral interests—it resells the mineral interests it acquires as soon as it gets a deed in hand. (II RR 50:9–51:7.)

If ES3 is not selling as many mineral interests today as it did two years ago, there's only one possible reason for that: it doesn't have as many mineral interests to sell. But that's not LMP's fault. No mineral-interest seller has ever rejected ES3's offer in favor of one from LMP. (III RR 65:16–

21.) And LMP has never encouraged a buyer not to do business with ES3. (IV RR at Defs.' Ex. 21, 111:10–112:14.)

In fact, ES3 itself has no idea why it is not selling as many mineral interests today as it did two years ago. As to his relationship with end-buyers, Stanton could only observe that "the vibe has changed." (II RR 80:19–82:13.) But Stanton could not link that vibe-shift to anything LMP has done, and he concedes that no buyer has indicated that they're not responding to ES3 because of work they're doing with LMP. (II RR 82:10–13.) When specifically asked by ES3's counsel "Can you tell the Court what customers you have lost over this year," Stanton answered "They haven't specified that they're not going to do business with me." (II RR 46:3–13.)

## M. The Travis County District Court issues the Temporary Injunction, which the Business Court modifies.

Alleging breach of Ryan's and Kreines's covenants not to compete and a variety of other business torts, ES3 filed suit against Appellants on September 18, 2024. ES3's Original Petition sought a temporary restraining order and temporary injunction, among other relief. After the district court denied its application for temporary restraining order, ES3 set its application for temporary injunction for October 29, 2024.

After a hearing, the district court granted the temporary injunction on November 26, though the parties were not notified of the order until December 19. Appellants noticed their appeal the following day.

Appellants subsequently removed this case to the Business Court on December 23—i.e., within thirty (30) days after the issuance of an order granting a temporary injunction—consistent with the provisions of Texas Rule of Civil Procedure 355 and Texas Government Code Section 25A.006(f)(2). The Business Court heard Appellants' Motion to Dissolve the Temporary Injunction for failure to meet the requirements of Rules 683 and 684 on February 27, 2025. On April 7, 2025, the Business Court issued its Order Modifying the Temporary Injunction. (2d. Suppl. CR 307–33.)

## SUMMARY OF THE ARGUMENT

The Temporary Injunction does not meet the specificity or reasoning requirements of Rule 683. It is therefore void, and the order issuing the injunction should be reversed.

Rule 683 requires that any order granting an injunction "describe in reasonable detail . . . the act or acts sought to be restrained." Tex. R. Civ. P. 683. Rooted in the Constitution's due-process guarantee, the specificity requirement means that an injunction must be clear, specific, and unambiguous. "Restrained parties should be able to pick up a temporary injunction order, read it, understand it, and not have to guess about what they are prohibited from doing upon threat of contempt." *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 372 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

The Temporary Injunction in this case does not meet that standard. It bars Defendants from "negotiating or entering into any transaction with any of Plaintiff's Buyers." (CR 998.) So far so good. But who are "Plaintiff's Buyers?"

That's where things become murky.

The Temporary Injunction provides a list of more than a hundred corporate buyers and more than a hundred "individual contacts" employed by those entities. (CR 1000–03.) But "Plaintiff's Buyers" is not limited to that list. It also includes "any contact and/or decision maker who is/was associated with" any of the listed entities." (2d. Suppl. CR 343.)

So to comply with the Temporary Injunction, Appellants cannot just pick up the order, read it, understand it, and not do business with a list of people. They have to guess about whether every business partner:

- "was/is associated with" any of the listed entities, and

- is or was a "contact" or a "decision maker" during that association with one of the listed entities.

Adding to the guesswork, the list itself is designated as "confidential" under the trial court's Confidentiality and Protective Order, so Appellants can't ask a potential business partner whether it has ever been a "contact and/or decision maker" with the listed off-limits buyers. Because Appellants have to guess about whether they're allowed to do a deal with a company, the Temporary Injunction does not meet Rule 683's specificity requirement.

Nor does the Temporary Injunction meet the Rule's "reasoning" requirement. Rule 683 requires that an order granting a temporary injunction "set forth the reasons" why the court deems it proper to issue the

writ. Tex. R. Civ. P. 683. The Rule requires specifics, not mere conclusions. *IPSecure, Inc. v. Carrales*, No. 04-16-00005-CV, 2016 Tex. App. LEXIS 6288, at \*56 (Tex. App.—San Antonio June 15, 2016, no pet.).

But conclusory statements are all the Temporary Injunction offers. It characterizes the means by which harm will occur but does not explain the reasons why irreparable injury will result without an injunction. It does not explain why ES3's losses would be difficult to measure (or even state that they would be difficult to measure). Instead, the Temporary Injunction simply states that "[a]ny suit for money damages would not be an adequate remedy at law to protect Plaintiff's rights." Such a conclusory statement does not meet Rule 683's requirement.

The trial court presumably could not explain the need for an injunction because there was none. The undisputed evidence before the trial court was that ES3's injury—insofar as it has one—is neither imminent nor irreparable. ES3 has an adequate remedy at law. It is the same remedy ES3 had for the thirteen months between the time LMP began operating and when ES3 filed suit.

Moreover, the trial court's explanation for the injunction is lacking because the Temporary Injunction prohibits Defendants from engaging in

lawful conduct. The covenant not to compete is limited to Texas; the Temporary Injunction contains no geographic restriction. The covenant not to compete restricts Ryan's activities for 24 months after the end of his employment; the Temporary Injunction applies for more than four years after Ryan's 2021 termination.

In issuing a temporary injunction that was so contrary to the evidence, the trial court abused its discretion. That abuse was multiplied when it required only a nominal bond, contrary to the requirements of Rule 684. Accordingly, the Court should reverse the decision of the district court to issue the Temporary Injunction and remand the case to the Business Court for further proceedings.

## ARGUMENT & AUTHORITIES

The Rules governing the issuance of temporary injunctions are mandatory and must be strictly followed. A temporary injunction that does not meet the requirements of Rules 683 and 684 is "void and must be dissolved." *Conlin v. Darrell Haun & Solarcraft, Inc.*, 419 S.W.3d 682, 687 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *accord Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000).

The trial court abused its discretion when it issued a temporary injunction that (1) did not meet the requirements of Rules 683 and 684 and (2) was so contrary to the evidence that it ended up restraining Defendants from engaging in lawful activities. The trial court's order issuing the Temporary Injunction should therefore be reversed.

## A. The Temporary Injunction does not meet the requirements of Rules 683 or 684.

The Temporary Injunction neither describes in reasonable detail the acts to be restrained nor sets forth the reasons supporting the undefined restrictions imposed. Finally, the Temporary Injunction does not set an adequate bond as security as required by Rule 684. Accordingly, the Temporary Injunction is fatally defective, and the trial court's issuance of that defective order should be reversed.

### 1. The Temporary Injunction does not set out the reasons why ES3's harm is irreparable as required by Rule 683.

The Temporary Injunction's restrictions are not supported by the findings made by the enjoining court. Rule 683 requires that an order granting a temporary injunction "set forth the reasons" why the court deems it proper to issue the writ. Tex. R. Civ. P. 683. "[I]n other words, the order must explain the reasons why the court believes the applicant's probable right will be endangered if the writ does not issue." *IPSecure, Inc.*, 2016 Tex. App. LEXIS, at \*56 (citing *Tuma v. Kerr Co.*, 336 S.W.3d 277, 279 (Tex. App.—San Antonio 2010, no pet.). "And, when setting forth the reasons for granting a temporary injunction, the trial court must set forth specific reasons, not merely make conclusory statements." *Id.*

A statement is conclusory if it does not articulate the factual basis on which it rests, effectively insisting that the reader accept the writer's say-so without explanation." *Home Asset, Inc. v. MPT of Victory Lakes Fcer*, No. 01-22-00441-CV, 2023 Tex. App. LEXIS 2890, at \*5 (Tex. App.—Houston [1st Dist.] May 2, 2023, no pet.) (citing *Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008)). Hence, a temporary-injunction order must articulate reasons why irreparable harm will occur, not merely assert that irreparable harm will occur. S*ee Clark v.*

*Hastings Equity Partners*, 651 S.W.3d 359, 373–74 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

Yet a conclusory statement about the supposed irreparable harm is all the Injunction contains:

> 16.    The Court finds that Plaintiff has shown there would be a probable imminent, and irreparable injury from the actions it seeks to enjoin. Plaintiff has shown the loss of exclusive use of its Trade Secrets, a loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Defendants are enjoined. Defendants Ryan and Kreines were closely associated with Plaintiff's goodwill, and by their actions they have diluted Plaintiff's goodwill with Plaintiff's Buyers and will continue to do so. Plaintiff's probable, imminent, and irreparable injuries include:
>
> a) Defendant Kreines's misappropriation of trade secrets.
>
> b) Plaintiff's loss of goodwill and customers.
>
> c) Defendants Kreines's and Ryan's breaches of their noncompetition agreements.
>
> 17.    Any suit for money damages would not be an adequate remedy of law to protect Plaintiff's rights.

(2d. Suppl. CR 339.)  According to the Injunction, "unless Appellants are enjoined," ES3 will lose "exclusive use of its Trade Secrets," "deals with specific buyers," "gross profits," and employees.  (CR 997, ¶ 16.)  But why? *Cf., Clark*, 651 S.W.3d at 373–74.  The Temporary Injunction offers only the

most conclusory statement that Ryan and Kreines have "diluted Plaintiff's goodwill." But how?

Without answering the "why" and "how," the Temporary Injunction's Paragraph 16 closely mirrors the conclusory findings in *Clark*. The injunction in that covenant-not-to-compete case found "[t]he Respondents have violated certain covenants contained in the said Securities Purchase Agreement and will, if not restrained, likely engage in conduct that will cause Petitioners to suffer immediate and irreparable injury, loss or damage; and . . . the threatened damage to Petitioners is impossible to accurately and fully assess." *Clark*, 651 S.W.3d at 374. With no explanation as to why the purported injury would be "immediate and irreparable," the First Court of Appeals concluded that the statement was conclusory and did not meet the requirements of Rule 683. *See id.*

Likewise, in *Kotz v. Imperial Capital Bank*, the San Antonio Court of Appeals concluded that a temporary injunction reciting that the applicants "will suffer irreparable injury in their possession and use of the Subject Property in the event that the requested injunctive relief is not granted" did not meet the requirements of Rule 683. 319 S.W.3d 54, 56–57 (Tex. App.— San Antonio 2010, no pet.). To comply with Rule 683, an injunction must

"set forth any underlying facts to support its finding" that an irreparable injury will occur without the issuance of an injunction. *Id.* "At most, this language characterizes by what means harm will occur unless Kotz is enjoined from taking possession and use of the subject property—but does not state or explain the reasons why irreparable injury will result absent an injunction." *Id.*

The Injunction here similarly "characterizes by what means harm will occur unless" Appellants are restrained "but does not state or explain the reasons why irreparable injury will result absent an injunction." *Cf., id.* "In general, harm is irreparable when the harmed party has no adequate remedy at law." *Home Asset, Inc.*, 2023 Tex. App. LEXIS 2890, at *7 (citing *Kennedy v. Gulf Coast Cancer & Diagnostic Ctr.*, 326 S.W.3d 352, 360 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "So, for example, harm is irreparable if the harm cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Id.*

The Temporary Injunction does not state or explain any reasons why those injuries cannot be remedied at law. As in *Home Asset*, the Temporary Injunction "does not even explain why [ES3's] losses would be difficult to measure under the circumstances of this case." *Compare* 2023 Tex. App.

LEXIS 2890, at *7, *with* CR 997 at ¶¶ 16–17. Instead, the Temporary Injunction simply states in conclusory fashion that "[a]ny suit for money damages would not be an adequate remedy at law to protect Plaintiff's rights." (CR 997–98 at ¶ 17.)

The Temporary Injunction concludes that ES3 will suffer "the loss of exclusive use of its Trade Secrets, the loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Appellants are enjoined" because Appellants "have diluted Plaintiff's goodwill with Plaintiff's Buyers and will continue to do so." (CR 864 at ¶ 16.) But why can those injuries not be remedied at law? The Temporary Injunction here is silent. And why will this Injunction prevent those losses when it does nothing to restrict Appellants from acquiring mineral interests—i.e., the thing that the buyers want to buy? The Injunction offers no answers; it provides only the conclusion of imminent and irreparable injury.

As set forth by consistent Texas precedent, the Temporary Injunction's findings of imminent and irreparable harm are conclusory and thus violate Rule 683. Accordingly, the Court should reverse the trial court's order issuing the Injunction.

### 2. *The Temporary Injunction does not meet the specificity requirement of Rule 683.*

Perhaps arising from the fact that the Injunction can't explain the reasons for its issuance, it also can't identify exactly with whom Appellants can't transact business. But Rule 683 requires a temporary injunction to "describe in reasonable detail . . . the act or acts sought to be restrained." Tex. R. Civ. P. 683. A specific description "describes the enjoined acts without requiring inferences or conclusions about which persons might well differ and without leaving anything for further hearing." *Whinstone US Inc. v. Rhodium 30MW, LLC*, 691 S.W.3d 47, 50–51 (Tex. App.—Austin 2024, no pet.) (cleaned up).

Because an injunction is enforced with the threat of criminal contempt, the specificity requirement of Rule 683 is rooted in the Constitution's due-process guarantee. *Ex parte Jackman*, 663 S.W.2d 520, 523 (Tex. App.—Dallas 1983, no writ). Hence, an injunction must "set forth the terms of compliance in clear, specific and unambiguous terms so that the person charged with obeying the decree will readily know exactly what duties and obligations are imposed upon him." *Ex parte Chambers*, 898 S.W.2d 257, 260 (Tex. 1995). "Restrained parties should be able to pick up a temporary injunction order, read it, understand it, and not have to guess

about what they are prohibited from doing upon threat of contempt." *Clark*, 651 S.W.3d at 372.

As the Texas Supreme Court has stated:

> Where the court seeks to punish either by fine, arrest, or imprisonment for the disobedience of an order or command, such order or command must carry with it no uncertainty, and must not be susceptible of different meanings or constructions, but must be in the form of a command, and, when tested by itself, must speak definitely to the meaning and purpose of the court in ordering.

*Ex parte Hodges*, 625 S.W.2d 304, 306 (Tex. 1981). "In other words, to be enforceable by contempt, the order must clearly, specifically, and unambiguously state the conduct required for compliance." *In re Luther*, 620 S.W.3d 715, 722 (Tex. 2021).

Given these requirements, the Temporary Injunction fails in important and determinative ways. Listing the people with whom Appellants cannot do business would provide certainty. But the Injunction doesn't do that. It instead creates an uncertain list that deprives Appellants of notice of what they can and can't do.

### a. The Temporary Injunction does not define specific persons with whom Appellants cannot do business.

The Temporary Injunction's list of customers with whom Appellants cannot transact business lacks specificity. The list of entities and persons

whom are off-limits is specific.  But the Temporary Injunction then contains an additional catch-all:

> "ES3 Buyers" shall mean any contact and/or decision maker who is/was associated with the following entities:

(2d. Suppl. CR 343.)    This additional term deprives the Temporary Injunction of the specificity required by Rule 683.

### i. Appellants do not know with whom they cannot transact business from a simple reading of the Temporary Injunction.

Appellants have no way of knowing whether an individual was a "contact and/or decision maker" who "was associated" with the listed entities.  The Temporary Injunction fail to define who a "decision maker" would be.

But even without knowing who would be a "decision maker," the Temporary Injunction would, if read broadly, include each and every person who has been associated with the listed entities without a time constraint. Appellants have no way of knowing the identity of every person who is or has ever been a "contact" or "decision maker" at every one of the 100+ companies listed in the Temporary Injunction.  The Temporary Injunction therefore fails to notify Appellants what they're enjoined from doing.

Not only does the Temporary Injunction fail to notify Appellants what they're restrained from doing, it doesn't provide the trial court with enough information to enforce it. Rule 683's specificity requirement enables the trial court to "determine whether the injunction has been violated." *Paul v. Roy F. & JoAnn Cole Mitte Found.*, No. 03-21-00502-CV, 2023 Tex. App. LEXIS 772 at *5 (Tex. App.—Austin Feb. 8, 2023, pet. denied). But without the necessary specificity, enforcement is impossible without additional evidence and inferences.

To enforce the Temporary Injunction, the Court would have to have an additional hearing to take evidence on a potential buyer's past employment, the capacity in which the buyer was employed, and the buyer's job duties during that previous employment. That necessity renders the Temporary Injunction invalid. *See Whinstone US Inc. v. Rhodium 30MW, LLC*, 691 S.W.3d 47, 52 (Tex. App.—Austin 2024, no pet.); *accord Tarr v. Lantana Sw. Homeowners' Ass'n*, No. 03-14-00714-CV, 2016 Tex. App. LEXIS 13372, at *11 (Tex. App.—Austin Dec. 16, 2016, no pet.) (dissolving injunction in which the determination of "whether certain acts constitute[d] a breach of the Declaration of Covenants would [have] require[d] inferences

and conclusions about which persons might disagree and would [have] require[d] further hearing.").

### ii. Appellants cannot conduct their own investigation to ensure compliance with the Temporary Injunction because its limitations are confidential.

Not only can Appellants not identify the scope of the Temporary Injunction today, they can't ascertain what it will be tomorrow. That's because the scope of the Temporary Injunction changes every time an employee of one of the "Plaintiff's Buyers" changes jobs. Aside from the entities listed, the Temporary Injunction prevents Appellants from transacting business with any entity that may employ a "contact" or "decision maker" of one of "Plaintiff's Buyers" in the future.

Under the Injunction, if a "contact" or "decision maker" has moved jobs to Company X, which has never done business with ES3, then Company X is added to the list of people with whom Appellants cannot transact business. But how would Appellants know? Appellants could do a deal with Company X wholly ignorant of the "contact's" new employment.

To be safe, Appellants would have to ask each new potential business partner whether it currently employs any "contact and/or decision maker" associated with the entities listed in the Injunction. Doing so, however,

would violate the confidentiality designation placed on the list of off-limits entities.

Such a Catch-22 is exactly the type of non-specificity that caused the Dallas Court of Appeals to invalidate the temporary injunction in *Computek Computer & Office Supplies, Inc. v. Walton.* *See* 156 S.W.3d 217, 222 (Tex. App.—Dallas 2005, no pet.) ("Because these OEM clients are not specifically named, we agree with Computek that it must ask every non-ABBA contact it makes whether it was an OEM client during the relevant times, and that question may be construed as 'canvassing' or 'soliciting,' and thus a violation of the permanent injunction."). Moreover, requiring Appellants to conduct their own fact-finding to determine exactly what actions they're restrained from doing renders the Temporary Injunction void under Rule 683 even if they could do that investigation without violating the trial court's protective order. *See id.*

### b. *By barring Appellants from doing business with unknown companies, the Temporary Injunction violates Rule 683.*

The scope of the Temporary Injunction, which prevents Appellants from doing business with certain mystery companies that can only be identified after further fact-finding, has been consistently held to violate

47

Rule 683. Specifically, and in the context of enforcing a noncompete clause, the Dallas Court of Appeals has concluded that Rule 683 requires an injunction enjoining a party from doing business with clients to specifically identify those clients. *Computek Computer & Office Supplies, Inc.*, 156 S.W.3d at 223.

In *Computek*, the court held that an order enjoining a former employee and his new employer from doing business with a non-exclusive list of clients would require the Appellants to ask any potential client if it had ever done business with the plaintiff. *See id.* at 221–23 (striking down injunction that enjoined Computek from doing business "with any OEM client not listed on Attachment A or that was a new account set up while Williams worked for OEM."). Apart from being insufficiently specific, that inquiry itself could be seen as soliciting and thus a violation of the injunction. *See id.* at 221–22. Therefore, the injunction lacked specificity under Rule 683 and was unenforceable. *Id.* at 223.

Similarly, in *In re Krueger*, the Austin Court of Appeals rejected an injunction that barred a company executive from "contacting any of Cru Energy, Inc.'s investors or potential investors, or any other persons doing business with or potentially a participant in the business of Cru Energy,

Inc." No. 03-12-00838-CV, 2013 Tex. App. LEXIS 5984, at *24 (Tex. App.—Austin May 16, 2013, no pet.). The court concluded that the prohibition failed to inform the executive "of who he is enjoined from contacting, and it requires him to infer the identity of those individuals based on his then-existing knowledge of the company's operations." *Id.* The Temporary Injunction suffers from the same infirmity as it requires Appellants to infer the identity of companies with which they cannot transact business.

Likewise, in *In re Luther*, the trial court enjoined a hair stylist from "conducting in-person services at the salon 'in violation of State of Texas, Dallas County, and City of Dallas emergency regulations related to the COVID-19 pandemic.'" 620 S.W.3d 715, 722 (Tex. 2021). That injunction, however, lacked specificity in two ways: (1) it did not "describe with specificity which 'in-person services' were restrained," and (2) it did not specify "any particular state, county, or city regulation" that Luther "is being commanded to stop violating." *Id.* at 722–23.

Accordingly, "Luther could not know without analyzing a multitude of regulations—state, county, and city emergency orders referenced in the temporary restraining order, plus the federal guidelines they referenced—

what conduct was prohibited at any given time the temporary restraining order was in effect." *Id.* at 723. Such lack of specificity violated Rule 683.

The Temporary Injunction in this case requires a similar investigation by Appellants to determine what conduct is prohibited at any given time. Each time they do a deal, Appellants need to ask the party on the other side of the table for a complete list of its employees. Appellants then presumably need to ask each employee whether he or she has ever been a contact or decision maker associated with any of the listed entities. Absent such a detailed investigation, Appellants risk unwittingly negotiating or entering into a transaction with a "Plaintiff's Buyer" as that term is ambiguously defined in the Injunction.

The Injunction thus follows the same formula found to be deficient in *Luther*, *Krueger*, and *Computek*. Appellants do not know with whom they can't do business without analyzing the employment history of each employee of every potential business partner. And the trial court cannot enforce the Injunction without an evidentiary fact-finding. The Injunction therefore violates Rule 683 and the Court should reverse the trial court's decision to issue it.

### 3. *The bond required by the Temporary Injunction is inadequate and contrary to the evidence.*

Texas Rule of Civil Procedure 684 requires that orders granting temporary injunctions must set a bond. Tex. R. Civ. P. 684. Texas law requires a bond to obtain a temporary injunction because the applicant does not have to prove its entire case at the temporary-injunction hearing. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990).

"An injunction plaintiff need not establish the correctness of his claim to obtain temporary relief, but must show only a likelihood of success of the merits. Correspondingly, an injunction defendant has a lesser burden to establish his right to recover on an injunction bond than would be required in an ordinary action for malicious prosecution." *Id.* The bond should therefore adequately compensate the enjoined party for the damages caused by the issuance of the injunction in the event it is dissolved. *See id*. at 685–86.

The bond set in the Temporary Injunction does not accomplish that purpose. It is instead a nominal bond that does not meet the requirement established by Rule 684 to set a security. Because the bond fixed does not provide adequate security to Appellants, the order issuing the Injunction

should be reversed.  *See* Tex. R. Civ. P. 684; *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000).

### a. The trial court set a nominal bond that was unsupported by the evidence.

A bond must be set at an amount that will adequately protect the enjoined party's interests.  *DeSantis*, 793 S.W.2d 685.  For example, in *Franklin Savings Association v. Reese*, the Austin Court of Appeals reversed and remanded an injunction preventing the foreclosure of a home when the bond was set at $10,000.  756 S.W.2d 14, 16 (Tex. App.—Austin 1988, no writ).  The court identified that the property at issue was valued at between $25 million and $50 million and the interest accruing on the debt would exceed $2 million over the life of the injunction.  *Id.*  As such, the court found that the bond of $10,000 was inadequate to protect the enjoined party.  *Id.*

The evidence before the trial court showed that LMP would be unable to close five deals that were under contract.  The inability to close those deals alone would result in a loss of approximately $3,595,415.00 in gross revenue. (CR 766–67.)

The testimony at the temporary injunction hearing echoed this evidence.  (II RR 71:17–21.)  Aside from the contracts of which an injunction could cause a breach, an injunction would impair LMP's ability to do

business. With realized profits of $6.7 Million on gross revenue of $20.2 Million in the first ten months of 2024 (III RR 52:9–16, 71:22–25), the damage to Appellants resulting from a ten-month temporary injunction is far greater than $25,000.

> **b. The bond should have been set on the basis of lost revenue, but even a lost-profit standard would have resulted in a significantly higher bond amount.**

To adequately protect LMP in the event that the injunction is later dissolved, the bond should have reflected the lost gross revenue that LMP is experiencing as a result of the Injunction. "The purpose of the bond is to protect the defendant from the harm he may sustain as a result of temporary relief granted upon the reduced showing required of the injunction plaintiff, pending full consideration of all issues." *DeSantis*, 793 S.W.2d at 685–86. In this case, the harm sustained is by not being able to sell mineral interests LMP has acquired.

LMP still has to pay the original sellers for those mineral interests; it still has to make payroll. It still has to keep the lights on (metaphorically and literally). Lost profits do not protect Appellants from the harm they have sustained from the void Injunction.

But even if the proper measure of the bond were restricted to lost profits, that number would be vastly greater than $25,000. In the first ten months of LMP's operation, LMP realized profits of $6.7 Million on gross revenues of $20.2 Million. (III RR 52:9–16, 71:22–25.) In the context of such profits and revenues, a nominal bond of $25,000 is insufficient, and the trial court's order issuing the Injunction with an inadequate bond should be reversed.

### c. The nominal bond set by the trial court essentially eliminated the bond requirement altogether.

Against the amount in dispute and the likely losses caused by the Injunction, a bond of $25,000 is nominal. Such a bond should be avoided. As Justice Young stated in his dissent in *Van Huis v. Marine Ventures, Ltd.*, a nominal bond "could be tantamount to dispensing the bond requirement altogether." 672 S.W.3d 22, 26 (Tex. 2023) (Young, J., dissenting).

That is the situation here. While the amount of the bond is within the trial court's discretion, the failure to require a bond renders an injunction void. *See Whitlow v. Polley*, 670 S.W.2d 318, 319 (Tex. App.—Tyler 1984, no writ). In a case in which (1) the undisputed evidence demonstrated that the issuance of an injunction imperiled pending contracts worth $3,595,415.00, (2) LMP realized profits of $6.7 Million over the preceding 10-month period,

and (3) ES3 affirmatively acknowledged the amount in controversy exceeds $5 million when it did not challenge the removal of the case to the Business Court, *see* Tex. Gov't Code § 25A.004(b), a $25,000 bond is "tantamount to dispensing with the bond requirement altogether." *Van Huis*, 672 S.W.3d at 26. It is, in effect, no bond at all.

In setting a nominal bond that effectively dispensed with the Rule 684 bond requirement, the trial court abused its discretion. The Temporary Injunction is therefore void, and the order issuing it should be reversed.

## B. The evidence does not support the issuance of a temporary injunction.[1]

The trial court could not state its reasons for issuing the Temporary Injunction as required by Rule 683 because the evidence did not support it. Instead, even taken in the light most favorable to ES3, the evidence demonstrates that ES3 faces no probable, imminent, and irreparable injury for which the extraordinary remedy of a temporary injunction is necessary.

---

[1] ES3 attempted to offer and admit into evidence a number of exhibits en masse at the end of the hearing without a sponsor or foundation. As Judge Eiserloh stated at the conclusion of the hearing, the reason she normally doesn't admit exhibits "without being sponsored by a witness" is because she then "doesn't have anything to connect them to." (III RR at 95:2–5.) Judge Eiserloh further explained, and as is evident by this record and the Temporary Injunction issued, "that's kind of a bit of an issue." (III RR at 95:6.)

"Establishing probable, imminent, and irreparable injury requires proof of an actual threatened injury, as opposed to a speculative or purely conjectural one." *Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 908 (Tex. App.—Austin 2009, no pet.). "[T]o support injunctive relief, the commission of the act must be more than speculative and the injury that flows from the act must be more than conjectural." *Archon Design v. Naim*, No. 03-23-00226-CV, 2023 Tex. App. LEXIS 6740, at *13 (Tex. App.—Austin Aug. 30, 2023, no pet.).

An injury is irreparable if damages cannot be measured or would not adequately compensate the injured party. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Breach-of-contract claims generally don't meet this standard. *Archon Design*, 2023 Tex. App. LEXIS 6740, at *13. The evidence in this case confirms that ES3's alleged injuries are not such as to extract its case from that general rule.

### 1.   *There is no imminent and irreparable harm to ES3*

ES3 failed to show that Appellants have caused it immediate and irreparable harm. ES3 has not lost a single buyer or a single deal. (III RR 65:16–21.) ES3 did not identify any present or future harm.

56

In reality, ES3 feels harmed by Defendants' success in business. Speculation, much less jealousy, is not a basis for enjoining a party. *Huynh v. Blanchard*, 694 S.W.3d 648, 679 (Tex. 2024) ("An injunction will not lie to prevent an alleged threatened act, the commission of which is speculative and the injury from which is purely conjectural.").

### a. ES3's injury was not "immediate."

ES3 sought to enjoin Defendants in late September 2024 after LMP had been in operation for over a year. (CR 393 at ¶ 50.) For a year, the alleged competition from LMP was so non-injurious that ES3 was unaware that LMP even existed. (CR 398, ¶ 68.)

ES3 has not identified how Appellants' actions have caused it injury beyond speculation. *Huynh*, 694 S.W.3d at 679. No buyer has refused to do business with ES3 due to competition with LMP. (II RR 46:3–6.). Defendants have never diverted or discouraged any buyer from buying minerals from ES3. (IV RR at Defs.' Ex. 21, at 111:18–112:14.) And LMP has never competed against ES3 to acquire a mineral interest from a selling owner. (IV RR at Defs.' Ex. 21 at 85:19–23 (sealed).)

### b. ES3 has not endured an injury requiring injunctive relief.

ES3 does simultaneous closings, or what is commonly known as arbitrage, for the mineral interests it acquires. (III RR 13:15–21.) ES3 buys a mineral interest from an owner, ES3 immediately turns it around to sell that mineral interest to a buyer.

ES3 presented no evidence that LMP has ever competed with it on the acquisition side because ES3 and LMP had never pursued the same mineral interest held by a mineral owner. (III RR 65:16–21.) Such evidence would be easy to produce as ES3's software program keeps a record of ES3's correspondence with potential mineral sellers. (III RR 57:13–25, 58:1–2.) ES3 has not and cannot point to a single acquisition that LMP procured that ES3 also attempted to procure.

ES3 instead complains that Appellants were interfering with ES3's relationships with buyers and repeatedly defines the market of buyers as "ES3 Buyers." (CR 1214, 1329.) This description is misleading. (III RR 26:14–20.)

ES3 paints the mineral-interest industry to be one in which each buyer loyally purchases mineral interests from only one broker. But buyers in the minerals industry are not loyal to a single broker; they purchase from

whomever has valuable mineral interests. (III RR 22:23–24:20.) Buyers are like used-car dealerships, such as Carvana or CarMax. A used-car dealership does not buy used cars from a single person—it buys from anyone that has a used car that the dealership believes will be a worthwhile asset. The used-car dealership may resell the car, break it down for parts, or simply hold on to it while deciding what to do next. Buyers in the minerals market similarly purchase mineral interests from brokers and either repackage them for sale as securitized instruments or develop them for extraction themselves. Buyers in the minerals market are ready to buy any mineral interest that they believe will be a valuable asset from any broker or seller. (III RR 25:24–25; 26:1–6.)

If ES3 procures valuable assets, there is a willing and ready market ready to buy those assets. Alternatively, if ES3 has been injured (it has not), it would be from LMP successfully procuring mineral interests out from under ES3 such that ES3 did not have any inventory to sell to any buyers. (III RR 22:7–11; 26:21–24.) But that is not the case. ES3 drafted and submitted a temporary injunction to the trial court that enjoins the divestiture side of dealing rather than the acquisition side.

Why?

Because ES3 cannot identify any competition or harm on the acquisition side. And with no harm on the acquisition side, it cannot have an injury on the sales side given the nature and dynamics of the industry.

### c. ES3's alleged damage to its relationship with buyers is speculative.

To further address any alleged damage on the buyers' side of ES3's transactions, there is no evidence that any buyers are refusing to work with ES3, just Stanton's testimony that the "vibe" is different:

> Q: Can you tell the court what customers you have lost this year?
>
> A: They haven't specified that they're not going to do business with me, but we have done very little deals with Tailwater, very little deals with Mesa. Kevin – Kevin Christian doesn't even respond to my text messages anymore hardly. It's completely a different vibe.

(II RR 46:3–10.)

Stanton does not state that ES3 has done **no** deals with Tailwater or Mesa, but rather "very little." (II RR 46:6–7.) No buyer has refused to work with ES3. It is unclear, merely speculative, as to why ES3 has not closed more deals with a handful of buyers. It very well may be that ES3 has not procured mineral interests that buyers find to be valuable. (III RR 22:7–11.) Yet, ES3's failure to complete deals is not evidence that Appellants have diminished ES3's goodwill in the minerals market.

Trey Stanton notably could not identify any damage to ES3 during his deposition or testimony at the Temporary Injunction hearing tied to Appellants' actions. His inability to identify damages does not mean ES3 has an irreparable injury, it means ES3 does not have any injury. Without damages, much less immediate and irreparable damages, the trial court abused its discretion by issuing the injunction against Appellants.

2. ***The trial court improperly granted the Temporary Injunction because there is no probable right of relief on ES3's claims.***

This suit isn't about ES3's difficulties—it's about LMP's success. It's not about protection, but punishment.

Trey Stanton thinks that he has captured lightning in a bottle with ES3. But as laid out by Steven Hatcher, Appellants' industry expert, the business of buying and selling mineral interests "is simple, it's not easy." (*See* III RR at 36:3.) The mineral-brokerage industry is based on the use of public records and valuation formulas that are general industry knowledge. The only real barrier to entry is a healthy work ethic.

In its Third Amended Petition, ES3 pleads violation of the Texas Uniform Trade Secrets Act, violation of the Texas Theft Liability Act, breach of contract, breach of fiduciary duty by Nicholas Kreines, tortious

interference by LMP, and civil conspiracy by all of the Appellants. ES3's claims center on alleged violation of a non-compete by Ryan and Kreines and alleged misappropriation of trade secrets. But in an industry that relies on fundamental sales principles, in which buyers advertise, and in which key customer data is reflected in the public tax rolls and the Texas Railroad Commission website, these allegations are unsupported. And consequently the temporary injunction record does not reflect a likely chance of success on the merits.

> ### a. *This industry relies on the most basic principles of economics and marketing.*

While adjacent to the oil-and-gas industry, the business of brokering mineral interests is a simple and separate matter of real-estate transactions, or even more simply, pure sales. You acquire mineral interests and then you sell them. Trey Stanton in fact hired David Ryan because of his strong background in sales. That's consistent with the model of this industry. As ES3 pleaded, there was no need for prior industry knowledge. (CR 386–87; II RR 46:19–47:1, 50:9–15.)

Companies that buy mineral interests from brokers like ES3 actively market themselves to brokers. They contact brokers through direct communications on LinkedIn and other platforms, participation in industry

conferences, and regularly conducted social events. (IV RR at Defs.' Ex 21, 79:3–81:1, Defs.' Ex. 22, 116:6–122:21.) They offer brokers gifts as part of their marketing efforts. (CR 396 at ¶ 60.)

In fact, buyers are so active in marketing themselves that LMP has never had to solicit them. Every mineral interest LMP has sold has been bought by a company that contacted LMP first. (III RR 78:24–25.) Again, it's a simple sales model; it makes sense that buyers buy. The temporary-injunction record is devoid of any controverting evidence on this point.

### b. *ES3 identifies no trade secret that has been taken.*

A finding of misappropriation of trade secrets requires trade secrets to misappropriate. In this case, ES3 paints with a broad brush and covers everything fundamental to the business of buying and selling mineral interests as proprietary and confidential in an effort to support its claim that the only way Appellants could work and succeed in this industry is through misconduct.

The list and explanation of what is a "trade secret" has evolved over the life of the underlying litigation to include the software platform, simultaneous acquisition and divestiture transactions, creating siloed departments, customer information, and pricing methodology. (*Compare*

CR 5–31 *with* CR 376–410.) However, not only are these not confidential and proprietary matters, there are material differences in the way that LMP and ES3 operate that defeat ES3's claims.

Though the trial court made a conclusory finding that trade secrets were misappropriated, the Temporary Injunction fails to identify the *what* and the *how*.

### i. Though there is overlap due to the nature of the industry, the two companies employ different business practices.

Included in the original petition and in the Agreements signed by Ryan and Kreines are reference to "simultaneous closings." (CR 396 at ¶ 61, CR 419.) However, Trey Stanton and ES3 did not invent the concept of simultaneous closings. Steven Hatcher, Appellants' industry expert testified that simultaneous closing is commonplace in the industry and that he himself uses it. (III RR 13:15–14:1.) And as Ryan testified, the simultaneous closing method is not even unique to this industry, as he used the simultaneous closing, or arbitrage, model when he was working in the semiconductor industry. (III RR 58:18–59:4.)

Stanton prides himself on having "designed a[n] assembly line, three different silos" within ES3, whereby he could bring in people with no

industry knowledge.  (II RR 46:16–47:1.)  He walled these groups off from one another, restricting information between them.  (II RR 47:6–8.)  Though he now says that it was to prevent someone from replicating what he built, what he portrayed to ES3 employees was about efficiency—not confidentiality.  (II RR 47:9–12.)

But while having internal silos is not unique to ES3, it is unique as between ES3 and LMP.  ES3 segregates its employees into different departments; LMP actively encourages collaboration between teams.  Even if siloing could be considered a trade secret, there is no evidence in the record that Ryan, Kreines, or LMP took advantage of that in their dealings after ES3.  (III RR 19:10–17.)  And as Ryan himself was an industry outsider who was siloed while at ES3, his ability to start LMP lends support that this is an industry with low barriers to entry and has a public facing nature.  Stanton's claims are undermined by the perceived threat this lawsuit evidences.

Silos are not the only difference between ES3's and LMP's operations.  LMP has actively sought AMI agreements with end buyers; ES3 eschews such arrangements, and never agreed to an AMI in Texas while Kreines or Ryan was working for ES3.  (*See* III RR 65:12–15.)  There is no evidence in

the record about why ES3 does not do AMIs or whether this material way of going after and developing business could be attributable to the differences in ES3's profits. There is no development in the record of the vague allegation that business methods were misappropriated, and thus nothing to support a finding of misappropriation of trade secrets.

The only business methods identified by ES3 are (1) not trade secrets, and (2) not used by LMP. Thus, it is unlikely that ES3 would or even could succeed on the merits

> ### ii. *There are material differences in the pricing formula stemming from the differences in business practices.*

ES3 also cites its pricing method as a trade secret (without specifying how or why). (CR 399 at ¶ 72.) LMP prices its deals based on an entirely different model from ES3. ES3's model prices its mineral interests for sale to buyers based on a cash-flow analysis ES3 assigned a moniker to. (III RR 15:9–16:16.) As Steven Hatcher noted, however, this supposedly confidential pricing method is "effectively a derivative of a multiple of cash-flow analysis." (III RR 15:22–16:5.) This purported trade secret is "as basic as it gets." (III RR 16:11–16.) Thus, ES3's multiple-of-cash-flow analysis is a basic valuation model that is common in the industry. (III RR 16:6–16.)

In contrast, LMP bases its pricing mainly off its agreements with its AMI counterparties. (III RR 66:10–18.) And as explained above, ES3 does not engage in many (if any) AMI deals, so the pricing methodology would necessarily deviate.

### iii. The two companies' software platforms are different.

ES3 also alleged that LMP's software was plagiarized from ES3's software. (CR 399 at ¶ 72.) There is no allegation that Ryan or Kreines stole the code—in fact the uncontroverted testimony is that they never had access. Further, neither Ryan nor Kreines are software engineers or developers. (IV RR at Defs.' Ex. 21 at 17:19–18:4.) They lacked the opportunity and capability to support such a claim.

Instead, ES3 tried to claim "functional plagiarism"—the two platforms performed some of the same functions. ES3 explained that its software as "aggregat[ing] information and manipulat[ing] information from select public sources, non-public sources, and proprietary sources." (CR 378 at ¶ 7.) But there's nothing unique about that concept. As ES3's CEO acknowledged, other data-aggregating customer relationship management platforms can be bought off the shelf. (IV RR at Defs.' Ex. 21, 45:2–48:8.)

67

LMP's independent development of software that does what multiple other well-known software platforms do is not actionable.

And as Plaintiff's software expert, Dr. Mark Gianturco, acknowledged, the two software platforms look very different. Gianturco focused on functionality, but he readily acknowledged that he has no background in this industry and thus doesn't know what functionality is common to all platforms used in the industry. (II RR 106:3–16.) The record before the trial court made clear that to the extent there is overlap in functionality, the incorporation and display of industry data (tax rolls, Railroad Commission information, etc.) is information that *all* mineral interest brokers use. (III RR 26:21–29:22.)

The fact that the software platforms have some overlap is no evidence of plagiarism. As explained in the deposition testimony of Dr. Jeff Miller admitted into the record at the temporary-injunction hearing, many software platforms have similar functionality. But just because Google Docs does word processing doesn't mean that it is plagiarized from Microsoft Word. (IV RR at Defs.' Ex. 23 at Vol. 1, 18:7–19:21.) A review of the platforms reveals functionality unique to LMP's platform. (IV RR at Defs.' Ex. 23 at Vol. 1, 60:17–19.)

For example, LMP's platform is optimized working with an AMI. As David Ryan described, LMP's software allows it to run reports that ES3's software cannot. (III RR 69:3–25.)

Moreso than function, however, Gianturco's opinion that LMP's software is derivative of ES3's software came from his surmise that LMP's software could not have been built in two months if it didn't have a head start. The first and only time Gianturco reviewed LMP's software was in October 2024. (II RR 106:17–107:2.) Since it was initially developed, the software has undergone constant and significant revisions. (IV RR at Defs.' Ex. 23 at Vol. 1, 37:2–17.)

Gianturco is right—LMP's software wasn't built in two months; it was built over the 12 months between when it was started and when he reviewed it. (IV RR at Defs.' Ex. 20, 54:10–13.) To put that into context, Stanton testified that it took him only six months to develop ES3's software. (IV RR at Defs.' Ex. 21, 43:8–20.)

While the trial court correctly excluded the software from its findings in the Temporary Injunction, the evidence presented on the software platform speaks to the larger theme here: ES3 can see no way anyone could

compete in this space without copying ES3. The evidence, however, does not support that supposition.

#### iv. *The identities of ES3's buyers are not secret.*

The buyers of mineral interests from ES3 don't belong to ES3—they're companies that buy from any broker willing to sell mineral interests. (IV RR at Defs.' Ex. 22 at 116:6–122:21.) Not only are they readily identifiable from a review of county deed records, mineral-interest buyers make sure that nobody has to go to that effort to find them. (IV RR at Defs.' Ex. 22 at 121:25–124:19.)

Nicholas Kreines already had a well-established network prior to his tenure at ES3. As Stanton testified, when they reconnected at NAPE Kreines introduced Stanton to Kreines's preexisting network. (II RR 79:6–12, 16–19.) Stanton brought Kreines to keep "fostering and building continued relationships." (II RR 79:12–15.)

The buyers in the mineral brokerage space buy from any broker with mineral interests to sell—whether it be from LMP, ES3, or any one of the hundred other brokers in the market (with which both Hatch and Mesa have done hundreds of deals). Hatcher made clear that no end buyer buys exclusively from a single broker. Buyers advertise their desire to buy

mineral interests to the wide world in industry publications. They advertise the price at which they buy to anyone with a mineral interest to sell.

These buyers weren't exclusive to ES3. They weren't exclusive to LMP. As Stanton testified, the same companies he complains LMP was working with do business with others. (II RR 80:11–15.) He doesn't know the number of deals, only that the buyers acquire interests from multiple sources. (II RR 80:16–18.) There are in fact numerous companies that compete with ES3 for mineral interests (IV RR at Defs.' Ex. 21 at 54:23–55:20.) But ES3 doesn't know what business method those companies use or how it is different from ES3's. (IV RR at Defs.' Ex. 21 at 115:4–19.) And ES3 acknowledges that those companies are not relying on a business method stolen from ES3. (IV RR at Defs.' Ex. 21 at 54:23–56:3.)

Setting aside ES3's telling lack of interest in exploring how other competitors might be affecting his business, if the buyer and contact information was confidential, how would those other individuals and entities do business with the same buyers? The clear answer—and the answer that is in the record—is that the buyers seek out deals. They are the ones doing the courting.

### c. The evidence doesn't support ES3's allegation that Ryan and Kreines have breached an enforceable covenant not to compete.

Nor does the evidence support the issuance of a temporary injunction on the basis of the covenant not to compete. "The hallmark of enforcement is whether or not the covenant is reasonable." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex. 2011). Ryan is not breaching his covenant not to compete—its restrictions expired. Moreover, Ryan's and Kreines's covenants not to compete are unenforceable under Texas law, and cannot form the basis for an injunction.

### i. David Ryan has not breached the covenant not to compete.

As both Ryan and Stanton testified, Ryan resigned from ES3 in 2021. (II RR 57:14–18; III RR 42:8–10.) Though he later rejoined ES3, he did not sign a new contract. (II RR 17:6–10.) The two-year restriction on Ryan thus lapsed in 2023.

There is no tolling language in the agreement between Ryan and ES3. The agreement expressly states that "Accordingly, Employee agrees that, during employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, directly or indirectly" compete with ES3, accept employment or

72

have an ownership interest in a competing business, solicit customers, or discourage customers from doing business with ES3. (CR 420–21.) The relevant language is clear. *See Citation 2002 Inv. Llc, & Endeavor Energy Res., L.P. v. Occidental Permian*, 662 S.W.3d 550, 554–55 (Tex. App.—El Paso 2022), *aff'd*, 689 S.W.3d 899 (Tex. 2024) (contracts should be enforced based on what is expressed within the "four corners" of the agreement and "[a]mbiguity does not arise merely because parties assert differing interpretations."). The trigger for the two-year restriction was the ending of Ryan's employment "regardless of the reason for or manner of termination."

Ryan complied with that restriction. After his employment at ES3 ended in 2021, he did not compete with ES3. Instead, he went back to work in the semiconductor industry. He then returned to ES3—the opposite of competition. But he did not enter into a new agreement restricting his activities after his second stint of employment ended. The Temporary Injunction enforcing a covenant not to compete with which Ryan fully complied therefore runs contrary to the totality of the record evidence.

### ii. The covenants are not supported by consideration.

A covenant not to compete is enforceable only "if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is

made." Tex. Bus. & Com. Code § 15.50(a). Under this statutory requirement, there must be a nexus between the consideration provided to the employee and the restrictions imposed. *See Marsh USA Inc.*, 354 S.W.3d at 775–76. "Consideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus." *See id.*

In conclusory (and implausible) fashion, ES3 asserts that *everything* it does is confidential. (IV RR at Defs.' Ex. 21, 110:6–16.) But the reality is that virtually everything ES3 does is the general practice that everyone else in the hundreds-of-players industry follows. ES3 didn't give Kreines and Ryan any confidential information; it gave them (at most) general industry knowledge. But general industry knowledge is not a trade secret. *See Stewart & Stevenson Servs. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 95 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

Moreover, as Stanton testified, ES3 silos its employees specifically to ensure that they do not have access to its trade secrets. (II RR 47:6–16.) Ryan and Kreines did not have access to ES3's software; only to a small portion of it. (*Id.*) And to the extent that any of ES3's business methods or

74

practices are trade secrets, the siloing of Ryan and Kreines prevented them from having knowledge of them.

Because ES3 did not provide consideration that was reasonably related to any business interest worthy of protection, it is not enforceable under the Act.

### iii. *The restrictions in the covenants not to compete are unreasonable.*

With no actual trade secrets, ES3 relies on an unenforceable covenant not to compete to try and destroy LMP and the livelihoods of Ryan and Kreines.

### A) *The temporal restriction is unreasonable.*

In this case, the two-year restriction is unreasonable when (1) Hatcher's testimony is that an outsider could come into the industry and start competing in a few months and (2) Stanton testified that he recruits from outside the industry because sales experience is more important than any industry knowledge. (II RR 46:14–47:1; CR 386–87 at ¶ 34.) No evidence was presented at the hearing or is in the record to support the length of the restriction.

### B) *The geographic restriction is unreasonable.*

A geographic restriction for the entire state of Texas is unreasonable. As Ryan testified, his work with ES3 was limited to the Permian Basin. (III RR 59:13–18.) There was no evidence presented by ES3 as to why Texas was a reasonable geographic restriction.

### C) *Industry-wide restriction is invalid as a matter of Texas law.*

ES3's definition of a competing business contains an industry-wide restriction. An industry-wide restriction, however, is unreasonable as a matter of law. *Peat Marwick Main & Co. v. Haas*, 818 S.W.2d 381, 386–88 (Tex. 1991).

ES3 alleges Appellants violated the agreement by being in the same business space—not competing over a specific deal. David Ryan testified that LMP and ES3 have never bid against one another on any acquisition deal. And Trey Stanton agreed. (IV RR at Defs.' Ex. 20 at 85:19–23.) But ES3 offered no evidence that it had *ever* sought to buy *any* of the mineral interests that LMP has acquired.

In this case, the absence of evidence *is* evidence of absence as to competition. And a restriction as broad as the one in the non-competes is not enforceable.

The Covenants Not to Compete Act, Tex. Bus. & Com. Code § 15.51, *et seq.*, sets out the framework and requirements for crafting valid and enforceable non-compete agreements. The statute's "core inquiry is whether the covenant contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promissee." *Marsh US, Inc.*, 354 S.W.3d at 777.

Again, the statewide geographic restriction is unreasonable when Ryan and Stanton testified that they only did deals in the Permian Basin. And the industry-wide restriction is unreasonable as a matter of law. *Peat Marwick Main & Co.*, 818 S.W.2d at 386–88.

> **3.** **The Temporary Injunction does not contain a geographic restriction, thereby barring Appellants from engaging in lawful activity.**

Not only did the trial court enforce an overbroad covenant not to compete; it went *beyond* the overbroad restrictions in the covenant not to compete and erased any geographic restriction. The enabling statutory authority for the non-compete states that:

> Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made **to the**

**extent that it contains limitations as to** time, **geographical area,** and scope of activity to be restrained that are reasonable and **do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee**.

Tex. Bus. & Com. Code § 15.50 (emphasis added).

The covenants not to compete included a geographic scope limiting its restrictions to the State of Texas:

> (b) have any interest as an owner, investor, shareholder, partner, member, lender, director, officer, manager, employee, consultant, guarantor, representative, or agent or in any other manner whatsoever, directly or indirectly, carry on or be engaged in (or make preparations for carrying on or being engaged in), financially or otherwise, or advise in the establishment of, a Competing Business within the state of Texas; provided, however, Employee may make solely passive investments in any Competing Business up to one percent (1%) of the common stock of which is "publicly held," and of which Employee shall not own or control, directly or indirectly;

(CR 421 (emphasis added).) The relevant language in the documents signed by Ryan and Kreines is identical. (*See also* CR 427.)

The Temporary Injunction contains no geographic restriction. (See CR 871–77.) Challenge to the enforceability of the Agreements notwithstanding, the non-competition language in the Agreements that was signed by the parties restricts prohibited conduct within Texas. By failing to include any geographic imitation, the trial court put in restrictions to which the parties did not agree.

Texas courts have rejected temporary injunctions that fail to adhere to the requirements for a valid non-compete agreement. In *Parker v. Schlumberger Tech. Corp.*, the non-compete agreements that were executed by the parties were to last for one year. 475 S.W.3d 914, 928 (Tex. App.—Houston [1st Dist.] 2015, no pet.) The temporary injunction issued by the trial court, however, extended to the time of trial—significantly outlasting the one-year period contained in the contracts themselves. *Id.* at 921. Accordingly, the First Court of Appeals held the injunction to be invalid because it barred competition that would be legal and not prohibited by the noncompetition agreement. *See id.*

The lack of geographic restriction in this Temporary Injunction is exactly like the lack of temporal restriction in the *Parker* case. An essential term is missing, invalidating the Temporary Injunction.

## CONCLUSION AND PRAYER

The evidence introduced at the temporary-injunction hearing therefore did not support the restrictions contained in the Temporary Injunction. Indeed, because there was no evidence of an imminent or irreparable harm, the trial court erred in issuing any temporary injunction at all.

The lack of evidence to support a temporary injunction prevented the trial court from explaining the reasons for its issuance. But such an explanation is required by Rule 683. So are specific restrictions that Appellants can understand and abide by, but the Temporary Injunction omits those, too.

For these reasons, Appellants therefore respectfully ask the Court to reverse the order of the district court and render judgment dissolving the Temporary Injunction.

Respectfully submitted,

**LLOYD GOSSELINK
  ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800 Phone
(512) 472-0532 Facsimile

By:  */s/ James F. Parker*
       JAMES F. PARKER
       State Bar No. 24027591
       jparker@lglawfirm.com
       GABRIELLE C. SMITH
       State Bar No. 24093172
       gsmith@lglawfirm.com
       SYDNEY P. SADLER
       State Bar No. 24117905
       ssadler@lglawfirm.com

**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent to the following counsel of record, in accordance with the Texas Rules of Appellate Procedure, via the Court's electronic case filing system and electronic transmission on this 17th day of April, 2025:

Michael D. Marin
mmarin@boulettegolden.com
Tori B. Bell
tori@boulettegolden.com
BOULETTE GOLDEN & MARIN L.L.P.
2700 Via Fortuna, Suite 250
Austin, TX 78746

**ATTORNEYS FOR APPELLEE**

*/s/James F. Parker*
JAMES F. PARKER

# CERTIFICATE OF COMPLIANCE

I, James F. Parker, attorney for Appellants, certify that this document was generated by a computer using Microsoft Word 365, which indicates that the word count of this document is 11809 per Tex. R. App. P. 9.4(i).

*/s/James F. Parker*
JAMES F. PARKER

## INDEX OF APPENDICES

**Tab A**      November 26, 2024 Temporary Injunction (CR 860–66)

**Tab B**      April 7, 2025 Order Modifying Temporary Injunction (2d. Suppl. CR 307–33)

**Tab C**      April 7, 2025 Temporary Injunction (2d. Suppl. CR 334–46)

**Tab D**      Confidentiality, Non-Competition and Non-Solicitation Agreement of David P. Ryan (CR 419–23)

**Tab E**      Confidentiality, Non-Competition and Non-Solicitation Agreement of Nick Kreines (CR 425–29)

**Tab F**      Relevant Excerpts of Testimony Taken During the October 29, 2024 Temporary Injunction Hearing (Volume II of the Reporter's Record)

**Tab G**      Relevant Excerpts of Testimony Taken During the October 29, 2024 Temporary Injunction Hearing (Volume III of the Reporter's Record)

**Tab H**      Tex. Bus. & Com. Code § 15.50

**Tab I**      Tex. Gov't Code § 25A.004

**Tab J**      Tex. Gov't Code § 25A.006

**Tab K**      Tex. R. Civ. P. 355

**Tab L**      Tex. R. Civ. P. 683

**Tab M**      Tex. R. Civ. P. 684

# TAB A

CAUSE NO. D-1-GN-24-006854

| | | |
|---|---|---|
| ES3 MINERALS, LLC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | 459th JUDICIAL DISTRICT OF |
| NICHOLAS KREINES, DAVID P. | § | |
| RYAN, LIBERTY MINERAL | § | |
| PARTNERS LLC, NAK RESOURCES | § | |
| INC, CGR OIL AND GAS, LLC, | § | |
| | § | |
| | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## [PROPOSED] TEMPORARY INJUNCTION

On October 29-30th, 2024, the Court heard Plaintiff ES3 Minerals, LLC's ("Plaintiff" or "ES3") Application for Temporary Injunction, and took it under advisement. The Court also asked the Parties to provide a ten-page closing brief, which they did. The Parties also each filed briefs in support of their respective positions.

The Court, after examining the pleadings and documents, the arguments of counsel, the evidence presented, and all other matters properly before the Court, finds:

### I. VALID CAUSES OF ACTION

1. Plaintiff has asserted valid causes of action.

### II. PROBABLE RIGHT TO RELIEF

2. Plaintiff has shown a probable right to relief against Defendants Nicholas Kreines ("Kreines"), David P. Ryan ("Ryan"), and Liberty Mineral Partners LLC ("LMP").

#### A. DEFENDANT KREINES

3. The Court finds that Plaintiff has sufficiently shown that it will probably succeed on the merits of its claims against Defendant Kreines for (1) violations of trade secret misappropriation under the Texas Uniform Trade Secrets Act ("TUTSA"), (2) breaches of

860

fiduciary duty, and (3) breaches of contract (confidentiality, non-solicitation-of-buyers, non-solicitation-of-employees, and non-competition provisions).

4. The Court finds that Plaintiff will probably succeed on its claim that Defendant Kreines kept and continues to use and disclose materials and information that are Plaintiff's trade secrets to land deals for Defendant LMP, including deals with Plaintiff's Buyers; that Defendant Kreines facilitated a deal for Defendant LMP with an existing Plaintiff Buyer while still employed with Plaintiff; and that Defendant Kreines solicited and will continue to solicit Plaintiff's Buyers and employees for Defendant LMP's benefit.

**B. DEFENDANT RYAN**

5. The Court finds that Plaintiff has sufficiently shown that it will probably succeed on the merits of its claims against Defendant Ryan for breaches of contract (non-solicitation-of-buyers, non-solicitation-of-employees, and non-competition provisions). Plaintiff has also sufficiently shown for this temporary injunction that the relevant provisions of Defendant Ryan's contract did not change after his brief absence from the company.

6. The Court finds that Plaintiff will probably succeed in showing that Defendant Ryan has made and will continue to make deals with Plaintiff's Buyers.

**C. DEFENDANT LMP**

7. The Court finds that Plaintiff will probably succeed in showing that Defendant LMP tortiously interfered with Plaintiff's agreements with Defendants Kreines and Ryan (including their noncompetition and non-solicitation provisions) and will continue to do so.

**D. TRADE SECRETS MISAPPROPRIATED**

8. The Court finds that Plaintiff will probably succeed on its claim that Plaintiff's Buyer information, including buyer lists, pricing information, contact information for key-decision makers, the specific asset preferences of those buyers, and the details of the mineral interest

purchases of those buyers are Plaintiff's trade secrets ("Trade Secrets"). The Court further finds that Plaintiff will probably succeed on its claim that Plaintiff has taken reasonable measures under the circumstances to keep this information secret, and this information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other people who can obtain economic value from the disclosure or use of the information. The Court further finds that Plaintiff will probably succeed on its claim that Kreines misappropriated Plaintiff's Trade Secrets for his own benefit and the benefit of LMP and will continue to do so.

### E. BREACH OF CONTRACT AND INTERFERENCE

9. The Court finds that Plaintiff will probably succeed on its claim that, as a condition of employment with Plaintiff, Defendants Kreines and Ryan entered into Confidentiality, Non-Competition and Non-Solicitation Agreements with identical terms ("Kreines Agreement" and "Ryan Agreement" respectively, and together, "Agreements").

10. The Court finds that Plaintiff will probably succeed on its claim that Defendant Kreines has breached the Agreement's confidentiality provisions by taking, using, and disclosing Plaintiff's Confidential Information for his own benefit and for the benefit of Defendant LMP.

11. In Paragraph 4 of their respective Agreements, Kreines and Ryan agreed to the following restrictions during employment with ES3 and for twenty-four (24) months thereafter:

> Non-Competition; Non-Solicitation of Customers and Prospective Customers. Employee acknowledges that in the course of fulfilling Employee's responsibilities to ES3, Employee will be a representative of the company to, and in some instances may be ES3's primary contact with, existing customers as of the Termination date and prospective customers with whom ES3 has contacted within the 24-month period preceding the Termination date (collectively, "Customers and Prospective Customers"). Employee agrees that the goodwill and relationships developed with ES3's Customers and Prospective Customers is a special, valuable and unique asset of ES3 and should be used for the exclusive benefit of ES3. Accordingly, Employee agrees that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee

will not, directly or indirectly, except in connection with Employee's employment with ES3: . . .

(c)     induce, solicit or take away (or attempt to induce, solicit, or take away) any Customer or Prospective Customer of ES3 and/or encourage any Customer or Prospective Customer to discontinue or limit its relationship with ES3; … or

(e)     divert or discourage any Customer or Prospective Customer from entering into a business relationship with and/or obtaining products or services from ES3.

12.     The Court finds that Plaintiff will probably succeed on its claim that: (a) Defendants Kreines and Ryan have breached the Agreements' Non-Competition and Non-Solicitation Provisions by using for their own benefit Plaintiff's' goodwill and that they have diluted Plaintiff's goodwill with Plaintiff's Buyers; (b) Defendants Kreines and Ryan have induced, solicited and taken away (and attempted to induce, solicit, or take away) Plaintiff's Buyers and have encouraged Plaintiff's Buyers to discontinue or limit their relationship with ES3; (c) Defendants Kreines and Ryan have diverted or discouraged Plaintiff's Buyers from entering into a business relationship with and/or obtaining products or services from ES3; and (d) Defendant LMP was aware of Defendant Kreines and Ryan's contractual obligations to Plaintiff and intentionally interfered.

13.     The Court finds that Plaintiff's list of Plaintiff's Buyers attached to this order (which is marked CONFIDENTIAL) are ES3 customers for whom Kreines was a representative to and did business with on behalf of ES3 during the 24-month period preceding Kreines's termination date of January 31, 2024, and specifically includes the entities on the list as well as any subsidiaries, funds or other entities, formed by the listed entities for the purposes of executing a transaction as well as entities the individual contacts on the list are currently working for, and thus are within the definition of Customers and Prospective Customers under the Agreements ("Plaintiff's Buyers").

14.     In Paragraph 5 of their respective Agreements, Kreines and Ryan agreed to "that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless

863

of the reason for or manner of termination, Employee will not, on behalf of Employee or any other person or entity except ES3, directly or indirectly hire, solicit, induce or encourage (or attempt to hire, solicit, induce or encourage) any employee or officer of ES3 to terminate his/her relationship with ES3, without the prior written consent of ES3." The Court finds that Plaintiff will probably succeed on its claim that Defendants Kreines and Ryan violated their Agreements by soliciting Plaintiff's employees, including Curtis Menchaca, inducing them to terminate their employment with Plaintiff and work for LMP.

15. The Court finds that Plaintiff will probably succeed on its claim that the Agreements are valid, and the post-employment restrictions recited above were ancillary to or a part of an otherwise enforceable agreement at the time the Agreements were made; ES3 performed under the Agreements; and Defendants Kreines and Ryan violated the Agreements and continue to do so.

## III. PROBABLE, IMMINENT, AND IRREPARABLE HARM

16. The Court finds that Plaintiff has shown there would be a probable imminent, and irreparable injury from the actions it seeks to enjoin. Plaintiff has shown the loss of exclusive use of its Trade Secrets, a loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Defendants are enjoined. Defendants Ryan and Kreines were closely associated with Plaintiff's goodwill, and by their actions they have diluted Plaintiff's goodwill with Plaintiff's Buyers and will continue to do so. Plaintiff's probable, imminent, and irreparable injuries include:

a) Defendant Kreines's misappropriation of trade secrets.

b) Plaintiff's loss of goodwill and customers.

c) Defendants Kreines's and Ryan's breaches of their noncompetition agreements.

17. Any suit for money damages would not be an adequate remedy of law to protect

Plaintiff's rights.

**IT IS, THEREFORE, ORDERED** that, until the time of final trial on the merits:

1.   **DEFENDANT KREINES**, and any person acting in concert or participation with him who receives actual notice of this Order, is commanded forthwith through January 31, 2026, to cease and desist, and otherwise refrain from directly or indirectly:

   a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above);

   b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff; and

   c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff.

2.   **DEFENDANT RYAN**, and any person acting in concert or participation with him who receives actual notice of this Order, is commanded forthwith through August 23, 2025, to cease and desist, and otherwise refrain, from directly or indirectly:

   a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above);

   b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff; and

   c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff.

3.   **DEFENDANT LMP**, and any person acting in concert or participation with LMP who receives actual notice of this Order, is commanded forthwith to cease and desist, and otherwise refrain, from tortiously interfering with Kreines and Ryan's agreements with Plaintiff not to:

   a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above). This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff;

   b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff. This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff; and

c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff. This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff.

**IT IS FURTHER ORDERED** that trial be set before the Court on August 18 , 2025, at 9:00 a.m.

The Clerk of the above-entitled Court shall forthwith, on the filing by Plaintiff of the bond hereinafter required, and on approving the same according to the law, issue a temporary restraining order in conformity with the law and the terms of this Order.

This Order shall expire at such time as this Court enters judgment in this cause.

This Order shall not be effective unless and until Plaintiff executes and files with the Clerk a bond, in conformity with the law, in the amount of twenty-five thousand dollars and 00/100 Dollars ($25,000.00).

SIGNED this ___26th_____ day of November 2024, at ___4:50_____ o'clock _p_ .m.

_____
THE HONORABLE JUDGE EISERLOH
455th District Court

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 12/30/2024 03:21:08 _____

VELVA L. PRICE
DISTRICT CLERK
By Deputy:

# TAB B



# The Business Court of Texas, Third Division

ES3 MINERALS, LLC,

    *Plaintiff/Counter-Defendant,*

v.

NICHOLAS KREINES, DAVID P. RYAN, LIBERTY MINERAL PARTNERS LLC, NAK RESOURCES, INC., AND CGR OIL AND GAS, LLC,

    *Defendants/Counter-Plaintiffs.*

§
§
§
§
§
§
§
§
§
§
§

Cause No. 24-BC03B-0005

---

## ORDER MODIFYING TEMPORARY INJUNCTION

---

Before the Court are two motions addressing the Temporary Injunction entered by Judge Eiserloh on November 26, 2024, 1) Defendants' Motion to Dissolve and 2) Plaintiff's Opposed Motion to Modify Temporary Injunction, Subject to Response to Motion to Dissolve. As detailed below, the Court partially grants Plaintiff's motion to modify and modifies paragraph 13 and the corresponding "Ordered" section of the Temporary Injunction, enters a Modified Temporary Injunction Order as reflected in the attached Exhibit A, and denies all other relief requested.

# BACKGROUND

This lawsuit was filed in Travis County District Court on September 18, 2024. ES3 Minerals, LLC ("ES3") moved for a temporary injunction that was heard on October 29, 2024 and October 30, 2024 by Judge Eiserloh. On November 26, 2024, the trial court entered a temporary injunction against Defendants Nicholas Kreines ("Kreines"), David Ryan ("Ryan"), and Liberty Mineral Partners LLC ("LMP"). In its seven-page injunction, the trial court found that ES3 had asserted valid causes of action, shown a probable right to recover on multiple claims, and had shown there would be a probable, imminent, and irreparable injury from the actions ES3 sought to enjoin. The trial court enjoined Kreines, Ryan and LMP from: 1) "Entering or negotiating any transaction with any of Plaintiff's Buyers"; 2) "Encouraging Plaintiff's Buyers to discontinue or limit their relationships with Plaintiff"; and 3) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff."[1] To identify the prohibited transactions the order included the following definitional paragraph:

> 13. The Court finds that Plaintiff's list of Plaintiff's Buyers attached to this order (which is marked CONFIDENTIAL) are ES3 customers for whom Kreines was a representative to and did business with on behalf of ES3 during the 24-month period preceding Kreines's termination date of January 31, 2024, and specifically incudes the entities on the list as well as any subsidiaries, funds or other entities, formed by the listed entities for the purposes of executing a transaction as well as entities the individual contacts on the list are currently working for, and thus are within the definition of Customers and Prospective Customers under the Agreements.[2]

---

[1] Temporary Inj. 6, Dec. 18, 2024.

[2] *Id.* ¶ 13, Dec. 18, 2024 (emphasis added).

Attached to the order was a list, deemed confidential by the trial court, of over 90 specific "ES3 Trusted Buyers" and approximately 200 associated contacts with whom the Defendants were enjoined from negotiating a transaction.

After the temporary injunction was issued, Defendants removed this action to the Texas Business Court on December 23, 2024. Defendants then filed Defendants' Motion to Dissolve Temporary Injunction, ES3 filed their response, and Defendants filed a reply in support. Plaintiffs then filed Plaintiff's Opposed Motion to Modify Temporary Injunction, Subject to Response to Motion to Dissolve and Defendants filed their response. Both motions were heard on February 27, 2025.

In their motion, Defendants argue the temporary injunction is deficient in the following ways: 1) it does not meet the specificity requirement of Rule 683 since it fails to identify the specific customers with whom the Defendants are prohibited from transacting business; 2) the temporary injunction does not set forth the reasons for its issuance in violation of Rule 683; and 3) the bond amount set for the temporary injunction is insufficient.

In its response, ES3 argues the injunction is sufficiently specific, that Defendants' motion is an attempt to relitigate issues previously decided by the trial court, and the injunction sufficiently sets forth the reasons for its issuance. In their motion to modify, while not conceding the validity of Defendants' motion, ES3 suggests modifications to the temporary injunction aimed at addressing Defendants' specificity contentions.

## ANALYSIS

To analyze the alleged deficiencies in the temporary injunction order, the Court reviews relevant case law and the text of Texas Rules of Civil Procedure 683 and 684.

**Legal Standard**

The purpose of a motion to dissolve is to provide a means to show that changed circumstances or changes in the law require the modification or dissolution of the injunction; it is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant."[3] A respondent cannot use a motion to dissolve or a motion to modify to relitigate the basis for the injunction when the basis has not changed.[4] Decrees of injunction may be reviewed, opened, vacated or modified by the trial court upon a showing of changed circumstances.[5] The determination of the question of whether to dissolve a temporary injunction is a matter lying within the discretion of the trial court.[6] The trial court has no duty, upon the filing of a motion to dissolve, to reconsider the propriety of the granting of a temporary injunction, at least where the motion does not allege fundamental error, and also where the motion is not based upon evidence of changed conditions but is

---

[3] *Tober v. Turner of Texas, Inc.*, 668 S.W.2d 831, 836 (Tex. App.—Austin 1984, no writ) ); *see also, e.g., Gruss v. Gallagher*, 680 S.W.3d 642, 660 (Tex. App.—Houston [14th Dist.] 2023, no pet.); *Chase Manhattan Bank v. Bowles*, 52 S.W.3d 871, 879 (Tex. App.—Waco 2001, no pet.); *Murphy v. McDaniel*, 20 S.W.3d 873, 877 (Tex. App.—Dallas 2000, no pet.).

[4] *Chase Manhattan Bank*, 52 S.W.3rd at 879.

[5] *See Id.* quoting (*Smith v. O'Neill,* 813 S.W.2d 501, 502 (Tex. 1991)).

[6] *Tober,* 668 S.W.2d at 834.

rather based upon evidence which was before the court at the prior hearing on the motion to grant the temporary injunction.[7]

**Rule 683 and 684**

Texas Rule of Civil Procedure 683 governs orders granting injunctions and restraining orders and requires the order to set forth the reasons for its issuance, be specific in its terms, and describe in reasonable detail the act or acts sought to be restrained.[8] The requirements of Rule 683 "are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved."[9] A trial court's failure to comply with an express requirement of Rule 683 is fundamental error;[10] it renders the injunctive order void, rather than merely voidable.[11]

"An injunction must be definite, clear, and concise, leaving the person enjoined in no doubt about his duties, and should not call on him for interpretations, inferences, or conclusions."[12]

---

[7] *Id.* at 835.

[8] TEX. R. CIV. P. 683.

[9] *Qwest Communs. Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000) (per curiam).

[10] *See Henke v. Peoples State Bank*, 6 S.W.3d 717, 721 (Tex. App. —Corpus Christi 1999, pet. dism'd w.o.j.), *abrogation recognized by Tex. Wrecker Serv. v. Resendez*, No. 13-16-00515-CV, 2017 WL 711642, at *5 (Tex. App.—Corpus Christi–Edinburg Feb. 23, 2017, no pet.); *Glennie v. Petty*, 591 S.W.2d 951, 952 (Tex. App.—Tyler 1979, no pet.); *United Farm Workers, AFL-CIO v. H.E. Butt Grocery Co.*, 590 S.W.2d 600, 606 (Tex. App.—Corpus Christi 1979, no writ) (holding that trial court's entry of overbroad injunction was not fundamental error and modifying rather than reversing order).

[11] *See, e.g., In re Luther*, 620 S.W.3d 715, 721 (Tex. 2021) (orig. proceeding) (per curiam); *Grounds v. First GroundRock Royalties, LLC*, 629 S.W.3d 674, 678 (Tex. App.—San Antonio 2021, no pet.); *In re Chaumette*, 456 S.W.3d 299, 307 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *In re Corcoran*, 343 S.W.3d 268, 269 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

[12] *Vaughn v. Drennon*, 202 S.W.3d 308, 316 (Tex. App.—Tyler 2006, no pet.).

Additionally, Texas Rule of Civil Procedure 684 requires a court granting any temporary restraining order to set a bond, executed by the applicant, and filed with the clerk.[13] The determination of the adequacy of the bond set by the trial court is to be made on a case-by-case basis considering the record before the reviewing court.[14] The amount of a bond is within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of that discretion.[15] The failure to require a bond in a sufficient amount does not render an injunction void.[16]

**Application**

The Court considers each of the Defendants' contentions concerning the alleged deficiencies in the temporary injunction order beginning with their allegations that the injunction does not sufficiently specify who the parties are prohibited from transacting business.

###### i.      Specificity of Prohibited Acts

Defendants' specificity arguments focus on portions of paragraph 13 that apply the injunction to, not only the individually listed and named "Plaintiffs Buyer's," but provisions that expand the definition of "Plaintiffs Buyer's" to include:

---

[13] TEX. R. CIV. P. 684.

[14] *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 203 (Tex. App.—Fort Worth 2005, no pet.).

[15] *Id.*

[16] *El Paso Dev. Co. v. Berryman*, 729 S.W.2d 883, 888 (Tex.App.—Corpus Christi 1987, no writ).

any subsidiaries, funds or other entities, formed by the listed entities for the purposes of executing a transaction as well as entities the individual contacts on the list are currently working for, and thus are within the definition of Customers and Prospective Customers under the Agreements.[17]

Defendants argue this language does not meet the specificity requirement of Rule 683 for multiple reasons. They assert they have no way of knowing the corporate structure of entities to whom they cannot sell mineral interests. To enforce the temporary injunction, they claim, the Court would be forced to conduct an additional hearing to consider evidence about the buyer's corporate structure, the purpose for which a corporate structure was organized, and the buyer's roster of employees. Defendants also argue other courts have rejected non-specific provisions included in similar orders. Defendants primarily cite three cases in support of their arguments: *In re Luther, Computek Computer & Office Supplies, Inc. v. Walton* and *In re Krueger.*

ES3 contends the temporary injunction issued by the trial court is sufficiently specific. It argues it is common in the mineral industry for buyers to form transaction specific entities and that Kreines, as the principal relationship manager to ES3's Buyers for several years, knows exactly which buyers are off-limits to him and Defendants. ES3 notes the temporary injunction attaches a specific list of ES3's Buyers and includes an explanation of the entities and individuals that are off-limits. Finally, ES3 argues the language concerning subsidiaries, funds, or other entities, and the language restricting Defendants from doing business with individuals on the list, regardless of where they work, is necessary to prevent circumvention of the injunction.

---

[17] Temporary Inj. ¶ 13, Dec. 18, 2024.

The Court first reviews Defendants' cited cases: *Luther, Computek*, and *Krueger.*

In *Luther*, a Dallas salon owner sought relief from a contempt judgment issued against her for violating a temporary restraining order that prohibited her from operating in-person services during the COVID-19 pandemic.[18] Luther argued that the order was void since it did not specify the exact conduct prohibited.[19] The Texas Supreme Court agreed, ruling that temporary restraining order issued by the trial court, failed to clearly outline which specific regulations Luther violated or which services at the salon were restrained.[20] The Court reasoned, "Luther could not know without analyzing a multitude of regulations—state, county, and city emergency orders referenced in the temporary restraining order, plus the federal guidelines they referenced—what conduct was prohibited at any given time the temporary restraining order was in effect."[21]

More persuasive is *Computek*.[22] There, OEM, an office supply company, sued Computek and its owner, a former OEM employee, alleging theft of OEM's trade secrets.[23] After the trial court issued a permanent injunction, Computek appealed, asserting the injunction was improperly broad and lacked specificity since it failed to clearly identify which OEM clients Computek could not contact.[24] The Dallas Court of Appeals agreed,

---

[18] *In re Luther*, 620 S.W.3d at 718.

[19] *Id.*

[20] *Id.* at 723.

[21] *Id.*

[22] *Computek Comput. & Off. Supplies, Inc. v. Walton*, 156 S.W.3d 217 (Tex. App.—Dallas 2005, no pet.).

[23] *Id.* at 219–20.

[24] *Id.* at 221–22.

noting that the injunction needed to specifically name the clients and define the information that could not be used or disclosed and that the lack of specificity could not be cured by any knowledge Computek might have outside the permanent injunction.[25]

*In re Krueger* involved an executive barred from "contacting any of Cru Energy, Inc.'s investors or potential investors, or any other persons doing business with or potentially a participant in the business of Cru Energy, Inc."[26] The district court found Krueger violated that provision by sending emails to vendors of Cru Energy.[27] On review, the Austin Court of Appeals found the injunction was not sufficiently specific since it failed to describe in reasonable detail the individuals or organizations that Krueger was prohibited from contacting.[28] Notably, the injunction failed to name or otherwise identify those who are considered "investors or potential investors" of Cru Energy, and those who are "persons doing business with or potentially a participant in the business of" Cru Energy.[29] The Court rejected Cru's argument that Krueger was in a position to know who the investors and persons were doing business with Cru energy because an injunction must be as "definite, clear and precise as possible . . . without calling on [the enjoined party] for

---

[25] *Id.* at 222–23 ("Thus, the injunction itself must provide the specific information as to the off-limits clients, without inferences or conclusions, or, in this case, implied references to other records Computek might have.").

[26] No. 03-12-00838-CV, 2013 WL 2157765, at *1 (Tex. App.—Austin May 16, 2013, orig. proceeding).

[27] *Id.* at *2.

[28] *Id.* at *8.

[29] *Id.*

inferences or conclusions about which persons might well differ and without leaving anything for further hearing."[30]

The Court finds *Computek* and *Kruger* persuasive and analogous to paragraph 13 of the order issued by the trial court. Here, the injunction specifically names the ES3 Buyers that are off-limits to Defendants and attaches a list of those entities and individuals. These provisions are definite, specific and clear and the Court declines Defendants' suggestion to modify those provisions.

However, the second prohibition contained in paragraph 13 of the temporary order is less specific. It includes, in addition to the list of ES3 Buyers, "any subsidiaries, funds or other entities, formed by the listed entities for the purposes of executing a transaction" and "entities the individual contacts on the list are currently working for . . . ."[31] As in *Computek,* the prohibition on business dealings with "subsidiaries, funds, or other entities" depends on Defendants' knowledge of the ownership structure of the companies with whom they are attempting to enter a deal or it would require Defendants to perform an inquiry prior to dealing with any new companies and is comparable to the language in *Computek* that the Court found problematic. Similarly, the clause in paragraph 13 that prohibits executing a transaction with entities and individuals on the list that "are currently working for" the individual or entity would require Defendants to conduct an

---

[30] *Id.*

[31] Temporary Inj. ¶ 13, Dec. 18, 2024.

inquiry prior to any transaction about the status of any individuals and employees employed by the entity.

Rule 683 provides that a temporary injunction "shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained."[32] The purpose of Rule 683's specificity requirement is to "ensure that parties are adequately informed of the acts they are enjoined from doing and the reasons for the injunction."[33] The Texas Supreme Court has required "strict compliance with Rule 683, so that a temporary restraining order itself informs a party, unambiguously and with a reasonable degree of specificity, of the conduct to be restrained."[34] The requirements of Rule 683 are mandatory and must be strictly followed.[35]

Here, the order falls short of those specificity provisions. Therefore, the Court modifies the two definitional provisions in paragraph 13, as reflected in the attached Exhibit A, to more clearly specify the acts Kreines, Ryan and LMP are prohibited from committing.

### ii. Sufficiency of reasoning for issuance of temporary injunction

Defendants also allege the temporary injunction fails to provide sufficient reasons for its issuance as required by Rule 683. Defendants contend that the temporary injunction order "must explain the reasons why the court believes the applicant's probable right will

---

[32] TEX. R. CIV. P. 683.

[33] *McCaskill v. Nat'l Circuit Assembly*, No. 05-17-01289-CV, 2018 WL 3154616, at *2 (Tex. App.— Dallas June 28, 2018, no pet.) (mem. op.).

[34] *In re Luther*, 620 S.W.3d at 723.

[35] *Id.*; *Qwest*, 24 S.W.3d at 337.

be endangered if the writ does not issue."[36]  Citing *Home Asset, Inc. v MPT of Victory Lakes Fcer LLC,* an unpublished opinion from the Houston Court of Appeals, Defendants argue that to the extent reasons were set forth in the temporary injunction issued by the Court, they were conclusory and  did not "articulate the factual basis on which it rests, effectively insisting that the reader accept the writer's say-so without explanation."[37]

In response, ES3 argues the temporary injunction sufficiently sets forth the reasons for its issuance.  ES3 notes the Court found it is likely to succeed in "proving Kreines misappropriated ES3's trade secrets for its own benefit and for the benefit of LMP and will continue to do so," that ES3 "will probably succeed on its breach of contract and tortious interference claims against the Defendants based on factual findings," that "Kreines and Ryan violated the Agreements and continue to do so"  that the "Plaintiff has shown there would be a probable imminent and irreparable injury from the actions it seeks to enjoin" and that it sets forth "the reason why ES3 would suffer probable, imminent and irreparable injury absent an injunction."[38]

---

[36] Def.s' Mot. to Dissolve Temporary Inj. 18, Jan. 7, 2025; *IPSecure, Inc. v. Carrales*, No. 04-16-00005-CV, 2016 WL 3342108, at *2 (Tex. App.—San Antonio June 15, 2016, no pet.)(mem. op.).

[37]*Home Asset, Inc. v MPT of Victory Lakes Fcer, LLC,* No. 01-22-00441-CV, 2023 WL 3183322, at *2 (Tex. App.—Houston [1st Dist.] May 2, 2023, no pet.) (mem. op.); Def.s' Mot. to Dissolve Temporary Inj. 18, Jan. 7, 2025.

[38] Pl.'s Resp. to Def.s' Mot. To Dissolve Temporary Inj. 21–22, Feb 14, 2025.

Rule 683 requires a temporary injunction to include the "reasons for its issuance."[39] That requirement is mandatory and a temporary injunction that does not meet it is subject to being declared void and dissolved as it would constitute fundamental error.[40]

While Defendants relies on *Home Asset* and *Clark* the underlying facts there are distinguishable. In *Home Asset*, the Court found that a single sentence in a temporary order that addressed irreparable injury, stating that "the appellees will be irreparably harmed if the appellants are allowed to terminate the leases without explaining why doing so will cause irreparable harm" was a "mere recital" and therefore insufficient under Rule 683 and therefore void.[41]

The facts in *Clark v. Hastings* are also distinguishable. In *Clark,* the trial court entered an injunction that it modified just two weeks later by entering a second order.[42] The Houston Appellate Court found the changes made by the second order to be of a "substantive nature" making it the operative temporary injunction order subject to the requirements of Rule 683.[43] The Court held the order contained no attempt to satisfy the requirements of Rule 683 and both parties agreed the second order was insufficient.[44] The Court also commented that even if both orders were read in tandem, the only language that

---

[39] TEX. R. CIV. P. 683.

[40] *See Henke*, 6 S.W.3d at 721.

[41] 2023 WL 3183322, at *2–3.

[42] *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 363–64 (Tex. App. 2022).

[43] *Id.* at 370.

[44] *Id.* at 370, 371 n.8.

provided the basis for the ruling was itself insufficient.[45] That portion of the order provided, "The Respondents have violated certain covenants contained in the said Securities Purchase Agreement and will, if not restrained, likely engage in conduct that will cause Petitioners to suffer immediate and irreparable injury, loss or damage; and . . . the threatened damage to Petitioners is impossible to accurately and fully assess."[46] The Court held this brief, conclusory explanation did not satisfy Rule 683.

The trial court's order here is more detailed and contains significantly more exposition than those in *Clark*. In fact, the trial court's temporary injunction contained multiple provisions that "set forth the reasons" for the issuance of the injunction. In addition to the excerpts ES3 cited above, the temporary injunction begins by summarizing parties briefing leading up to the temporary injunction.[47] It also contains paragraph 16 entitled "Probable, Imminent, And Irreparable Harm" that provides among other things that: "Plaintiff has shown . . . the loss of exclusive use of its Trade Secrets, a loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Defendants are enjoined."[48] Paragraph 16 also recites that Ryan and Kreines were "closely associated with Plaintiff's goodwill, and by their actions they have diluted Plaintiff's goodwill with Plaintiff's Buyers and will continue to do so."[49] The

---

[45] *Id.* at 374.

[46] *Id.*

[47] Temporary Inj. Page 1, Dec. 18, 2024.

[48] *Id.* ¶ 16.

[49] *Id.*

imminent and irreparable injuries are identified as "misappropriation of trade secrets . . . loss of goodwill and customers" and "breaches of their noncompetition agreements."[50]

And while the seven-page order does not provide an exhaustive exposition of the factual basis underlying its conclusions and could have contained additional specificity, the Court finds the order contains a sufficient description to "set forth the basis" of the injunction.

### iii. Bond Sufficiency

Finally, Defendants challenge the bond amount set by the trial court. Following the hearing conducted in this matter, the trial court's temporary injunction set ES3's bond at $25,000. Defendants contend the bond amount is inadequate and contrary to the evidence. Defendants rely on *Franklin Sav. Association v. Reese*, a case from the Austin Court of Appeals where the trial court found a $10,000 bond an improper and disproportionately small sum, unable to protect the $25 to $50 Million property at issue.[51] They also rely on Justice Young's dissent in *Van Huis v. Marine Ventures, Ltd.*, where he asserted that a nominal bond in a high value case "could be tantamount to dispensing the bond requirement altogether."[52]

In response, Plaintiff argues that the Defendants are attempting to relitigate issues determined in the sound discretion of the court and that the bond amount is sufficient based on the evidence. ES3 also contends Texas law requires evidence of lost-profits, not lost-

---

[50] *Id.*

[51] 756 S.W.2d 14, 16 (Tex. App.—Austin 1988, no writ).

[52] 672 S.W.3d 22, 26 (Tex. 2023) (Young, J., dissenting).

gross revenues,[53] and that Defendants have provided only evidence of lost-gross revenues. Finally, ES3 cites *Topheavy Studios, Inc. v. Doe,* contending that without evidence of lost profits, the $25,000 bond amount is sufficient as a matter of law.[54]

Rule 684 requires the trial court to set a bond when it grants a temporary injunction.[55] The text of the rule provides no guidance on the "amount of security" the Court must require.[56] But courts have held that the purpose of a bond is to protect the enjoined party from any possible damages occurring as a result of an improperly granted injunction.[57] The *amount* of a bond is within the trial court's sound discretion, but a temporary injunction issued *without a bond* is void.[58] And the failure to require a bond in a sufficient amount does not render an injunction void.[59]

"The purpose of the motion to dissolve is to provide a means to show that changed circumstances or changes in the law require the modification or dissolution of the

---

[53] *See, e.g., Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992) ("The correct measure of damages is lost net profit, not gross profits."); *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (same); *MJAH Holdings, LLC v. Henson*, No. 03-18-00012-CV, 2019 WL 1413282, at *5 (Tex. App.—Austin Mar. 29, 2019, no pet.) (mem. op.) (same).

[54] No. 03-05-00022-CV, 2005 WL 1940159, at *7–8 (Tex. App.—Austin Aug. 11, 2005, no pet.).

[55] Tex. R. Civ. P. 684.

[56] *Id.*

[57] *IAC*, 160 S.W.3d at 203; *Bayoud v. Bayoud*, 797 S.W.2d 304, 312 (Tex. App.—Dallas 1990, writ denied).

[58] *Whitlow v. Polley*, 670 S.W.2d 318, 319 (Tex. App.—Tyler 1984, no writ) (emphasis added); *IAC*, 160 S.W.3d at 203.

[59] *El Paso,* 729 S.W.2d at 888.

injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant."[60]

In this case, this Court did not conduct the underlying temporary injunction hearing, hear the evidence, issue the temporary injunction, nor set the amount of the bond. The parties have presented insufficient evidence of changed circumstances since the issuance of the current bond. And while a motion to dissolve is the proper mechanism to address a *void* temporary injunction—one where no bond was set—here the district court temporary injunction set a bond, which met the threshold requirements of Rule 684.[61] Since the Defendants have not demonstrated a change of circumstances since the temporary injunction was granted, the Court does not reconsider nor modify the amount of the original bond setting.

## SUMMARY

The Court, after examining the pleading and documents, the arguments of counsel, and all other matters properly before the Court, finds:

- That paragraph 13 of the Temporary Injunction entered in the 459th Travis County on November 26, 2024 does not sufficiently meet the specificity requirement under Rule 683 and therefore should be partially modified.

- The Temporary Injunction sufficiently set forth the reasons for its issuance as required by Rule 683.

---

[60] *Tober,* 668 S.W.2d at 836.

[61] *See Id.*; TEX. R. CIV. P. 684.

- That the trial court set a bond in the case in accordance with Rule 684 and that no changed circumstances have been plead that warrant the reexamination of the sufficiency of the bond amount.

Based on the foregoing, the Court **ORDERS** a modification of the Temporary Injunction issued on November 26, 2024 as reflected in the attached Exhibit A, and the Court issues a new Modified Temporary Injunction reflecting those modifications. The Court denies all other relief requested.

Hon. Patrick K. Sweeten
Judge of the Texas Business Court
Third Division

DATED: April 7, 2025

# Exhibit A



# The Business Court of Texas,
# Third Division

| | | |
|---|---|---|
| ES3 MINERALS, LLC, | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| v. | § | |
| NICHOLAS KREINES, DAVID P. | § | |
| RYAN, LIBERTY MINERAL | § | Cause No. 24-BC03B-0005 |
| PARTNERS LLC, NAK | § | |
| RESOURCES INC., AND CGR | § | |
| OIL AND GAS, LLC, | § | |
| *Defendants/Counter-Plaintiffs.* | § | |

## MODIFIED TEMPORARY INJUNCTION

On October 29–30th, 2024, the 459th District Court of Travis County heard Plaintiff ES3 Minerals, LLC's ("Plaintiff" or "ES3") Application for Temporary Injunction. On November 26, 2024, the district court issued a temporary injunction order. Later, the above-captioned case was removed to this Court. This Court held a hearing on February 27, 2025, on Defendants' Motion to Dissolve Temporary Injunction and Plaintiff's Opposed Motion to Modify Temporary Injunction, Subject to Response to Motion to Dissolve and after examining the pleadings and documents, the arguments of counsel, the evidence presented, and the full record, the Court finds as follows:

**VALID CAUSES OF ACTION**

1.     Plaintiff has asserted valid causes of action.

**I.     PROBABLE RIGHT TO RELIEF**

2.     Plaintiff has shown a probable right to relief against Defendants Nicholas Kreines ("Kreines"), David P. Ryan ("Ryan"), and Liberty Mineral Partners LLC ("LMP").

**A.  DEFENDANT KREINES**

3.     The Court finds that Plaintiff has sufficiently shown that it will probably succeed on the merits of its claims against Defendant Kreines for (1) violations of trade secret misappropriation under the Texas Uniform Trade Secrets Act ("TUTSA"), (2) breaches of fiduciary duty, and (3) breaches of contract (confidentiality, non-solicitation-of-buyers, non-solicitation-of-employees, and non-competition provisions).

4.     The Court finds that Plaintiff will probably succeed on its claim that Defendant Kreines kept and continues to use and disclose materials and information that are Plaintiff's trade secrets to land deals for Defendant LMP, including deals with Plaintiff's Buyers; that Defendant Kreines facilitated a deal for Defendant LMP with an existing Plaintiff Buyer while still employed with Plaintiff; and that Defendant Kreines solicited and will continue to solicit Plaintiff's Buyers and employees for Defendant LMP's benefit.

**B.  DEFENDANT RYAN**

5.     The Court finds that Plaintiff has sufficiently shown that it will probably succeed on the merits of its claims against Defendant Ryan for breaches of contract (non-solicitation-of-buyers, non-solicitation-of-employees, and non-competition provisions). Plaintiff has also sufficiently shown for this temporary injunction that the relevant provisions of Defendant Ryan's contract did not change after his brief absence from the company.

6.     The Court finds that Plaintiff will probably succeed in showing that Defendant

Ryan has made and will continue to make deals with Plaintiff's Buyers.

## C. DEFENDANT LMP

7. The Court finds that Plaintiff will probably succeed in showing that Defendant LMP tortiously interfered with Plaintiff's agreements with Defendants Kreines and Ryan (including their noncompetition and non-solicitation provisions) and will continue to do so.

## D. TRADE SECRETS MISAPPROPRIATED

8. The Court finds that Plaintiff will probably succeed on its claim that Plaintiff's Buyer information, including buyer lists, pricing information, contact information for key-decision makers, the specific asset preferences of those buyers, and the details of the mineral interest purchases of those buyers are Plaintiff's trade secrets ("Trade Secrets"). The Court further finds that Plaintiff will probably succeed on its claim that Plaintiff has taken reasonable measures under the circumstances to keep this information secret, and this information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other people who can obtain economic value from the disclosure or use of the information. The Court further finds that Plaintiff will probably succeed on its claim that Kreines misappropriated Plaintiff's Trade Secrets for his own benefit and the benefit of LMP and will continue to do so.

## E. BREACH OF CONTRACT AND INTERFERENCE

9. The Court finds that Plaintiff will probably succeed on its claim that, as a condition of employment with Plaintiff, Defendants Kreines and Ryan entered into Confidentiality, Non-Competition and Non-Solicitation Agreements with identical terms ("Kreines Agreement" and "Ryan Agreement" respectively, and together, "Agreements").

10. The Court finds that Plaintiff will probably succeed on its claim that Defendant Kreines has breached the Agreement's confidentiality provisions by taking, using, and disclosing

2d. Suppl. CR 328

Plaintiff's Confidential Information for his own benefit and for the benefit of Defendant LMP.

11. In Paragraph 4 of their respective Agreements, Kreines and Ryan agreed to the following restrictions during employment with ES3 and for twenty-four (24) months thereafter:

> Non-Competition; Non-Solicitation of Customers and Prospective Customers. Employee acknowledges that in the course of fulfilling Employee's responsibilities to ES3, Employee will be a representative of the company to, and in some instances may be ES3's primary contact with, existing customers as of the Termination date and prospective customers with whom ES3 has contacted within the 24-month period preceding the Termination date (collectively, "Customers and Prospective Customers"). Employee agrees that the goodwill and relationships developed with ES3's Customers and Prospective Customers is a special, valuable and unique asset of ES3 and should be used for the exclusive benefit of ES3. Accordingly, Employee agrees that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, directly or indirectly, except in connection with Employee's employment with ES3: . . .

> (c) induce, solicit or take away (or attempt to induce, solicit, or take away) any Customer or Prospective Customer of ES3 and/or encourage any Customer or Prospective Customer to discontinue or limit its relationship with ES3; … or

> (e) divert or discourage any Customer or Prospective Customer from entering into a business relationship with and/or obtaining products or services from ES3.

12. The Court finds that Plaintiff will probably succeed on its claim that: (a) Defendants Kreines and Ryan have breached the Agreements' Non-Competition and Non-Solicitation Provisions by using for their own benefit Plaintiff's' goodwill and that they have diluted Plaintiff's goodwill with Plaintiff's Buyers; (b) Defendants Kreines and Ryan have induced, solicited and taken away (and attempted to induce, solicit, or take away) Plaintiff's Buyers and have encouraged Plaintiff's Buyers to discontinue or limit their relationship with ES3; (c) Defendants Kreines and Ryan have diverted or discouraged Plaintiff's Buyers from entering into a business relationship with and/or obtaining products or services from ES3; and (d) Defendant LMP was aware of Defendant Kreines and Ryan's contractual obligations to Plaintiff and intentionally interfered.

2d. Suppl. CR 329

13.      The Court finds that Plaintiff's list of Plaintiff's Buyers attached to this order* (which is marked CONFIDENTIAL) are ES3 customers for whom Kreines was a representative to and did business with on behalf of ES3 during the 24-month period preceding Kreines's termination date of January 31, 2024, and specifically includes the individuals and entities on the list as well as any subsidiaries of those entities that are known to be subsidiaries by Kreines, Ryan or LMP, and thus are within the definition of Customers and Prospective Customers under the Agreements ("**Plaintiff's Buyers**"). If an individual on the list begins working at a new entity, the new entity is not included within the definition of Plaintiff's Buyers, however the individual on the list remains within the definition of Plaintiff's Buyers and prohibitions on Kreines, Ryan and LMP in this order apply to transactions where they have knowledge the individual is personally involved.

14.      In Paragraph 5 of their respective Agreements, Kreines and Ryan agreed to "that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, on behalf of Employee or any other person or entity except ES3, directly or indirectly hire, solicit, induce or encourage (or attempt to hire, solicit, induce or encourage) any employee or officer of ES3 to terminate his/her relationship with ES3, without the prior written consent of ES3." The Court finds that Plaintiff will probably succeed on its claim that Defendants Kreines and Ryan violated their Agreements by soliciting Plaintiff's employees, including Curtis Menchaca, inducing them to terminate their employment with Plaintiff and work for LMP.

---

* The attached Plaintiff's Buyers list has not been modified.

15. The Court finds that Plaintiff will probably succeed on its claim that the Agreements are valid, and the post-employment restrictions recited above were ancillary to or a part of an otherwise enforceable agreement at the time the Agreements were made; ES3 performed under the Agreements; and Defendants Kreines and Ryan violated the Agreements and continue to do so.

## II. PROBABLE, IMMINENT, AND IRREPARABLE HARM

16. The Court finds that Plaintiff has shown there would be a probable imminent, and irreparable injury from the actions it seeks to enjoin. Plaintiff has shown the loss of exclusive use of its Trade Secrets, a loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Defendants are enjoined. Defendants Ryan and Kreines were closely associated with Plaintiff's goodwill, and by their actions they have diluted Plaintiff's goodwill with Plaintiff's Buyers and will continue to do so. Plaintiff's probable, imminent, and irreparable injuries include:

a) Defendant Kreines's misappropriation of trade secrets.

b) Plaintiff's loss of goodwill and customers.

c) Defendants Kreines's and Ryan's breaches of their noncompetition agreements.

17. Any suit for money damages would not be an adequate remedy of law to protect Plaintiff's rights.

**IT IS, THEREFORE, ORDERED** that, until the time of final trial on the merits:

1. **DEFENDANT KREINES**, and any person acting in concert or participation with him who receives actual notice of this Order, is commanded forthwith through January 31, 2026, to cease and desist, and otherwise refrain from directly or indirectly:

a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above);

b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff; and

c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff; and

d) Conspiring to circumvent the restrictions imposed by sections a–c.

2. **DEFENDANT RYAN**, and any person acting in concert or participation with him who receives actual notice of this Order, is commanded forthwith through August 23, 2025, to cease and desist, and otherwise refrain, from directly or indirectly:

a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above);

b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff; and

c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff.

d) Conspiring to circumvent the restrictions imposed by sections a–c.

3. **DEFENDANT LMP**, and any person acting in concert or participation with LMP who receives actual notice of this Order, is commanded forthwith to cease and desist, and otherwise refrain, from tortiously interfering with Kreines and Ryan's agreements with Plaintiff not to:

a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above). This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff;

b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff. This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff; and

c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff. This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff.

d) Conspiring to circumvent the restrictions imposed by sections a–c.

**IT IS FURTHER ORDERED** that trial <mark>is set before the Court on October 20, 2025 at</mark> 9:00 a.m.

The Clerk of the above-entitled Court shall forthwith issue a <mark>Modified Temporary Injunction</mark> in conformity with the law and the terms of this Order.

This Order shall expire at such time as this Court enters judgment in this cause.

<mark>The bond filed by Plaintiff in conjunction with the prior injunction on December 18, 2024, shall be sufficient for the issuance of this Modified Temporary Injunction.</mark>

 

Hon. Patrick K. Sweeten
Judge of the Texas Business Court
Third Division

DATED: April 7, 2025

# TAB C



# The Business Court of Texas, Third Division

ES3 MINERALS, LLC,

    *Plaintiff/Counter-Defendant,*

v.

NICHOLAS KREINES, DAVID P. RYAN, LIBERTY MINERAL PARTNERS LLC, NAK RESOURCES, INC., AND CGR OIL AND GAS, LLC,

    *Defendants/Counter-Plaintiffs.*

§
§
§
§
§
§
§
§
§
§
§

Cause No. 24-BC03B-0005

## MODIFIED TEMPORARY INJUNCTION

On October 29–30th, 2024, the 459th District Court of Travis County heard Plaintiff ES3 Minerals, LLC's ("Plaintiff" or "ES3") Application for Temporary Injunction. On November 26, 2024, the district court issued a temporary injunction order. Later, the above-captioned case was removed to this Court. This Court held a hearing on February 27, 2025, on Defendants' Motion to Dissolve Temporary Injunction and Plaintiff's Opposed Motion to Modify Temporary Injunction, Subject to Response to Motion to Dissolve and after examining the pleadings and documents, the arguments of counsel, the evidence presented, and the full record, the Court finds as follows:

2d. Suppl. CR 334

**VALID CAUSES OF ACTION**

1. Plaintiff has asserted valid causes of action.

## I. PROBABLE RIGHT TO RELIEF

2. Plaintiff has shown a probable right to relief against Defendants Nicholas Kreines ("Kreines"), David P. Ryan ("Ryan"), and Liberty Mineral Partners LLC ("LMP").

### A. DEFENDANT KREINES

3. The Court finds that Plaintiff has sufficiently shown that it will probably succeed on the merits of its claims against Defendant Kreines for (1) violations of trade secret misappropriation under the Texas Uniform Trade Secrets Act ("TUTSA"), (2) breaches of fiduciary duty, and (3) breaches of contract (confidentiality, non-solicitation-of-buyers, non-solicitation-of-employees, and non-competition provisions).

4. The Court finds that Plaintiff will probably succeed on its claim that Defendant Kreines kept and continues to use and disclose materials and information that are Plaintiff's trade secrets to land deals for Defendant LMP, including deals with Plaintiff's Buyers; that Defendant Kreines facilitated a deal for Defendant LMP with an existing Plaintiff Buyer while still employed with Plaintiff; and that Defendant Kreines solicited and will continue to solicit Plaintiff's Buyers and employees for Defendant LMP's benefit.

### B. DEFENDANT RYAN

5. The Court finds that Plaintiff has sufficiently shown that it will probably succeed on the merits of its claims against Defendant Ryan for breaches of contract (non-solicitation-of-buyers, non-solicitation-of-employees, and non-competition provisions). Plaintiff has also sufficiently shown for this temporary injunction that the relevant provisions of Defendant Ryan's contract did not change after his brief absence from the company.

6. The Court finds that Plaintiff will probably succeed in showing that Defendant

Ryan has made and will continue to make deals with Plaintiff's Buyers.

### C. DEFENDANT LMP

7. The Court finds that Plaintiff will probably succeed in showing that Defendant LMP tortiously interfered with Plaintiff's agreements with Defendants Kreines and Ryan (including their noncompetition and non-solicitation provisions) and will continue to do so.

### D. TRADE SECRETS MISAPPROPRIATED

8. The Court finds that Plaintiff will probably succeed on its claim that Plaintiff's Buyer information, including buyer lists, pricing information, contact information for key-decision makers, the specific asset preferences of those buyers, and the details of the mineral interest purchases of those buyers are Plaintiff's trade secrets ("Trade Secrets"). The Court further finds that Plaintiff will probably succeed on its claim that Plaintiff has taken reasonable measures under the circumstances to keep this information secret, and this information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other people who can obtain economic value from the disclosure or use of the information. The Court further finds that Plaintiff will probably succeed on its claim that Kreines misappropriated Plaintiff's Trade Secrets for his own benefit and the benefit of LMP and will continue to do so.

### E. BREACH OF CONTRACT AND INTERFERENCE

9. The Court finds that Plaintiff will probably succeed on its claim that, as a condition of employment with Plaintiff, Defendants Kreines and Ryan entered into Confidentiality, Non-Competition and Non-Solicitation Agreements with identical terms ("Kreines Agreement" and "Ryan Agreement" respectively, and together, "Agreements").

10. The Court finds that Plaintiff will probably succeed on its claim that Defendant Kreines has breached the Agreement's confidentiality provisions by taking, using, and disclosing

2d. Suppl. CR 336

Plaintiff's Confidential Information for his own benefit and for the benefit of Defendant LMP.

11. In Paragraph 4 of their respective Agreements, Kreines and Ryan agreed to the following restrictions during employment with ES3 and for twenty-four (24) months thereafter:

> <u>Non-Competition; Non-Solicitation of Customers and Prospective Customers</u>. Employee acknowledges that in the course of fulfilling Employee's responsibilities to ES3, Employee will be a representative of the company to, and in some instances may be ES3's primary contact with, existing customers as of the Termination date and prospective customers with whom ES3 has contacted within the 24-month period preceding the Termination date (collectively, "Customers and Prospective Customers"). Employee agrees that the goodwill and relationships developed with ES3's Customers and Prospective Customers is a special, valuable and unique asset of ES3 and should be used for the exclusive benefit of ES3. Accordingly, Employee agrees that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, directly or indirectly, except in connection with Employee's employment with ES3: . . .
>
> (c) induce, solicit or take away (or attempt to induce, solicit, or take away) any Customer or Prospective Customer of ES3 and/or encourage any Customer or Prospective Customer to discontinue or limit its relationship with ES3; … or
>
> (e) divert or discourage any Customer or Prospective Customer from entering into a business relationship with and/or obtaining products or services from ES3.

12. The Court finds that Plaintiff will probably succeed on its claim that: (a) Defendants Kreines and Ryan have breached the Agreements' Non-Competition and Non-Solicitation Provisions by using for their own benefit Plaintiff's' goodwill and that they have diluted Plaintiff's goodwill with Plaintiff's Buyers; (b) Defendants Kreines and Ryan have induced, solicited and taken away (and attempted to induce, solicit, or take away) Plaintiff's Buyers and have encouraged Plaintiff's Buyers to discontinue or limit their relationship with ES3; (c) Defendants Kreines and Ryan have diverted or discouraged Plaintiff's Buyers from entering into a business relationship with and/or obtaining products or services from ES3; and (d) Defendant LMP was aware of Defendant Kreines and Ryan's contractual obligations to Plaintiff and intentionally interfered.

2d. Suppl. CR 337

13.     The Court finds that Plaintiff's list of Plaintiff's Buyers attached to this order[*] (which is marked CONFIDENTIAL) are ES3 customers for whom Kreines was a representative to and did business with on behalf of ES3 during the 24-month period preceding Kreines's termination date of January 31, 2024, and specifically includes the individuals and entities on the list as well as any subsidiaries of those entities that are known to be subsidiaries by Kreines, Ryan or LMP, and thus are within the definition of Customers and Prospective Customers under the Agreements ("**Plaintiff's Buyers**"). If an individual on the list begins working at a new entity, the new entity is not included within the definition of Plaintiff's Buyers, however the individual on the list remains within the definition of Plaintiff's Buyers and prohibitions on Kreines, Ryan and LMP in this order apply to transactions where they have knowledge the individual is personally involved.

14.     In Paragraph 5 of their respective Agreements, Kreines and Ryan agreed to "that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, on behalf of Employee or any other person or entity except ES3, directly or indirectly hire, solicit, induce or encourage (or attempt to hire, solicit, induce or encourage) any employee or officer of ES3 to terminate his/her relationship with ES3, without the prior written consent of ES3." The Court finds that Plaintiff will probably succeed on its claim that Defendants Kreines and Ryan violated their Agreements by soliciting Plaintiff's employees, including Curtis Menchaca, inducing them to terminate their employment with Plaintiff and work for LMP.

---

[*] The attached Plaintiff's Buyers list has not been modified.

15.     The Court finds that Plaintiff will probably succeed on its claim that the Agreements are valid, and the post-employment restrictions recited above were ancillary to or a part of an otherwise enforceable agreement at the time the Agreements were made; ES3 performed under the Agreements; and Defendants Kreines and Ryan violated the Agreements and continue to do so.

## II.     PROBABLE, IMMINENT, AND IRREPARABLE HARM

16.     The Court finds that Plaintiff has shown there would be a probable imminent, and irreparable injury from the actions it seeks to enjoin. Plaintiff has shown the loss of exclusive use of its Trade Secrets, a loss of deals with specific buyers, a decrease in gross profits, and a loss of employees, which is likely to continue unless Defendants are enjoined. Defendants Ryan and Kreines were closely associated with Plaintiff's goodwill, and by their actions they have diluted Plaintiff's goodwill with Plaintiff's Buyers and will continue to do so. Plaintiff's probable, imminent, and irreparable injuries include:

a)  Defendant Kreines's misappropriation of trade secrets.

b)  Plaintiff's loss of goodwill and customers.

c)  Defendants Kreines's and Ryan's breaches of their noncompetition agreements.

17.     Any suit for money damages would not be an adequate remedy of law to protect Plaintiff's rights.

**IT IS, THEREFORE, ORDERED** that, until the time of final trial on the merits:

1.     **DEFENDANT KREINES**, and any person acting in concert or participation with him who receives actual notice of this Order, is commanded forthwith through January 31, 2026, to cease and desist, and otherwise refrain from directly or indirectly:

a)  Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined

above);

b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff; and

c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff; and

d) Conspiring to circumvent the restrictions imposed by sections a–c.

2.    **DEFENDANT RYAN**, and any person acting in concert or participation with him who receives actual notice of this Order, is commanded forthwith through August 23, 2025, to cease and desist, and otherwise refrain, from directly or indirectly:

a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above);

b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff; and

c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff.

d) Conspiring to circumvent the restrictions imposed by sections a–c.

3.    **DEFENDANT LMP**, and any person acting in concert or participation with LMP who receives actual notice of this Order, is commanded forthwith to cease and desist, and otherwise refrain, from tortiously interfering with Kreines and Ryan's agreements with Plaintiff not to:

a) Entering or negotiating any transaction with any of Plaintiff's Buyers (as defined above). This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff;

b) Encouraging Plaintiff's Buyers (as defined above) to discontinue or limit their relationships with Plaintiff. This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff; and

c) Soliciting any of Plaintiff's employees or officers for employment or encouraging them to terminate their relationships with Plaintiff. This expires no later than twenty-four months after Defendants Kreines's and Ryan's terminations of employment with Plaintiff.

d) Conspiring to circumvent the restrictions imposed by sections a–c.

**IT IS FURTHER ORDERED** that trial is set before the Court on October 20, 2025 at 9:00 a.m.

The Clerk of the above-entitled Court shall forthwith issue a Modified Temporary Injunction in conformity with the law and the terms of this Order.

This Order shall expire at such time as this Court enters judgment in this cause.

The bond filed by Plaintiff in conjunction with the prior injunction on December 18, 2024, shall be sufficient for the issuance of this Modified Temporary Injunction.

_____
Hon. Patrick K. Sweeten
Judge of the Texas Business Court
Third Division

DATED: April 7, 2025

# Exhibit A

**CONFIDENTIAL**

# PLAINTIFF'S BUYERS

"ES3 Buyers" shall mean any contact and/or decision maker who is/was associated with the following entities:



2d. Suppl. CR 343

CONFIDENTIAL



CONFIDENTIAL

2d. Suppl. CR 345

CONFIDENTIAL



2d. Suppl. CR 346

# TAB D

## CONFIDENTIALITY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

This CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT (this "Agreement") is entered into by and between ES3 MINERALS, LLC, a Texas limited liability company ("ES3"), and DAVID P. RYAN ("Employee").

Recitals

WHEREAS, Employee desires gain employment as an employee of ES3 and ES3 desires to retain Employee as a Landman;

WHEREAS, during the course of employment, Employee will gain access to Confidential Information (as hereinafter defined), relating to the business of ES3, and ES3 has provided and will continue to provide Employee with Confidential Information so Employee may use same for the exclusive benefit of ES3;

WHEREAS, during the course of employment, ES3 has provided and will continue to provide Employee with compensation, expense reimbursements in accordance with company policy, and contact with customers and employees to assist Employee in developing goodwill for ES3, where applicable to Employee's position; and

WHEREAS, ES3 and Employee desire to enter into this Agreement in order to set forth their rights, limitations and obligations with respect to Confidential Information, solicitation of employees and customers, and the other matters set forth herein.

NOW, THEREFORE, in consideration of the employment of Employee, the compensation paid to Employee, and the access to Confidential Information and customers afforded to Employee, as well as the other mutual promises herein, ES3 and Employee agree as follows:

1.      Definitions. The terms used in this Agreement shall have the following meanings:

        a.      "Competing Business" means any business that: (i) actively solicits mineral and/or royalty owners for the purpose of purchasing their oil and gas interests; (ii) partners with "end buyers" to conduct "simultaneous closings" or "back to back" closings, so as to avoid having any substantial capital expenditure in the transaction; or (iii) acquires Oil and Gas Leases for the purposes of selling those leases for a profit, prior to exploiting by means of drilling for Oil and Gas production; or (iv) is so similar in nature to ES3 that it would displace business opportunities or customers of ES3.

        b.      "Confidential Information" is information acquired by Employee in the course and scope of his/her activities for ES3, both prior to and after execution of this Agreement, that is designated by ES3 as "confidential" or that ES3 indicates through its policies, procedures or practices should not be disclosed to anyone outside the company except through controlled means. Confidential Information includes, without limitation, the identity of and contact information for Current and Prospective Customers (as hereinafter defined), business strategies or plans, sales and/or marketing strategies and techniques, research and development information regarding existing and prospective products and services, financial statements and data, pricing and cost information, billing information, personnel files and employee evaluations, payroll and commission structures and rates, computer programs and software developed by or for ES3, custom enhancements to commercial software, computer access passwords, information and material provided to ES3 by third parties in confidence and/or with disclosure restrictions, and information concerning the services or products offered by ES3 which is not

1

generally known to customers or competitors. The controlled disclosure of Confidential Information to customers, contractors or vendors for legitimate business purposes and the availability of Confidential Information to others outside ES3 through independent means will not remove it from being protected as Confidential Information under this Agreement if acquired by Employee through employment with ES3. "Confidential Materials" means all memoranda, notes, records, reports, manuals, books, papers, letters, customer lists, contracts, software programs, information and records, instructions, guides and manuals, and other information relating to the business of ES3 (whether in written, graphic, recorded, electronic or other tangible form), which contain Confidential Information and which were furnished to Employee by ES3 or otherwise acquired or developed by Employee in connection with Employee's association with ES3.

2. Confidential Information and Trade Secrets. During Employee's employment ES3 has provided and will continue to provide Employee with and/or permit Employee access to Confidential Information and trade secrets applicable to Employee's position under ES3's normal policies and procedures. Employee understands and acknowledges that Confidential Information is highly sensitive and that its unauthorized disclosure could place ES3 at a competitive disadvantage. Accordingly, Employee agrees to use Confidential Information for the exclusive benefit of ES3. Employee further agrees that, during Employee's employment with ES3 and at all times thereafter, Employee and all agents, representatives and third parties acting on Employee's behalf shall:

(a) keep strictly confidential and not directly or indirectly communicate, disclose or use any Confidential Information for Employee's own benefit or for the benefit of any other person, partnership, proprietorship, association, corporation or entity, without the prior written consent of ES3; and

(b) not copy, duplicate, record or otherwise reproduce any Confidential Information, nor otherwise disclose, disseminate or make the same available to any person who is not an employee of ES3 or to any entity without the prior written consent of ES3.

Employee is not prohibited from disclosing information that has already been properly placed in the public domain by ES3 (public domain does not include limited disclosure to a contractor, Customer or Prospective Customer), or from disclosing Confidential Information when compelled to do so by subpoena or similar operation of law if Employee gives ES3 at least ten (10) days' advance written notice of such disclosure.

3. Handling and Return of Confidential Materials. All Confidential Materials are the exclusive property of ES3 and shall not be removed from ES3's premises without the prior written consent of ES3. If removed by consent, such Confidential Materials may be used only for the benefit of ES3 in the ordinary course of business. All Confidential Materials in Employee's possession, custody or control shall be returned to ES3 by Employee, immediately and without demand, upon termination of Employee's employment with ES3 ("Termination"), and shall be returned at any time if ES3 so demands. Employee will not make or retain copies, summaries or abstracts of any Confidential Materials.

4. Non-Competition; Non-Solicitation of Customers and Prospective Customers. Employee acknowledges that in the course of fulfilling Employee's responsibilities to ES3, Employee will be a representative of the company to, and in some instances may be ES3's primary contact with, existing customers as of the Termination date and prospective customers with whom ES3 has contacted within the __ month period preceding the Termination date (collectively, "Customers and Prospective Customers"). Employee agrees that the goodwill and relationships developed with ES3's Customers and Prospective Customers is a special, valuable and unique asset of ES3 and should be used for the exclusive benefit of ES3. Accordingly, Employee agrees that, during Employee's employment with ES3 and for twenty-four

2

(24) months thereafter, regardless of the reason for or manner of termination, Employee will not, directly or indirectly, except in connection with Employee's employment with ES3:

    (a)    directly compete with ES3;

    (b)    have any interest as an owner, investor, shareholder, partner, member, lender, director, officer, manager, employee, consultant, guarantor, representative, or agent or in any other manner whatsoever, directly or indirectly, carry on or be engaged in (or make preparations for carrying on or being engaged in), financially or otherwise, or advise in the establishment of, a Competing Business within the state of Texas; provided, however, Employee may make solely passive investments in any Competing Business up to one percent (1%) of the common stock of which is "publicly held," and of which Employee shall not own or control, directly or indirectly;

    (c)    induce, solicit or take away (or attempt to induce, solicit, or take away) any Customer or Prospective Customer of ES3 and/or encourage any Customer or Prospective Customer to discontinue or limit its relationship with ES3;

    (d)    call on, solicit, perform services for or accept work from any Customer or Prospective Customer for the benefit of a Competing Business with which Employee becomes in any way affiliated; or

    (e)    divert or discourage any Customer or Prospective Customer from entering into a business relationship with and/or obtaining products or services from ES3.

5.    Non-Solicitation of Employees. Employee agrees that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, on behalf of Employee or any other person or entity except ES3, directly or indirectly hire, solicit, induce or encourage (or attempt to hire, solicit, induce or encourage) any employee or officer of ES3 to terminate his /her relationship with ES3, without the prior written consent of ES3.

6.    Reasonableness of Covenants. Employee agrees that the covenants in Paragraphs 2, 3, 4 and 5 of this Agreement are necessary and reasonable, are supported by valid consideration, and are required to protect the legitimate business interests and goodwill of ES3. Employee acknowledges and agrees that enforcement by ES3 of such covenants will not create an undue hardship or unreasonably interfere with Employee's ability to pursue a proper livelihood.

7.    No Employment Contract. Employee understands and agrees that Employee's employment with ES3 is on an "at will" basis and may be terminated by Employee or ES3 at any time, with or without cause. Employee further understands and agrees that this Agreement is not, and shall not be construed to create, any contract of employment, express or implied, which is for a specified term or which in any way otherwise alters the "at will" status of Employee's employment.

8.    No Other Agreements. Employee represents to ES3 that his/her employment with ES3 will not violate any agreement Employee has made that prohibits Employee from disclosing any information Employee acquired prior to becoming employed by ES3. Employee has not previously, and will not in the future, disclose to ES3 any proprietary or confidential information or trade secrets belonging to any previous employer or others. Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement.

3

9. Survival. The agreements and covenants of Employee in this Agreement and the rights of ES3 there under shall survive termination, for whatever reason, of Employee's employment with ES3 and will remain in full force and effect for their stated duration.

10. Remedies. In the event of breach or threatened breach by Employee of any provision of this Agreement, Employee acknowledges that ES3 will suffer immediate and irreparable harm that cannot be accurately calculated in monetary damages. ES3 shall be entitled to (a) injunctive relief by temporary restraining order, temporary injunction and/or permanent injunction; (b) recovery of all attorney's fees and costs incurred by ES3 in obtaining such relief; and (c) any other legal and equitable relief, including monetary damages incurred as a result of said breach or threatened breach. ES3 may pursue any remedy available, including declaratory relief, concurrently or consecutively in any order, and the pursuit of one such remedy will not be deemed an election of remedies or waiver of the right to any other remedy. ES3 has the right to pursue partial enforcement and/or to seek declaratory relief regarding the enforceable scope of this Agreement without penalty and without waiving ES3's right to pursue any other available remedy subsequent to declaratory relief. The assertion or existence of any claim or cause of action by Employee against ES3, whether or not predicated on this Agreement, shall not constitute a defense to enforcement by ES3 of such agreements and covenants.

11. Attorneys' Fees and Indemnification. The prevailing party in any legal proceedings brought by or against the other party to enforce any provision of this Agreement shall be entitled to recover against the non-prevailing party the reasonable attorneys' fees, court costs and other expenses incurred by the prevailing party. Employee shall indemnify and hold ES3 harmless from any and all damages and expenses, including court costs and attorneys' fees, that ES3 may sustain as a result of Employee's breach of the terms of this Agreement.

12. Notification. Employee agrees to notify any prospective entity with which Employee becomes in any way associated after separation from employment with ES3 of the existence and provisions of this Agreement. Employee authorizes ES3 to notify anyone employing or evidencing an intention to employ Employee of the existence and provisions of this Agreement. Employee waives and releases ES3 from any claims, causes of action, or liability arising in connection with ES3's contact or communications with such third parties concerning the existence, terms and enforcement of this Agreement.

13. Notices. Any notices, consents, demands, requests, approvals and other communications required or permitted under this Agreement by either party to the other shall be in writing and delivered personally or placed in the United States Mail, certified or registered, return receipt requested, with postage prepaid, to Employee or to ES3 at the addresses set forth below. Notices delivered personally are effective upon actual receipt; mailed notices are effective as of three (3) days after deposit in the United States Mail. Either party may designate a different address by giving the other party written notice of such change in the manner provided herein.

14. Modification. This Agreement may be modified, altered or amended only by written instrument setting forth the amendment and signed by Employee and ES3 or by court order pursuant to Paragraph 19 (Severability) below.

15. Waivers and Consents. The failure of ES3 to require the performance of any term or condition of this Agreement, or the waiver by ES3 of any breach of this Agreement, shall not prevent the subsequent enforcement of any term or condition nor be deemed a waiver of any subsequent breach. If Employee becomes aware of any breach by ES3 of this Agreement, Employee must give ES3 written notice of the alleged breach within seven (7) days thereof and give ES3 thirty (30) days to cure such

4

422

alleged breach. Employee's failure to provide this notice and opportunity to cure to ES3 will waive Employee's right to assert such alleged breach at a later time.

16.    Assignment. This Agreement is binding upon and shall inure to the benefit of Employee and ES3 as well as their respective heirs, successors, legal representatives, executors and administrators. ES3 may assign this Agreement to any of its affiliates or successors, including any person or entity purchasing all or substantially all of its business and assets or with which ES3 merges or consolidates.

17.    Severability. Should any term or provision of this Agreement be determined by a court to be illegal, invalid or unenforceable, such term or provision will be deemed not to be a part hereof; however, the other portions of this Agreement shall remain in full force and effect. It is the parties' intent that the covenants herein be enforced to the fullest extent permitted by applicable law. Accordingly, should a court of competent jurisdiction determine that the scope of any covenant is too broad to be enforced as written, the parties request that the court reform the covenant to the maximum time period, the largest territory, the broadest scope of activity, or other limitation, which such court would find reasonable and enforceable and which effectively protects the business interests of ES3.

18.    Governing Law. THIS AGREEMENT SHALL IN ALL RESPECTS BE INTERPRETED, ENFORCED AND GOVERNED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. This Agreement shall be construed as a whole, according to its fair meaning, and not strictly for or against ES3 or Employee.

19.    Knowing and Voluntary Agreement. EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS BEEN AFFORDED ADEQUATE TIME TO REVIEW AND CONSIDER THE TERMS IN THIS AGREEMENT, AND EMPLOYEE UNDERSTANDS HIS/HER RIGHT TO DISCUSS ANY AND ALL ASPECTS OF THIS AGREEMENT WITH AN ATTORNEY OR OTHER REPRESENTATIVE OF HIS/HER CHOICE. EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS CAREFULLY READ THIS AGREEMENT, THAT HE/SHE FULLY UNDERSTANDS ITS TERMS, AND THAT EMPLOYEE AND ES3 HAVE ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY ES3 OTHER THAN THOSE CONTAINED HEREIN.

IN WITNESS WHEREOF, ES3 and Employee have executed this Agreement on and with an effective date of October 1, 2017.

ES3:                                  EMPLOYEE:

ES3 Minerals, LLC,
a Texas limited liability company

By: _____            _____
    Edward J. Stanton III, President            Name: David P. Ryan

Address: 13215 Bee Cave Parkway          Address: 202 Duffy Lane
          Suite B-120                        Austin, Texas 78738
          Austin, Texas 78738

5

# TAB E

## CONFIDENTIALITY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

This CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT (this "Agreement") is entered into by and between ES3 MINERALS, LLC, a Texas limited liability company ("ES3"), and NICK KREINES ("Employee").

### Recitals

WHEREAS, Employee desires gain employment as an employee of ES3 and ES3 desires to retain Employee as a Landman;

WHEREAS, during the course of employment, Employee will gain access to Confidential Information (as hereinafter defined), relating to the business of ES3, and ES3 has provided and will continue to provide Employee with Confidential Information so Employee may use same for the exclusive benefit of ES3;

WHEREAS, during the course of employment, ES3 has provided and will continue to provide Employee with compensation, expense reimbursements in accordance with company policy, and contact with customers and employees to assist Employee in developing goodwill for ES3, where applicable to Employee's position; and

WHEREAS, ES3 and Employee desire to enter into this Agreement in order to set forth their rights, limitations and obligations with respect to Confidential Information, solicitation of employees and customers, and the other matters set forth herein.

NOW, THEREFORE, in consideration of the employment of Employee, the compensation paid to Employee, and the access to Confidential Information and customers afforded to Employee, as well as the other mutual promises herein, ES3 and Employee agree as follows:

1.  Definitions. The terms used in this Agreement shall have the following meanings:

    a.  "Competing Business" means any business that: (i) actively solicits mineral and/or royalty owners for the purpose of purchasing their oil and gas interests; (ii) partners with "end buyers" to conduct "simultaneous closings" or "back to back" closings, so as to avoid having any substantial capital expenditure in the transaction; or (iii) acquires Oil and Gas Leases for the purposes of selling those leases for a profit, prior to exploiting by means of drilling for Oil and Gas production; or (iv) is so similar in nature to ES3 that it would displace business opportunities or customers of ES3.

    b.  "Confidential Information" is information acquired by Employee in the course and scope of his/her activities for ES3, both prior to and after execution of this Agreement, that is designated by ES3 as "confidential" or that ES3 indicates through its policies, procedures or practices should not be disclosed to anyone outside the company except through controlled means. Confidential Information includes, without limitation, the identity of and contact information for Current and Prospective Customers (as hereinafter defined), business strategies or plans, sales and/or marketing strategies and techniques, research and development information regarding existing and prospective products and services, financial statements and data, pricing and cost information, billing information, personnel files and employee evaluations, payroll and commission structures and rates, computer programs and software developed by or for ES3, custom enhancements to commercial software, computer access passwords, information and material provided to ES3 by third parties in confidence and/or with disclosure restrictions, and information concerning the services or products offered by ES3 which is not

1

generally known to customers or competitors. The controlled disclosure of Confidential Information to customers, contractors or vendors for legitimate business purposes and the availability of Confidential Information to others outside ES3 through independent means will not remove it from being protected as Confidential Information under this Agreement if acquired by Employee through employment with ES3. "Confidential Materials" means all memoranda, notes, records, reports, manuals, books, papers, letters, customer lists, contracts, software programs, information and records, instructions, guides and manuals, and other information relating to the business of ES3 (whether in written, graphic, recorded, electronic or other tangible form), which contain Confidential Information and which were furnished to Employee by ES3 or otherwise acquired or developed by Employee in connection with Employee's association with ES3.

2. Confidential Information and Trade Secrets. During Employee's employment ES3 has provided and will continue to provide Employee with and/or permit Employee access to Confidential Information and trade secrets applicable to Employee's position under ES3's normal policies and procedures. Employee understands and acknowledges that Confidential Information is highly sensitive and that its unauthorized disclosure could place ES3 at a competitive disadvantage. Accordingly, Employee agrees to use Confidential Information for the exclusive benefit of ES3. Employee further agrees that, during Employee's employment with ES3 and at all times thereafter, Employee and all agents, representatives and third parties acting on Employee's behalf shall:

(a) keep strictly confidential and not directly or indirectly communicate, disclose or use any Confidential Information for Employee's own benefit or for the benefit of any other person, partnership, proprietorship, association, corporation or entity, without the prior written consent of ES3; and

(b) not copy, duplicate, record or otherwise reproduce any Confidential Information, nor otherwise disclose, disseminate or make the same available to any person who is not an employee of ES3 or to any entity without the prior written consent of ES3.

Employee is not prohibited from disclosing information that has already been properly placed in the public domain by ES3 (public domain does not include limited disclosure to a contractor, Customer or Prospective Customer), or from disclosing Confidential Information when compelled to do so by subpoena or similar operation of law if Employee gives ES3 at least ten (10) days' advance written notice of such disclosure.

3. Handling and Return of Confidential Materials. All Confidential Materials are the exclusive property of ES3 and shall not be removed from ES3's premises without the prior written consent of ES3. If removed by consent, such Confidential Materials may be used only for the benefit of ES3 in the ordinary course of business. All Confidential Materials in Employee's possession, custody or control shall be returned to ES3 by Employee, immediately and without demand, upon termination of Employee's employment with ES3 ("Termination"), and shall be returned at any time if ES3 so demands. Employee will not make or retain copies, summaries or abstracts of any Confidential Materials.

4. Non-Competition; Non-Solicitation of Customers and Prospective Customers. Employee acknowledges that in the course of fulfilling Employee's responsibilities to ES3, Employee will be a representative of the company to, and in some instances may be ES3's primary contact with, existing customers as of the Termination date and prospective customers with whom ES3 has contacted within the 24-month period preceding the Termination date (collectively, "Customers and Prospective Customers"). Employee agrees that the goodwill and relationships developed with ES3's Customers and Prospective Customers is a special, valuable and unique asset of ES3 and should be used for the exclusive benefit of ES3. Accordingly, Employee agrees that, during Employee's employment with ES3 and for twenty-four

2

(24) months thereafter, regardless of the reason for or manner of termination, Employee will not, directly or indirectly, except in connection with Employee's employment with ES3:

(a)     directly compete with ES3;

(b)     have any interest as an owner, investor, shareholder, partner, member, lender, director, officer, manager, employee, consultant, guarantor, representative, or agent or in any other manner whatsoever, directly or indirectly, carry on or be engaged in (or make preparations for carrying on or being engaged in), financially or otherwise, or advise in the establishment of, a Competing Business within the state of Texas, provided, however, Employee may make solely passive investments in any Competing Business up to one percent (1%) of the common stock of which is "publicly held," and of which Employee shall not own or control, directly or indirectly;

(c)     induce, solicit or take away (or attempt to induce, solicit, or take away) any Customer or Prospective Customer of ES3 and/or encourage any Customer or Prospective Customer to discontinue or limit its relationship with ES3;

(d)     call on, solicit, perform services for or accept work from any Customer or Prospective Customer for the benefit of a Competing Business with which Employee becomes in any way affiliated; or

(e)     divert or discourage any Customer or Prospective Customer from entering into a business relationship with and/or obtaining products or services from ES3.

5.     **Non-Solicitation of Employees.** Employee agrees that, during Employee's employment with ES3 and for twenty-four (24) months thereafter, regardless of the reason for or manner of termination, Employee will not, on behalf of Employee or any other person or entity except ES3, directly or indirectly hire, solicit, induce or encourage (or attempt to hire, solicit, induce or encourage) any employee or officer of ES3 to terminate his/her relationship with ES3, without the prior written consent of ES3.

6.     **Reasonableness of Covenants.** Employee agrees that the covenants in Paragraphs 2, 3, 4 and 5 of this Agreement are necessary and reasonable, are supported by valid consideration, and are required to protect the legitimate business interests and goodwill of ES3. Employee acknowledges and agrees that enforcement by ES3 of such covenants will not create an undue hardship or unreasonably interfere with Employee's ability to pursue a proper livelihood.

7.     **No Employment Contract.** Employee understands and agrees that Employee's employment with ES3 is on an "at will" basis and may be terminated by Employee or ES3 at any time, with or without cause. Employee further understands and agrees that this Agreement is not, and shall not be construed to create, any contract of employment, express or implied, which is for a specified term or which in any way otherwise alters the "at will" status of Employee's employment.

8.     **No Other Agreements.** Employee represents to ES3 that his/her employment with ES3 will not violate any agreement Employee has made that prohibits Employee from disclosing any information Employee acquired prior to becoming employed by ES3. Employee has not previously, and will not in the future, disclose to ES3 any proprietary or confidential information or trade secrets belonging to any previous employer or others. Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement.

3

9. Survival. The agreements and covenants of Employee in this Agreement and the rights of ES3 there under shall survive termination, for whatever reason, of Employee's employment with ES3 and will remain in full force and effect for their stated duration.

10. Remedies. In the event of breach or threatened breach by Employee of any provision of this Agreement, Employee acknowledges that ES3 will suffer immediate and irreparable harm that cannot be accurately calculated in monetary damages. ES3 shall be entitled to (a) injunctive relief by temporary restraining order, temporary injunction and/or permanent injunction; (b) recovery of all attorney's fees and costs incurred by ES3 in obtaining such relief; and (c) any other legal and equitable relief, including monetary damages incurred as a result of said breach or threatened breach. ES3 may pursue any remedy available, including declaratory relief, concurrently or consecutively in any order, and the pursuit of one such remedy will not be deemed an election of remedies or waiver of the right to any other remedy. ES3 has the right to pursue partial enforcement and/or to seek declaratory relief regarding the enforceable scope of this Agreement without penalty and without waiving ES3's right to pursue any other available remedy subsequent to declaratory relief. The assertion or existence of any claim or cause of action by Employee against ES3, whether or not predicated on this Agreement, shall not constitute a defense to enforcement by ES3 of such agreements and covenants.

11. Attorneys' Fees and Indemnification. The prevailing party in any legal proceedings brought by or against the other party to enforce any provision of this Agreement shall be entitled to recover against the non-prevailing party the reasonable attorneys' fees, court costs and other expenses incurred by the prevailing party. Employee shall indemnify and hold ES3 harmless from any and all damages and expenses, including court costs and attorneys' fees, that ES3 may sustain as a result of Employee's breach of the terms of this Agreement.

12. Notification. Employee agrees to notify any prospective entity with which Employee becomes in any way associated after separation from employment with ES3 of the existence and provisions of this Agreement. Employee authorizes ES3 to notify anyone employing or evidencing an intention to employ Employee of the existence and provisions of this Agreement. Employee waives and releases ES3 from any claims, causes of action, or liability arising in connection with ES3's contact or communications with such third parties concerning the existence, terms and enforcement of this Agreement.

13. Notices. Any notices, consents, demands, requests, approvals and other communications required or permitted under this Agreement by either party to the other shall be in writing and delivered personally or placed in the United States Mail, certified or registered, return receipt requested, with postage prepaid, to Employee or to ES3 at the addresses set forth below. Notices delivered personally are effective upon actual receipt; mailed notices are effective as of three (3) days after deposit in the United States Mail. Either party may designate a different address by giving the other party written notice of such change in the manner provided herein.

14. Modification. This Agreement may be modified, altered or amended only by written instrument setting forth the amendment and signed by Employee and ES3 or by court order pursuant to Paragraph 19 (Severability) below.

15. Waivers and Consents. The failure of ES3 to require the performance of any term or condition of this Agreement, or the waiver by ES3 of any breach of this Agreement, shall not prevent the subsequent enforcement of any term or condition nor be deemed a waiver of any subsequent breach. If Employee becomes aware of any breach by ES3 of this Agreement, Employee must give ES3 written notice of the alleged breach within seven (7) days thereof and give ES3 thirty (30) days to cure such

4

alleged breach. Employee's failure to provide this notice and opportunity to cure to ES3 will waive Employee's right to assert such alleged breach at a later time.

16. **Assignment.** This Agreement is binding upon and shall inure to the benefit of Employee and ES3 as well as their respective heirs, successors, legal representatives, executors and administrators. ES3 may assign this Agreement to any of its affiliates or successors, including any person or entity purchasing all or substantially all of its business and assets or with which ES3 merges or consolidates.

17. **Severability.** Should any term or provision of this Agreement be determined by a court to be illegal, invalid or unenforceable, such term or provision will be deemed not to be a part hereof; however, the other portions of this Agreement shall remain in full force and effect. It is the parties' intent that the covenants herein be enforced to the fullest extent permitted by applicable law. Accordingly, should a court of competent jurisdiction determine that the scope of any covenant is too broad to be enforced as written, the parties request that the court reform the covenant to the maximum time period, the largest territory, the broadest scope of activity, or other limitation, which such court would find reasonable and enforceable and which effectively protects the business interests of ES3.

18. **Governing Law.** THIS AGREEMENT SHALL IN ALL RESPECTS BE INTERPRETED, ENFORCED AND GOVERNED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. This Agreement shall be construed as a whole, according to its fair meaning, and not strictly for or against ES3 or Employee.

19. **Knowing and Voluntary Agreement.** EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS BEEN AFFORDED ADEQUATE TIME TO REVIEW AND CONSIDER THE TERMS IN THIS AGREEMENT, AND EMPLOYEE UNDERSTANDS HIS/HER RIGHT TO DISCUSS ANY AND ALL ASPECTS OF THIS AGREEMENT WITH AN ATTORNEY OR OTHER REPRESENTATIVE OF HIS/HER CHOICE. EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS CAREFULLY READ THIS AGREEMENT, THAT HE/SHE FULLY UNDERSTANDS ITS TERMS, AND THAT EMPLOYEE AND ES3 HAVE ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY ES3 OTHER THAN THOSE CONTAINED HEREIN.

IN WITNESS WHEREOF, ES3 and Employee have executed this Agreement on and with an effective date of August 12, 2019.

ES3:                                         EMPLOYEE:

ES3 Minerals, LLC,
a Texas limited liability company

By: _____          _____
Edward J. Stanton III, President          Name: Nick Kreines

Address: 13215 Bee Cave Parkway           Address: 3501 FM 620 S.
         Suite B-120                                Apt. 14105
         Austin, Texas 78738                        Austin, Texas 78738

5

429

# TAB F

THE COURT: Okay.

MR. MARIN: And that he not carry on in a competing business.

THE COURT: Okay.

MR. MARIN: With respect to Mr. Ryan, he also has a noncompete. You will hear some testimony about that one that's a little bit distinct, because he left our employment for a period of time in 2021 for about a month, and then he came back, and he didn't sign a new noncompete. But the way the noncompete reads, it's still enforceable. There's going to be some argument about that. But those are --

THE COURT: Yeah.

MR. MARIN: -- two distinct noncompetes.

THE COURT: I saw that he didn't sign a new noncompete, and I was wondering about that. So what you're saying is, Yeah, so what? The original was still in full force and effect; right?

MR. MARIN: That's correct.

THE COURT: Okay.

MR. MARIN: Because when he came back, he was doing the same job. We were sharing the same confidential information with him. He was still leading the same part of the company. And -- and it -- the agreement doesn't say -- and there are other parts of

$6.7 million?

A    I did hear that.

Q    Yeah.  Can you tell the Court what customers you have lost over this year?

A    They haven't specified that they're not going to do business with me, but we have done very little deals with Tailwater, very little deals with Mesa. Kevin -- Kevin Christian (phonetic) doesn't even respond to my text messages anymore hardly.  It's a completely different vibe.

Q    Are you -- have you been ghosted by some of your former buyers?

A    Yes.

Q    Let's talk about ES3 and when you founded it. What was the idea behind ES3?

A    ES3 was, like I said, an assembly line.  Before I -- I had an idea to -- a way to appeal to mineral owners and kind of convince them/persuade them to sell their minerals.  And so I designed a assembly line, three different silos, that if I took people and taught them to do very specific tasks within that specific silo, then we could have a service-handoff model to where I can kind of plug and play and hire new people from outside of the industry and give them an opportunity to have exposure to the oil and gas industry

that they never thought possible.

Q   Explain for the Court the three silos that you created.

A   So I -- I created a analyst silo, a producer silo, and a business development silo.

Q   And did you restrict information between those three silos?

A   Absolutely.

Q   Why?

A   Well, I kind of portrayed it as if it's more efficient, but the real reason is to prevent any one person from being able to replicate what I built.

THE COURT:  And so the three silos are analyst, producer, and what was the third?

THE WITNESS:  Business development.

THE COURT:  Business development.  Okay.

Q   (BY MR. MARIN) And was -- did you have an idea with respect to a database?

A   Yes.

Q   Or a software platform more generally?

A   Yes.

Q   When you had that idea, can you describe for the Court what that was?

A   Yeah.  30,000-foot view.  It was a -- a culmination of data that is laid out in a very specific

move forward with you guys because y'all know more than anybody I've ever heard from.

And so we -- we hear that a lot. Once they get the verbal, they -- they send the deal back to the analyst who's the oil and gas kind of person who will get the deal papered up; they'll negotiate directly with the owner. Meanwhile, the producer's over here hunting, getting yeses all day long.

And these are people who we pull from other industries, not oil and gas -- that we pull them from other industries and we give them specific information that they can be really deadly with in the first two weeks on the phones. And so it -- it's a very -- a specific training that -- that we send them to.

But -- so it goes back to the analyst. The analyst is -- their job is to get the deal signed, get the -- get -- get the deal under a letter agreement. Ones it's signed, they need to get the deed in hand, and then they take it over to the business development, and the bus- --

(Reporter clarification)

THE WITNESS: Sorry. I know we're short on time. The --

THE COURT: But you don't need to talk so

fast that you mess up the record. So --

THE WITNESS: Okay.

THE COURT: -- take a breath --

THE WITNESS: All right.

THE COURT: -- and slow down a little.

A So then the business development will be in charge of selling that deal at that time.

Q (BY MR. MARIN) Did you have strict protocols that you enforced with respect to information?

A Yes.

Q I want you to tell the Court about the buyer relationships that you developed over time from the inception to -- to now.

A Okay. So when we first started, I would -- we would get a deal, and then we would send it to a buyer and try to get them to conduct a simultaneous close or back-to-back close. And one -- some of the first comments you will hear when you do that is: Have you closed the deal? And are you the current record title -- record owner? And when you say, No, I've got this guy under contract and I don't have the deal closed yet, they say, Okay, well, contact me when you get the deal closed.

That's very common, and I heard that every single day whenever I first started ES3. We kind of

Q   Is this the handbook or excerpts from your handbook?

A   Correct.

Q   Okay.

MR. MARIN:  We move Exhibit Number 5 into the record, Your Honor.

THE COURT:  5 is admitted.  Plaintiff 5 is admitted.

(Plaintiff's Exhibit 5 admitted)

Q   (BY MR. MARIN) Did -- you had an employment agreement with your employees to protect confidential information; right?

A   Absolutely.

Q   And you had confidential information -- and we -- we're going to argue about these, but I just -- you had a handbook that talked about confidential information?

A   Yes.

Q   And you had protocols to protect your confidential information?

A   Correct.

Q   At some point, you hired David Ryan as -- into your company; correct?

A   That's right.

Q   And what was he hired to do?

A He was hired as a producer initially.

Q Okay. And then did you eventually promote him?

A I did.

Q What did you promote him to?

A Vice president of acquisitions I believe was the title.

Q Showing you exhibit Number P-4-B. Do you recognize this document?

A Yes.

Q Is this the -- an example of enforcing the information pro- -- the information -- the protocol regarding protecting information?

A Correct.

Q Tell the Court -- this is an example of you doing this. Tell the Court what's going on here.

A What's going on is, Mr. Ryan took it upon himself to breach protocol and tried to take a deal that he had gotten under contract and sell it directly to a buyer. And I told him that that is not the way we do things. If you do it again, you're done, and you -- if -- if you have a buyer in mind, great. You have to share it with Nick, though, because he is that silo, he's that person who's our face of the industry.

Q Okay. Did you train Mr. Ryan?

A I did.

those com- -- the company that we hired to help train our salespeople.

THE COURT: Do you seek admission?

MR. MARIN: Yes, Your Honor. We -- we move to admit Exhibit Number 37, which includes both the contract and an e-mail related to the contract, which follows -- which we'll speak to in just a second.

THE COURT: Plaintiff 37 is admitted. Proceed.

(Plaintiff's Exhibit 37 admitted)

Q (BY MR. MARIN) This is an example, you say, of one of the trainings that you -- that you brought on?

A Correct.

Q There's been a -- first, there was a -- a moment in time in 2021 where Mr. Ryan left the company briefly and then came back like a month later; is that right?

A Correct.

Q Tell the Court exactly what happened from your perspective.

A He came in and told me that he was burned out with buying minerals and that he was going to go get into the semiconductor business. And I told him that -- Hey, if it doesn't work out, I'll leave the door open for you. Just come on back and --

Q    Did he came back?

A    He came back a month later.

Q    Was there any document when he left that was --
did he -- did you have to sign any new documents with
respect to payroll, 401(k), or anything like that?

A    No.  We just kept the paperwork in place.

Q    Was it like he just left and came back like a
leave of absence for a month?

A    Right.

Q    After he came back, was his job business as
usual in terms of access to confidential information?

A    Correct.

Q    Was his job still vice president of -- of
acquisitions?

A    Correct.

Q    Eventually, he did leave.  Did you fire him?

A    No.

Q    In -- in August 2023, tell the Court what
happened.

A    So he -- I was monitoring him for a day of
one-on-ones with the producers, and I had become
concerned about his ability to coach, and so I just kind
of wanted to help him.  And this was --

THE COURT:  His ability to what?

THE WITNESS:  To coach producers on the

phone, people who --

THE COURT: Oh --

THE WITNESS: -- you know, the guys who are on the phones.

THE COURT: Okay.

A    And so I wanted to help him.  And at the end of the day -- I was quiet that whole day just listening.  But at the end of the day, I sat down in the conference room with him, and I told him that I needed to have a heart-to-heart with him.  And he kind of cut me off, and he said, "I don't think I'm the right person for this job anymore."

Q    (BY MR. MARIN) The allegation has been made that you fired him because he refused to commit a crime.  Did you do that?

A    No.  That's the first I've heard about that.

Q    Okay.  There was an issue that did arise with respect to the Topaz training materials; right?  Do you recall that?

A    Yes.

Q    What was the issue?

A    We had used the Topaz training materials to create custom training because there was a big disconnect with some of the verbiage and how the training relates to our buyer -- our -- our mineral

buyers, our producers. And so I came up with the idea, Let's transcribe the videos, and let's make them to where they're easier to digest and make it basically our own and train the sales guys that way.

And so I brought it up to David and Adam at the time. David agreed. He assisted me in -- in making those edits to the transcripts before we were going to convert it into a video.

THE COURT: And "David," you mean Mr. Ryan.

THE WITNESS: Mr. Ryan, yes.

THE COURT: Be -- be a little careful on that because if you start -- we need to call the people by the same name.

THE WITNESS: Okay.

THE COURT: It's on -- if this goes up on appeal, it's --

THE WITNESS: Yes, Your Honor.

THE COURT: -- better that Mr. Ryan -- Mr. Ryan rather than David. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you, sir.

A And so Mr. Ryan assisted with that, and then I got a call from him in -- I think it was early August, that he didn't feel comfortable doing it because he

thought we were doing something wrong. And that was the first time I had heard about that. And so I assured him that we have the right to do that under the terms of the contract. And he said, Okay, well, that makes me feel better.

And he was going on a vacation during that time. And so I -- I kind of got -- that night I came home, and I felt like -- I was kind of thinking about it. And so I decided to e-mail the CEO of the training company and let him know that we're going to be modifying the material. And this -- I think what you're showing here is the -- is -- is that e-mail.

Q    (BY MR. MARIN) Is this the e-mail that you sent?

A    Correct.

Q    Exhibit 37.

A    Yes.

Q    Explain to the Court what the gist of this e-mail exchange is. This is attached to our brief so the --

A    The gist is -- I reiterated exactly what I just said, that we're having issues; we're having hurdles with some of the terminology, and that we're --

(Reporter clarification)

THE WITNESS: I'm sorry.

THE COURT: All right. It's admitted. What was it? 19-C?

MR. MARIN: 19-B, Your Honor.

THE COURT: 19-B is admitted. Under the rule of optional completeness, the cover e-mail will be included with it.

(Plaintiff's Exhibit 19-B admitted)

MR. PARKER: Thank you, Your Honor.

THE COURT: All right.

MR. MARIN: No objection, Your Honor.

THE COURT: Thank you.

Q   (BY MR. MARIN) I don't have it here. The -- I thought I did. The -- can you tell the Court who the last -- who the buyers were during the last 24 months?

THE COURT: Hang on.

Mr. Parker?

MR. PARKER: I'm sorry, Your Honor, to interrupt. To just make the record cleaner, I -- we do have a copy of that e-mail, if I may approach and offer it to the court reporter.

THE COURT: I don't think we can do it -- I think you need to scan it.

MR. PARKER: We'll scan it.

THE COURT: All right.

MR. PARKER: Okay. We'll get it during a

THE COURT: All right.

MR. MARIN: I guess we'll deal with it when we're doing the seal motion. That one, Your Honor, is Exhibit Number 3. And we'd offer --

THE COURT: 3.

MR. MARIN: -- Exhibit Number 3 under --

THE COURT: Okay. Exhibit Number 3. And I noticed that there was a -- when you offered your exhibits earlier, 3 wasn't there, so I was expecting it.

MR. MARIN: Yes.

THE COURT: So what they're saying is that this is an AEO document they want to admit under seal, but they want to put it in the record, so it's going to have to be sealed. Any objection to it being admitted?

MR. PARKER: No. No objection.

THE COURT: All right. Plaintiff 3 is admitted. It is under seal. Therefore, we'll have the actual document. We'll have to figure that one out a little bit later, but we'll have it brought in under seal. You may proceed.

(Plaintiff's Exhibit 3 admitted)

MR. MARIN: Thank you, Your Honor.

Q (BY MR. MARIN) Mr. Stanton, when Mr. Kreines resigned, did he -- tell the Court how that happened.

A He just notified me that he feels like his

tenure with ES3 has come to an end, and he sent a resignation letter.

THE COURT: Okay.

Q (BY MR. MARIN) When he sent his resignation letter, did you try to talk him out of resigning?

A I did.

Q Did you make him an offer?

A I did. I made him a substantial pay increase to try to get him to stay with the company.

Q Did you have a dialogue with him about the noncompete?

A Yes.

Q Did you have -- did you send him a severance agreement?

A I did.

Q Did he sign the severance agreement?

A He did not.

Q What did the dialogue on the noncompete say?

A Well, I was trying to figure out where he was going to go because the amount of money that I was paying him was very, very well above market, in my opinion. And so he said that he just felt like the Lord was calling him to something else, and he didn't really give me an answer.

And I said, Well, what are you going to do

about money? Because he and I had -- Mr. Kreines and I had known each other for a long time. And his comment was, I can go start running title with any of my contacts tomorrow if I wanted to. And so I wished him the best, and it was an emotional meeting, and that -- I think that was it.

Q Okay. When -- when Mr. Kreines left, did he take any information with him, to your knowledge?

A Originally, I didn't think so, but, yes, he did.

Q Did you become aware of him e-mailing himself documents from the company to his nak@gmail address?

A Yes.

Q What -- what were those -- those e-mails that he sent himself?

A These were e-mails of -- that -- correspondence that he had with specific buyers, specific ES3 buyers.

Q All right. Let me show you -- let's see here -- bear with me. Sorry. Did he send himself information concerning purchase and sale agreements?

A Yes.

Q And the information that was contained in the document that we reviewed that's entitled DEFS00249512, do you recall that information with respect to having buyer price information?

**CROSS-EXAMINATION**

BY MS. SMITH:

Q   So I have just a few questions for you today, Mr. Stanton.  You've known Mr. Kreines for a long time; is that correct?

A   That's correct.

Q   And prior to Mr. Kreines joining ES3, how did you-all reconnect?

A   We reconnected at a NAPE conference where his ex-company, Dudley, was throwing a party.  And I met him at the Dudley party.

Q   Why did you hire Mr. Kreines?

A   I liked how he could work a room.  And I'm kind of an introvert, and he's an extrovert.  And so I liked his interpersonal skills.

THE COURT:  And the NAPE conference, I know that's a -- I know what the -- I know what NAPE is, but what does the acronym stand for, sir?

A   North American Petroleum Expo, I think.

THE COURT:  I think that sounds right.

THE WITNESS:  I think that's right.

THE COURT:  All right.  You may proceed, Ms. Smith.

MS. SMITH:  And I actually think it's the North American Prospect Expo; is that correct?

THE WITNESS:  That may be right.

THE COURT:  All right.  Very good.

THE WITNESS:  Sorry.

THE COURT:  You may proceed.

MS. SMITH:  Thank you.

Q    (BY MS. SMITH) And so you liked the way that Mr. -- that Mr. Kreines was able to network and -- and build his network; is that correct?

A    I didn't really have any -- any necessarily knowledge of how he built his network.  I literally saw him at the Dudley party, and he was not afraid to go into a group of people and introduce me.  And I was like, that would be nice to have him by my side and kind of, you know, fostering and building continued relationships on the -- on behalf of ES3.

Q    So when y'all reconnected, he -- he took you under his wing and introduced you to folks at his -- at that party?

A    Correct.

Q    And, now, Mr. Stanton, I think you were testifying that maybe 2024 hasn't been the best year for ES3; is that correct?

A    Correct.

Q    And why -- well, let me ask you this:  Do you think that that is attributable to LMP's operation?

A    After looking at the -- the numbers and the amount of deals that we've done with our top buyers, I do.

Q    So your -- your testimony is based on the number of deals that ES3 has done?

A    And to see the influx of deal flow that they've had with those same buyers.  The combination of both leads me to believe that, yes, they have a very big part to do with, you know, this year and, you know, future potential for success for my company.

Q    Mr. Stanton, are you aware of deals that any of those buyers have done with any company that isn't ES3 or LMP?

A    Yes.  I'm aware that those companies do business with other folks.

Q    Do you know how many?

A    I don't.  Other than what Mr. Parker has said. I don't have an exact number.

Q    And so you don't have any testimony about if those -- if those other -- those other companies have had an increase in their deals with those buyers?

A    If those other companies -- which other companies --

Q    You know what, I'm going to ask that better. Let me try again.

A    Okay.

Q    Do -- do you know if those other companies have had an increase in their deals with those same buyers that you call ES3 buyers?

A    Are you -- are you talking about other -- I think I understand your question.  I don't know.  All I can speak to is the responses that we've received in e-mails from those buyers, and it's -- it's a lot colder than it used to be.  And the vibe has changed quite a bit.  So that's really all I can speak to.

THE COURT:  It's a lot -- I'm sorry.  It's a lot -- did you say --

THE WITNESS:  It's a -- it's a little colder.

THE COURT:  Colder.

THE WITNESS:  Before when we would send them a deal, they would get back to us within 24 hours or 48 hours.  Now --

THE COURT:  Okay.

THE WITNESS:  -- they're not -- they're not even getting back to us.  They're just not responding.

THE COURT:  Okay.

THE WITNESS:  And these are companies that we've done multimillion-dollar transactions with.

THE COURT:  Okay.

THE WITNESS:  And they just -- you know, when I review those e-mails that my new business development guy is getting from those trusted buyers --

THE COURT:  Got it.

THE WITNESS:  -- which I've done over the past, you know, week, it's pretty evident --

THE COURT:  Okay.

THE WITNESS:  -- in my opinion.

Q    (BY MS. SMITH) But none of those buyers has said that they're not responding to you because of any work they might be doing with LMP?

A    Of course not.

Q    How many -- how many producers do you currently have at ES3?

A    We have seven producers.

Q    And how many analysts do you have at ES3?

A    Three.

Q    And how many producers have you let go at ES3 this year?

A    I believe one.

Q    And, likewise, how many analysts?

A    We haven't let any analysts go.

Q    And earlier you were testifying regarding the workflow and kind of your system at ES3 in the silos.

documents that you've seen.  Do you have -- have you drawn any opinions in this case?

A    Yes, I have.

Q    Tell the Court what some of your opinions are.

A    So it's clear that the GoldDigger functionality is generally a subset of the Rainmaker functionality. It's clear that the items that were communicated to me as being trade secrets of ES3 have been replicated in the GoldDigger software.  And it's clear to me that the purported time frame in which the GoldDigger software was represented to be developed is not possible in the field of software engineering.

Q    Okay.  Can you tell the Court if these two software platforms look the same when you compare the screenshots?

A    No, they don't.

Q    Okay.  Does that mean that there wasn't software plagiarism?

A    No, it does not.  There --

Q    Explain that to the Court.

A    There are many types of software plagiarism. Academia tends to concentrate on source code plagiarism, but it's one of approximately seven types.  And in short, there are many views and artifacts that are built as part of software application.  One of them is the

comparisons and aspects of a software development life cycle that map across industries.

Q   And so your knowledge of what is a trade secret -- you testified that there were trade secrets. Where -- what made that -- well, sorry.  Sorry.  Strike that.

Do you have any knowledge of the industry that we're talking about here today?

A   Prior to two or three weeks ago, no, ma'am, I do not.

Q   And so the determination of what is or is not a trade secret, that determination was -- was explained to you by Plaintiff in this case; is that correct?

A   Yes, that's correct.  I'm not a lawyer.  I understand the principles of a trade secret, but I'm not qualified to say what is or is not.

Q   You talked a little bit about the review that was conducted last week, and I believe it was actually on Tuesday, not Wednesday.  Was that the first time that you had seen the GoldDigger platform?

A   Yes, that's the first time I had seen GoldDigger.

Q   And that's the only time you've seen the GoldDigger platform?

A   Well, I've -- I've referred to the screenshots

since, and it's the only time live I've seen the GoldDigger platform.

Q   And you did not -- to your testifying about an invoice, you did not see the GoldDigger platform back in April of 2024, did you?

A   I believe the version I saw is the version that's currently in use.

Q   What is that based upon?

A   Because I think it would have been deceptive to be showing me anything else.  I -- I don't know, but I assume it's the version that they're using.  I think that's what was specified to be shown.

Q   So you don't think there's been any updates in GoldDigger in the last six months?

A   I -- I don't know.

Q   You don't know.  Okay.

MS. SMITH:  No further questions.  Pass the witness.

THE COURT:  All right.  Thank you.

Any additional questions for this witness?

MR. MARIN:  Very quickly.

**REDIRECT EXAMINATION**

BY MR. MARIN:

Q   This software development you saw in -- in the documents, it was started while Mr. Kreines was still

# TAB G

THE COURT:  You got to go.

A    -- I guess we'll figure out what to do, but, yeah, for now I'm good to --

Q    (BY MR. PARKER) Well --

A    -- go.

Q    Well, I'll be succinct with this.

Mr. Hatcher, what do you do for a living?

A    I work in the oil and gas business, specifically with minerals and royalty.  And I also am a partner in an oil and gas operating company.

Q    Okay.  With respect to the minerals industry, what -- what do you do in the minerals industry?

A    Yeah.  So I am a broker of minerals.  So what we do is we generate opportunities through our platform, Minerals Guy.  And we are constantly seeking and finding mineral owners that are seeking liquidity, that are looking to sell.  And we find those opportunities, and we then effectively get them under contract, and then we find a buyer for them.

Q    Okay.  Is that the same industry that ES3 and Liberty Minerals are in?

A    Yes, it is.

Q    Okay.  How long have you been in that industry?

A    I started buying minerals in 2018, and I've been in the oil and gas business since I graduated from

Objection sustained. That was closer. But I think that the issue is the -- the parts of the business model. I think that's -- that's where it's pretty broad right now, like -- and, honestly, I'm looking at this in pieces as well, so I'd break it down a little bit more than that so it's -- if you want to ask the question, but it's sustained.

MR. PARKER: Sure, Your Honor.

THE COURT: Okay.

MR. PARKER: And I think this gets to our challenge of: The petition does not break down what about the business model would be a trade secret, but let me take a stab at this further.

THE COURT: Okay. Thank you.

Q    (BY MR. PARKER) In the original petition, Mr. Hatcher, it described a simultaneous close as being unique to ES3 whereby the buyer -- or whereby ES3 acquires from a landowner or mineral owner on the ground and then at the same time closes a deal with a -- with a buyer on the other side. Do you recall that?

A    Yes, I do.

Q    And do you have an opinion as to whether that is a unique trade secret or whether that is general industry knowledge?

A    It's very common in the industry. I actually

employ that method often in my business.

Q    Okay.  And you also saw from Mr. Stanton's deposition where he described a pricing method.  Do you recall that?  Which he calls BO to PO; right?

A    Yes.  Yes.

Q    Okay.  And do you have an opinion about whether that is a unique trade secret, or is that general industry knowledge?

MR. MARIN:  Objection, Your Honor.  Lack of foundation.

THE COURT:  Well, he says he's -- okay. He said that he's an industry expert, that he's presented -- he has a vlog, I guess.  That's the first time I've used that word in conversation.  I don't --

MR. MARIN:  I'm sorry.  A what, Your Honor?  I didn't --

THE COURT:  He's got a vlog.  He's got a video thing that he does, and he's got 66 of these that he's put up, and he's testified in front of the Montana Board of Oil and Gas.  So I'm not seeing why that's -- why that's no -- why he can't testify as to that.

MR. MARIN:  Well, Your Honor, if --

THE COURT:  The pricing method.

MR. MARIN:  It's what he's talking about when it's the underlying material that he's referencing

that I'm objecting to. We haven't established what that is.

THE COURT: Okay. All right. So I -- he's qualified to talk about it. Just -- I think let's be a little -- it's -- it's sustained. Let's -- a little more specific in terms of the underlying pricing method.

MR. PARKER: Sure. Sure, Your Honor.

Q (BY MR. PARKER) You reviewed Mr. Stanton's deposition in which he talks about his preferred pricing method for acquiring minerals from landowners; right?

A I saw some references to -- to -- yes, how they -- they generate a value that they can then present through an offer. To -- to -- yes.

Q And what was that description?

A There were references to, effectively, a multiple of cash flow analysis, right, which there are a few different methods of -- of valuation of -- of -- of mineral rights. Multiple cash flow analysis being one of those methods, the most simplistic method that there is.

There -- there was reference to, you know, so-called BO to PO -- which I'm assuming from, you know, my review of the deposition testimony that that's effectively a derivative of a multiple of cash flow

analysis where instead of saying, you know -- instead of offering, you know, X number of months, right, to pay out, they're saying to the -- to the potential seller, Hey, it would take you 60 months to achieve the level of value that I'm offering you in this number; right?

All -- all it does is just convert it to barrels and say, These wells would have to recover X number of barrels of oil, right, for you to achieve the value that I'm offering you today.  That -- that was my understanding from the deposition.

Q    Sure.  And do you have an opinion about whether that is a trade secret, or is that consistent with general industry practice?

A    I believe that a multiple of cash flow analysis is -- is as basic as it gets.  And the BO-to-PO analysis is just a simple derivative of that.

Q    And you also, from Mr. Stanton's deposition testimony that you reviewed, saw his practicing of siloing various departments; right?

A    That's correct.

Q    Okay.  And can you describe for me kind of what -- what he does?

A    Yeah.  Sure.  From my review of the deposition testimony, it looks like he divides roles within his organization between analysts, you know, folks who are

two silos rather than three, right, where you've got -- the salesperson understands the number that they can offer but they don't understand much more than that; right?

And it allows them to go into that interaction blind, so to speak, if that makes sense. And then we get a response from the seller, and then it goes back to whoever is performing the analysis, and it -- it just maintains objectivity through the process.

Q    (BY MR. PARKER) Now, from your investigation, do you know what Liberty Minerals does?

A    I don't believe that they use the same silos that ES3 used. I believe that they have folks that -- that, you know, specialize in different roles; right? But the strict siloing of information between departments is not something that I gleaned from the deposition testimony that they are doing.

Q    Now, when we talk about this industry, you described it briefly. But fundamentally, what are ES3 and LMP and other companies like it doing?

A    Yeah. So here's the way that I described the industry. And I did this in my -- in my deposition last week. But if you imagine the minerals business as a pyramid, right, where the base of the -- the first level of the pyramid are all of the individual owners of

mineral rights in the country; right?

So they -- those could be, you know, individuals or trusts or family-owned companies; right? They sit at the base of the pyramid; right? And -- and one level up from that would be the -- these so-called broker aggregators; right? Like myself, like ES3, like LMP.

And if you take a step up from -- from there, you -- you -- the so-called private-end buyers, and at the top of the pyramid, you have the public companies, publicly-traded-end buyers of mineral rights. And so, generally, the deals flow up; right? They flow up from the base of the pyramid, you know, to -- you know, up -- up to the end buyers.

And -- and that's not a -- in the strictest sense, that's not the way that every deal closed, but if you're trying to envision, you know, how these transactions are flowing, right, they flow from individual landowners, you know, to broker aggregators and up to end buyers; right?

And so ES3, LMP, and myself really sit in that, you know, so-called broker aggregator position on the triangle.

Q    Okay.

A    Or pyramid, rather.

Q   Right.  So is that part of the oil and gas industry?

A   I would -- I'd say yes and no; right?  It's -- it's adjacent to.  And a great example would be, for example, a real estate broker; right?  A real estate broker is -- is buying and selling homes that are trading the dirt; right?  Whereas, the broader oil and gas industry would be like homebuilders, for example, general contractors; right?  So they're related, right, and -- and there are similarities throughout both, but they would be distinct industries, in my view.

Q   Okay.  Now, what does it take to be successful in the mineral-interest trading industry?

A   A lot of things.  You have to be able to find opportunities.  You -- you know, very importantly, you know, salesmanship is -- is critical; right?  So not only do you have to know who owns what, right, who owns these mineral right -- these mineral rights, who are your targets, right, you also -- at the end of the day, you have to convince that mineral owner to part ways with their property; right?

So this is -- it's not like traditional sales, right, so to speak, where I'm trying to sell something to somebody.  It's reverse sales, right, where, you know, it -- it can be -- it's difficult;

right?  These are covenant assets to a pretty large degree.  And so it's -- it -- it takes a -- a couple of difficult things to be successful.  You have to be able to find people.  You have to be able to generate leads; right?  But you also have to do -- be pretty good at sales.

Q   And so if you don't convince the mineral owners on the ground to sell their mineral interests to you, then I guess you have no assets to -- to pitch to a buyer?

A   Yes, that's correct.

Q   And how many companies are there out -- are out there buying and selling their mineral -- or buying and selling mineral interests in Texas?

A   I don't know the exact number, but that is -- we talked about this in my deposition.  That number is -- is nullable, I suppose.  You could do that research in the public records to figure out, you know, all the mineral transactions in the state of Texas and how -- exactly how many buyers there are.  But I would estimate it would probably be about a hundred, the buyers of mineral rights.

Q   So on this pyramid -- let's talk first about the -- the buyers, the folks who were above these broker aggregators on your pyramid.  Who are these buyers?

A    Yes.  So they are, like I mentioned, right, both private and public companies.  The publics are the biggest; right?  And bigger companies want bigger deals.  But in the kind of private-end-buyer space, you've got companies that are privately funded.  You know, family offices are -- are in the space.  You've got private equity companies that are buyers, and that -- that's a pretty good description of the universe of buyers.

Q    Is there anything -- anything secret about who these buyers are?

A    No.  Not at all.  These -- they are -- the buyers want everybody to know that they are in the business of -- of buying and selling minerals and -- and that -- the reality is that in order for -- because of the statute of (audio distortion), right, in the state of (audio distortion) and elsewhere.

(Reporter clarification)

THE COURT:  Hang on.  Statute of frauds.

Hang on, sir.  We lost you right -- just said -- you said because of the statute of frauds, and then you broke up a little bit.  So if you'd start right there.

A    The requirements for recording, right, in order for real property transfers to be effective against third parties, right, all of these transactions are

recorded in the public records of the county where the property is situated; right? And, you know, those deeds tell you exactly who it is, right, who's -- exactly who the buyers are; right? So the idea that the buyers could somehow be confidential, right, in -- in some is -- is -- it just doesn't make sense, right, because they're out there -- the -- literally the world to see.

Q (BY MR. PARKER) So if I want to figure out who a buyer is, do I need to run down to the courthouse?

A No, you don't. I mean, most courthouses are -- have -- have their records available online today. So you -- you can -- you can do it pretty easily. The other thing that I'll say is that, in the mineral-rights industry, you know, there are a number of events that take place, networking opportunities, conferences, and all of these buyers -- I mean, what they want is deal flow at the end of the day. They want the -- the world of mineral sellers and brokers to know that they are open for business so that they can have the opportunity to purchase those.

Q From the standpoint of the broker aggregator, is there anything secret about how much a buyer will pay for a mineral interest?

A If you want to know what a buyer will pay for an interest, all you have to do is call them.

Q   Okay.  So -- so who's competing for whose business here between the broker and the buyer?  Is -- are -- are the brokers competing for a buyer, or is it the buyers who are actually competing for deals, to get deals from the broker?

A   The buyers are competing for all the deals that they can get their hands on, and they don't really care where it comes from.  So brokers -- a lot of these (audio distortion) -- large pools of capital.

(Reporter clarification)

THE COURT:  Hang on, sir.  Hang on.  Hang on.  Hang on.  Stop.  You broke up a little bit.

THE WITNESS:  Yeah.

THE COURT:  You were saying before the large pool of capital -- you broke up a little bit.  So the buyers -- we understand that the buyers are competing for all the deals they can get their hands on.  Start right there and slow down just little bit because you broke up and my court reporter couldn't hear you.  We're trying to make a nice, tidy record.  Okay?

THE WITNESS:  No problem.

THE COURT:  All right.  Thank you.  Go ahead.

A   So the buyers are managing these large pools of capital; right?

THE COURT: Large pools of capital.

A   And they -- they need as many deals as they possibly can so that they can spend that money. So they are very hungry for opportunities, and they're not particularly -- they don't care where the opportunities come from.

Q   (BY MR. PARKER) So that's why a buyer was sending Nick Kreines tomahawk steaks like you saw in the petition; right?

A   I don't know the specific reason that the buyers sent him those stakes, but you can interpret it to say: Thank you for bringing me this deal. Please bring me another one.

Q   And so a broker like yourself or like ES3 or -- or like LMP, does it own a buyer?

A   I've seen a lot of reference to ES3's buyers with a possessive -- like "ES3's buyers." They're not ES3's buyers. They're buyers. They are buyers in the market. But the idea that ES3 could possess those buyers in some way doesn't make any sense.

Q   So is the key here to -- to be a mineral broker aggregator, in your view, to have an inventory of mineral interests to sell to the end buyers?

A   Yes.

Q   Okay. So how do these companies identify who

has a mineral interest that may be willing to sell?

A    Yes.  So in different states it happens different ways.  But in Texas -- primarily (audio distortion) Texas loves property tax, as I'm sure all of you well know.  And minerals are -- producing minerals are taxed at -- and the -- the county tax assessor maintains a record of every -- every producing mineral owner's interest in the state of Texas, and -- and they're commonly referred to as the tax rolls; right?  So it's very easy to determine who owns minerals in the state of Teas and what exactly it is that they own.

Q    Okay.  So then once you've identified who owns minerals, what do you do?

A    You would contact (audio distortion) for those individuals, and you would call them.

Q    Just cold calling?

A    Cold calling, yes.  That's it.

Q    Okay.

A    Now, there are other methods; right?  You could send a flyer in the mail.  You could -- you know, you could show them a Facebook ad, for example.  There's different methods of outreach, but cold calling is very common.

Q    Okay.  And then how do you know how much to offer the mineral owner for their minerals?

A    Well, you could use one of the valuation methodologies that are common in the industry, including a multiple cash flow analysis.  Or if you had an interested seller, you could call a buyer and ask them what they would be willing to pay.

Q    As far as a multiple of cash flow analysis or any other mathematical formula that you use, what -- what are the inputs -- what -- what is the data that you need to fill that out?

A    Yeah.  So the first thing that you have to understand is how much revenue that owner is generating from their -- from their mineral rights.  And there are a couple of websites that you can use that will do that math for you, but it's a simple calculation of volume times their decimal interest, times the price of oil or natural gas.

Q    Okay.  And where do you get that information?

A    Yep.  So volume is state-reported volume, right, to the -- every operator in the state of Texas who's going to report production (audio distortion) to the Texas Railroad Commission.  The decimal interests come from the tax rolls.  And the price, you could get that information from a number of different places, CME, the Wall Street Journal, or energy -- the USIA, Energy Information Administration.

Q    So who knows about this?  Who knows where to
get this information?

A    Everybody does.

Q    Okay.  And does everybody price the same way?

A    Some folks use more sophisticated methods for
valuation, including either discounted cash flow
analysis or DCF analysis, and they do more reserved
engineering for technical evaluation.  But, yes, you're
either using a multiple of cash flow analysis which is
very simplistic -- you -- there's also acreage analysis
where you could compare one tract to another tract.  And
then the most complicated is -- is DCF or discounted
cash flow analysis.

Q    But are either of the parties in this case
using a DCF analysis?

A    No.

Q    Okay.

A    Or not that I know of, rather.

Q    Okay.  So if I wanted to start over and -- and
change careers and start buying and selling mineral
interests, is there something out on the public sphere
that would tell me how to do it?

A    Yeah.  You could watch -- you could watch a
bunch of my videos and you'd get a pretty good idea of
how to do it.

Q   Okay.  And if somebody wanted to start a new company with the information that's publicly and readily available and with the knowledge -- the knowledge that is generally known in the industry, how long would it take them to start buying and selling minerals?

A   Not very long.  With general industry knowledge, in a matter of weeks potentially.

Q   You've seen Mr. Stanton's description of ES3's software platform, which it calls the RainMaker; right?

A   That's correct.

Q   Okay.  Do you have something similar that does the same thing?

A   I use a couple of different tools, but yes.

Q   Okay.  What are those tools?

A   Yes.  So I have a CRM called GoHighLevel that I've customized to my needs which allows me to draft my communications with mineral-rights owners/potential sellers.  I have a subscription to Enverus, which is what I use to find production information, productivity information about wells, permits, permit information, and to generally understand the productivity of specific minerals.

And then I also use in Texas a service called mineralholders.com, which is an amalgamation of all the tax rolls in the state of Texas, and it allows

me to see how much revenue each owner is generating.

Q    Okay.  And are these subscription services?

A    Yes, correct.

Q    And these subscription services, what's the difference between them and what they enable you to do and what ES3's software platform enables it to do?

A    ES3's platform amalgamates data from public sources that it allows their analyst to identify certain target areas and to track their communications with potential sellers.  Some of the calculations that I do are -- are manual compared to what ES3 has automated. But beyond that, the calculations are fairly simplistic. They're not, you know, huge complex algorithms.

THE WITNESS:  It's -- it's -- the way that I explained it, Your Honor, is -- is:  In this business, we all have to get to the same answer; right?  We -- we -- we have to get to net royalty acres.  We have to get to cash flow.  We get there in different ways, so to speak, but none of -- all of us are doing it the same way, if that follows.

THE COURT:  Yes, it does.

MR. PARKER:  Pass the witness, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Marin, do you have any questions for this witness?

Q    You --

A    -- easier.  I'll say that it doesn't make -- the business is simple.  It's not easy.

Q    You haven't seen the paperwork used by LMP or ES3 to paper the acquisitions or the vestitures, have you?

A    No, I've not.

Q    Do you have --

A    But what I can say from my personal experience --

Q    Your --

A    -- is that --

THE COURT:  Okay.  Here's -- here's -- here's -- here's what I'm going to say.  I'm fine for you to ask your questions, but you have got to let him answer.  When you're talking over him, then I'm going to start getting my court reporter upset.  So please let him finish his answers.  Okay?

MR. MARIN:  Okay, Judge.

THE COURT:  This -- guys, I know you -- this is all -- this is not rocket science, and it's not even news.  Okay?  So let's let him finish his answers.

All right.

MR. MARIN:  Okay.

THE COURT:  You may proceed.

there's a confidential-information provision; right?

A    I believe that there is.  I haven't seen that agreement in a little while.

Q    Okay.  And you know there's a noncompete?

A    Yes.

Q    And there's a nonsolicit?

A    Yes.

Q    When you left employment in 2021 from ES3, you went -- you were gone for about a month; right?

A    That is correct.

Q    And when you came back, you had the same job?

A    Yes, that is --

Q    And --

A    -- correct.

Q    And you were vice president of minerals; right?

A    Not at that time.

Q    You were promoted to vice president of minerals shortly thereafter; right?

A    It was -- I would need to know how you define "shortly."  I was in acquisitions for quite a while after I came back.

Q    When you came back, you had the same job?

A    As an acquisitions person, yes.

Q    And you still had access to the RainMaker?

A    That is correct.

different departments communicating.

Q   Every single deal that has closed with LMP has been with a buyer that Mr. Kreines knew before joining ES3; correct?  I'm sorry, LMP.

A   That is correct.  It's all been buyers that have reached out to him.

Q   And you've closed 28 deals?

A   That is correct.

Q   And you didn't do any research to find what buyers were in the particular markets where you were going to operate, did you?

A   Yes, I did.  And -- and we haven't closed 28 deals.  I want to correct that.  We have 28 deals that have been under contract, not all closed yet.

Q   But you made $6.7 million?

A   That is correct.

Q   And you sent an e-mail to a developer in India to ask them to create a software database; right?

A   I posted a job on Upwork, which is a platform that is designed to find developers.

Q   The Upwork -- you heard the testimony of Dr. Gianturco yesterday; right?

A   Yes, I did.

Q   Do you dispute that everything that you asked that developer to do for you for the GoldDigger is

something that is doable on the RainMaker?

A    I am not privy to other departments and what they were able to do with the RainMaker.

Q    You were partnering with Jettie Rangel and Nick Kreines at the time you sent that e-mail, weren't you?

A    I was partnering with Jettie.  I did not know what Nick Kreines was going to do, if he was going to join us or not.

Q    This is a month -- you sent that e-mail a month and a half after this video I'm showing; right?

A    I sent which e-mail?  I -- sorry.

Q    The Upwork chat regarding the requirements.

A    I sent the Upwork -- I posted a -- a job ad on Upwork.  I believe it was in December after Mr. Tewksbury informed us that he was not going to have time that he thought he would have to work on this project and that he did not have anything that was available to show us of the work that he had done so far.

Q    You could have purchased software off the shelf; right?

A    Yes.

Q    You chose not to?

A    Correct.

Q   You -- you were talking to Mr. Mark Tufts about the commission agreement that he sent you in November, the commission agreement that he had with ES3; correct?

A   Mark Tufts sent me a text or called me and asked me for my e-mail address.  I gave it to him.  He sent that over.  I don't even think that I opened that agreement.  And I called Mark and asked him to please not send me anything else related to ES3.

Q   But you were speaking as an LMP representative to an ES3 employee.  In fact, ES3's top producer; correct?

A   I don't think Mark Tufts was the top producer at that time.  But Mark Tufts was also a good friend of mine and was a friend of mine before either one of us worked at ES3.

Q   You recall the -- the spreadsheets that we put up on the screen yesterday that showed Mark Tufts being the top producer, don't you?

A   Those spreadsheets were from March of 2022, I believe, and the top producer changed -- or 2023.  My apologies.

Q   Right.

A   The top producer changed pretty frequently.  Curtis Manchaca was the top producer after that.

Q   And you spoke to both of them.  Both of the top

producers at ES3, you were in contact with; right?

A    I was in contact with them on a friendly basis. I hired Curtis, and he called me because he was not happy.

Q    And when you hired him, you knew he had an agreement?

A    I did know that Curtis had an agreement, correct.

MR. MARIN:  Your Honor, I'm going to pass the witness because I'm going to reserve my time.  I'm going to introduce the exhibits later as -- as per our earlier discussion --

THE COURT:  All right.

MR. MARIN:  -- just in the interest of time.

THE COURT:  Thank you.

Mr. Parker, do you have any questions for this witness?

MR. PARKER:  Yes, Your Honor.  Thank you.

**CROSS-EXAMINATION**

BY MR. PARKER:

Q    Mr. Ryan, before joining ES3, what was your job experience?

A    I had been in sales my entire career from the time I was 18 years old.

Q   And what was your job at ES3 in a nutshell?

A   My job at ES3 was to call mineral owners based off of leads that were provided to me and pricing that was provided to me and make cold calls and try to find people that I could convince to sell their minerals.

Q   Did you sometimes call someone and they just didn't want to sell mineral interests to you?

A   It happened all of the time.

Q   How many people would you have to talk to before you got one who wanted to sell a mineral interest?

A   It was somewhere right around a thousand phone calls to get one person under contract.

Q   Now, if you -- if you got somebody who was interested, how did you -- you know what price to offer?

A   The price was input in the system by our analyst.  So I -- I gave them the price that was provided to me.

Q   What access did you have to ES3's software, the -- the RainMaker platform?

A   I had access to the acquisitions department, which was the -- the salespeople.

Q   Okay.  Now, did you have any role in developing the RainMaker?

A   Mr. Stanton and I were friends before I joined

ES3, and there was a -- a time back in 2017 before ES3 was started, I believe, or as he was starting it, where he invited me out to his father-in-law's ranch with some other buddies and asked me a lot of questions about how CRM systems work and -- and, you know, how to track notes and -- and correspondence with potential customers.

(Reporter clarification)

Q    (BY MR. PARKER) And did Mr. Stanton use that information?

A    He developed a database that also had CRM functions, yes.

Q    What all did you suggest --

A    He asked me questions like, Should I build a database?  I asked him how he was doing things at that time.  He said that he was using spreadsheets, looking up phone numbers.  I talked to him about my experience working at CAE, which is a semiconductor trading firm.  I explained to him how much data had been captured over years and years of talking to the same customers and how much value -- how much value there is in doing that, as well as the ability to schedule follow-up dates and record all of your correspondence for future communications.

Q    In any event, does RainMaker have those kind of

features?

    A    RainMaker does have those kinds of features.

    Q    Now, while at ES3, did you receive any kind of training?

    A    I received, as an acquisitions person, a script and was told to -- to read through the script, learn it. A few hours later Mr. Stanton came in and went through the script with me a couple times, and then he had me sit in his office and listen to him make phone calls for half a day. After that, I was handed a phone and some leads, and -- and said, I think you got this.

    Q    Any other training?

    A    Not as an acquisitions person early on. In the future after I became the VP of acquisitions, Mr. Stanton brought in a third-party training company called Topaz to do some sales and sales management training with the entire team.

    Q    In what way was this -- was the work that you did for ES3 similar to sales work that you had done in the semiconductor industry?

    A    The semiconductor industry I -- I did simultaneous closings or -- or the arbitrage model. So my goal or my job there was to go find underpriced or un- -- underutilized semiconductor manufacturing assets globally and get all of the details on those assets and

then go out and find a buyer, negotiate contracts on both sides, have the buyer from the transaction so we -- we closed with the buyer prior to closing with the seller.

Q    Now, when you went over to ES3, where were you working?  You were working at your home here in Austin.

A    At -- at ES3 we were working in an office off of Bee Cave.

Q    Okay.  But to where were you making calls?

A    I was making calls until COVID.  So for the first year and a half, I was working out of the office in Austin and then working from home.

Q    Who were the landowners that you were contacting?

A    I was contacting mostly people in the Permian Basin, exclusively in the Permian Basin and as an acquisitions person.  Sorry.  I -- I misunderstood the question.

Q    Sure.  Now, over the past two years, how has the sales force at ES3 changed?  We talked about Mark Tufts.  We talked a little bit about Curtis Manchaca.  How -- how has the sales force otherwise changed?

A    Yeah.  So I -- I was the first salesperson hired in 2018 other than Mike Beck (phonetic), who was

in acquisitions at the time that I was hired. Shortly after I was hired, Mike came to me and said, I don't know how you do what you do, but I'm not cut out to be a salesperson; I'm going to go be an analyst. Shortly after that, Mark Tufts was hired as the second salesperson after ES3 was formed.

And we had a couple of people kind of come and go in the first few years. I don't think we ever grew beyond four salespeople. After I was promoted, I was put in charge of growing the sales team, hiring, training. And I eventually grew the sales team to 11 producers and a manager that worked under me.

Since then, all 11 of those producers, to my knowledge, are no longer working there. The manager that was working under me has been moved to a different department, and my understanding is that they've had several people come and go other than the ones that I know.

Q    Among the people that -- who has come and gone is you. And you indicated on -- on -- a moment ago, when answering Mr. Marin's questions, that you were fired. Can you tell me why you were fired?

A    Yes. After Topaz finished their six-week training program, I was asked to rewrite a lot of their training. Some of it made sense, and I -- and I could

agree with it, like structuring questions to mineral owners to fit our market. And I -- I did that working on intro statements for phone calls, worked on those sorts of things.

But then I was asked to copy all of Topaz's training material and rewrite it as ES3's own to be used. Mr. Stanton was going to hire an animator and a voice-over person and build training videos using -- using Topaz's material to use it to train new salespeople.

Q    And you refused to do that?

A    Yes, sir.

Q    Okay. Now, did you leave immediately, or was there a wind-down period?

A    I -- I voiced my concern about rewriting that material to Mr. Stanton. The next day, he came in, explained to me that he thought about it, asked Mr. Mongole, who was his in-house counsel, and myself to go sit in the conference room with him. We read through the -- the contract.

He asked Rob if there were any legal ramifications with doing what -- what he was asking me to do. Mr. Mongole -- I'm sorry -- not Rob. And Mr. Mongole read through the contract and said, You know, if we get sued, I think we would win. Mr. Stanton

the next day came to me and explained to me that he reached out to the owner of Topaz and had their blessing to go ahead and do it.

I didn't see any correspondence e-mails, and he told me there was a phone call. A few days later, Mr. Stanton sat in on my one-on-one meetings with the salespeople. After those meetings were over, he expressed that I didn't talk enough about philosophy, which was one of the big Topaz training points, and that's when I was let go.

Q    Was there any opportunity for you to take confidential information?

A    No, sir. We left from the -- from the conference room out to the car.

Q    And conversely, was there any opportunity to look through your computer and identify anything that had been on your computer from ES3 and have ES3 take it off?

A    There was not. I never accessed that computer again after that moment.

Q    So after you left ES3, what -- what did you do?

A    I went home and told my wife what happened. I have two kids that are homeschooled, and I told her for -- for that moment I wanted to take advantage of not having anybody to answer to for the first time since I

was 18 years old. And we went on a ten-day camping trip to New Mexico.

Q    And then what'd you do?

A    After that, I came home and got to work on starting LMP.

Q    How'd you -- how'd you get to work starting LMP?

A    I sourced tax rolls from county records. I thought that Mr. Tewksbury was working on a database for me. I sent him a lot of those tax rolls, sorted the tax rolls, and found out shortly after that -- that no work had been done. I, frankly, extremely luckily, had a gentleman from Mesa reach out to me on LinkedIn and express an interest in working with me. I ignored that request at first, and he reached out once again and asked me to just give him a call, so I did.

After I called him, he put me in touch with his vice president of acquisitions and said that they wanted to work with me on what's called an AMI. And within a couple of days, we had an AMI in place.

Q    So let me ask you a couple things. You talked about Mr. Tewksbury. In the event, did Mr. Tewksbury ever build anything for you?

A    Mr. Tewksbury explained to me that he had done some coding, but he didn't have anything of relevance to

be able to show me. He apologized and said, I'm so sorry. I know this puts you in a bind. You've been relying on me, but I've been too busy with my full-time job to be able to put as much work into it as I expected to.

Q    And going back, then, to Mesa, what -- what is an AMI?

A    An AMI is an area of mutual interest. And --

Q    So what is an area of mutual interest?

A    An area of mutual interest is -- basically, a buyer that would buy from a broker, provides legal descriptions in their pricing that they're willing to -- to buy an interest for and a specific section of land. And they send me -- and in Mesa's instance, it's on a Smartsheet -- they've asked me to go pull the tax rolls for each of those sections, identify the owners, calculate what they own, make an offer per -- on a per-net-royalty-acre basis, after calculating their exact royalty acres, and pull contact information to -- to reach out to those folks. So it was -- it was my job to get those people under contract, and then I had an agreed-upon price to sell it for.

Q    Sure. So -- and under that agreement, you will exclusively sell to them; right?

A    That is correct.

Q   Okay.  But they may not buy exclusively from you; they may buy from other people?

A   They buy from lots of other people, yes.

Q   Sure.  And how many mineral-interest owners did you try to contact before you got to your first yes?

A   It was several months, so likely several thousand owners.  I typically make 80 to 115, 120 phone calls a day when I'm on the phones.

Q   How many -- in addition to Mesa, how many AMI agreements does LMP currently have?

A   We have one other agreement.

Q   Okay.  Does ES3, in -- in your experience, do any AMIs?

A   My understanding was ES3 did not have any AMIs in my time there.

Q   And in the past year, have -- has LMP ever gone up against ES3 for the same mineral interests?  Have y'all ever been in a bidding war against one another?

A   Not that I am aware of.  I've never had a mineral owner express to me or any of our salespeople that we're also -- that they were also working with ES3.

Q   We've heard a lot about how ES3 silos its employees in different departments.  Do y'all do the same thing?

A   We do not.

Q   Why not?

A   I -- I got into sales in the Larry Miller organization, which was a 4,000-employee organization. And Larry Miller's model was train your replacement if you want to get promoted.  My goal was always to get promoted, and I was always training people behind me. And I just feel like, one, it builds distrust; and, two, that knowledge is power.  I want my -- my employees to know as much as they possibly can.

Q   And how do -- when -- when y'all are talking, then, to sellers of mineral interests and trying to acquire the mineral interests, how does LMP price out a deal to that seller?  And does that differ in any way from what ES3 does?

A   I -- I'm not privy to how ES3 priced their offers.  I -- I was not a part of that department, but our pricing is based mainly off of our agreements with our AMI partners.  So they provide the pricing to us.

Q   So LMP's not really using any formula?

A   No.

Q   Does LMP have any sales notes from ES3?

A   No.

Q   Did you take any documents when you left ES3?

A   No.

Q   Do you know any mineral-interest owners that

Q   You talked on direct examination about the software program and how you acquired it.  Let me -- let me just ask it plain.  Is GoldDigger a copy of RainMaker?

A   GoldDigger is not a copy of RainMaker.

Q   What additional functionality does -- does your platform have that ES3's does not?

A   GoldDigger is built highly around our AMIs because I had AMIs in place before I started construction of the GoldDigger.  So what it allows me to do is import individual leases that are assigned to me by our AMI partners, and it allows me to pull data directly from the leased import page as far as production data -- well production data from the railroad commission.

And lastly, it allows me from any lease page or from the list of lease pages to generate a report showing all of our correspondence under every owner for that specific lease, so I don't have to have long, drawn-out phone calls with our AMI partners explaining what's going on on each lease and trying to remember that.  I can generate a report, send it over to them in five minutes, and they -- they know exactly what our conversations have looked like with all of those owners.

Q    Somebody who was apparently not John Tewksbury, because he flaked; right?

A    Correct.

Q    So somebody else built that platform.  Who did that for you?

A    Stellans TechnoSoft is the name of the company. Maulik Dave is my contact there and the person that I work directly with.

Q    Okay.  And did Mr. Dave have suggestions about how to build this software?

A    Yes.  I -- I told Mr. Dave the information I needed.  I gave him an outline of what I wanted the software to be able to do, and I relied on his expertise to design and build it.

Q    Okay.  Did he have substantive suggestions, or was it just about how to code it?

A    It -- part of my interview process with developers was asking if they knew how to scrape public data from public websites.  And Mr. Dave expressed to me that he was an expert at doing that, but there was no -- no substantive data.  It was:  This is where the information is; I need to be able to put in notes under each owner; I need to be able to search by leases or owner names, and you design and build it.

Q    Now, LMP, over the past year -- we talked about

how much you have earned in profit over the past year. How many employees do y'all have now?

A    We have 12 employees including Mr. Dave.

Q    And if the Court were to grant the injunction that ES3 is asking for, what would happen to those folks?

A    It would not be good.  All -- all of our employees are married with kids and either work in a single- or -- or two-family, two -- two-working-family households and generate a lot to -- to their families well-being.  We've hired very senior salespeople out of other organizations that I've known personally for a really long time, and they left long-standing jobs to be a part of this.

Q    Do y'all have any deals currently in the pipeline?

A    We do.

Q    Are they placed with a buyer?

A    Some are placed with buyers, some are not.

Q    And what would happen with those deals?

A    We'd be in breach of contract on two sides.

Q    What has your gross revenue been?  We -- we heard about your profit.  What's your gross revenue been for the first ten months this year?

A    Roughly 20.2 million.

Q    Would you expect that to increase or decrease over the next ten months?

A    I would expect it to increase.

Q    Okay.  So if the Court would grant the injunction -- were to grant the injunction that ES3 is asking for, what do you expect would be the revenue that you would lose over the next year?

A    We've recently hired three additional salespeople in the beginning of September, and I would expect that that number would grow to 30 million or more.

Q    Thank you, Mr. Ryan.

MR. PARKER:  Pass the witness, Your Honor.

THE COURT:  All right.  Thank you.

Any additional questions for this witness?

MR. MARIN:  Just a couple Your Honor.

THE COURT:  All right.

**REDIRECT EXAMINATION**

BY MR. MARIN:

Q    LMP has no intention of slowing down; correct?

A    Correct.

Q    The first deal that you closed that was not an AMI deal was with Hatch Resources; correct?

A    That is correct.

Q    And you presented that deal to Hatch Resources

to Mr. Heath Thompson; correct?

A    I first presented it to Mesa because it was in is same area as -- as our AMI with Mesa.

Q    You presented it to Heath Thompson; correct?

A    I presented it to Mesa after they passed at a price that I needed to make it -- make the deal work, then I called Heath Thompson.

Q    The introduction to Heath Thompson was made by Mr. Kreines; correct?

A    That is correct.

Q    And Mr. Kreines has been paid 45 percent of the gross profit on every deal that you've made; right?

A    Mr. Kreines has been paid 45 percent of gross profit on every deal that we have closed since he's joined us.

Q    In this case, you marked your purchase and sale agreements attorneys' eyes only.  You understand that?

A    Yes.

Q    And that's because your pricing information is secret information worthy of protection; correct?

A    I don't know why our attorneys marked contracts attorneys' eyes only.

Q    Do you recall me asking you a question: Pricing information is secret information worthy of protection?  Do you recall that question?

A    I -- I don't recall the exact question.

Q    Do you recall testifying:  The company's financial information, I believe, is worthy of protection?

A    I think companies' financial information is worthy of protection, yes, but I don't remember specifically pricing information on a specific deal.

Q    Do you remember when I asked you if there was information that is confidential that is owned by LMP that maintains economic value by being kept secret?  Do you remember that question?

A    I remember you asking me about it, yes.

Q    Do you remember that the information that is owned by LMP that maintains as economic value if it's kept secret is pricing information?

A    I -- I do not remember that, no, but I'm -- I'm not disputing it.  I just don't remember that.

Q    Okay.  Is that true that pricing information is confidential and maintains its value for you?

A    I think it depends on the context of the pricing information.

Q    Okay.

            MR. MARIN:  Your Honor, I will pass the witness back.

            THE COURT:  All right.  Any other

questions for the witness?

MR. PARKER:  No, Your Honor.

THE COURT:  All right.  Thank you.

You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Marin, call your next witness.

MR. MARIN:  We call Mr. Kreines.

THE COURT:  Mr. Kreines, please come up to the witness stand.  Please raise your right hand.

(Witness sworn)

THE COURT:  Very good.  You may be seated. Please speak directly into the microphone.  And there's some water if you need it.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. Marin, you may proceed.

**NICHOLAS KREINES,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. MARIN:

Q    Mr. Kreines, when you were onboarded at ES3, Mr. Stanton emphasized the importance of confidentiality in the company; correct?

A    I don't remember.

that -- these buyers; right?

A    Correct.

Q    It has Trevor Berryman for Tailwater that you did business with; right?

A    Yes.

Q    At ES3; right?

A    Yes.

Q    And you negotiated the second AMI with Trevor Berryman, did you not, for LMP?

A    Yes.

Q    And it has Mesa on here; right?

A    Correct.

Q    And it has the contact information from -- for all of ES3's buyers, doesn't it?

A    These -- I mean, I wouldn't call them ES3 buyers, but, yes, I mean --

THE COURT:  That's where you got it from; right?  You got it from ES3.  You got that information from ES3; correct?  Answer.

THE WITNESS:  No.

THE COURT:  Where'd you get it from?

THE WITNESS:  I've -- I've got all of these business cards.  I've got them -- I've got all these people in my phone, and I haven't done a deal with a company that hasn't reached out to us first.

didn't they? Do you recall that line of questioning?

A Can you repeat that question?

Q ES3 invested their -- their goodwill in you so that you were out there being the face of ES3 to the buyer community?

A Yes.

Q And you're sill trading on that today after you left ES3, aren't you?

A Trading on?

MR. MARIN: Your Honor, I will pass the witness just because I want to reserve some time.

THE COURT: All right. Thank you.

Any questions for this witness, Ms. Smith?

MS. SMITH: Your Honor, I'll be respectful of the Court's time, but I do want to ask just a few questions.

THE COURT: All right. Go ahead.

MS. SMITH: All right.

THE COURT: Just grab the microphone, Ms. Smith. Pull it over by you.

MS. SMITH: Thank you.

**CROSS-EXAMINATION**

BY MS. SMITH:

Q Mr. Kreines, are you an employee of LMP?

A No.

Q   Are you the owner -- sorry.  Are you the owner of NAK Resources?

A   Yes.

Q   And is your work with LMP through your role as owner of NAK Resources?

A   Yes.

Q   And, Mr. Kreines, are you a certified professional landman?

A   Yes, that's correct.

Q   And really briefly, but not speaking too quickly, could you just tell the Court in a few words what a certified professional landman is?

A   Yes.  A certified professional landman or CPL -- there's different levels of landmen.  There's an RL, which is a registered landman.  They all require certain years of -- of service with AAPL, which is the American Association of Petroleum [sic] Landmen, plus years of service as a landman or work.

An RL is the bottom one, and there's an RPL, and then there's a CPL, which requires -- I believe it was ten credits.  I -- I could be wrong.  But a credit could be earned by years of work as a landman or education or higher education.

THE COURT:  Okay.  Thank you.

Q   (BY MS. SMITH) And how long have you been a

landman?

A    Since 2010 or 2011.

Q    So you were a landman before you started at ES3; is that correct?

A    Correct.

Q    And, again, briefly, how did you find yourself working at ES3 with Mr. Stanton?

A    I ran into Mr. Stanton at -- Mr. Stanton at NAPE in 2019 at the Hilton bar, which is a place everybody aggregates to -- in between time to network. I invited him to the Dudley Land Company party, which -- my company at the time, which was -- Dudley Land Company was having. I took him there, introduced him to a whole bunch of people that -- that he wanted to know that I thought he should know, some operators that he had bought minerals under and -- and just a -- yeah, a lot of people.

Q    So you connected Mr. Stanton with your network at NAPE?

A    Correct.

Q    And I think when you were speaking to Plaintiff's counsel momentarily, you talked about signing a con- -- not -- a confidentiality, nonsolicitation, and noncompete agreement. Do -- do you -- do you recall that?

A    Yes.

Q    And do you recall any conversations you had with Mr. Stanton or anyone else at ES3 about that agreement?

A    Yeah.  I mean, when I first was presented with the agreement, I had a lot of questions and concerns for Mr. Stanton.  Unfortunately, I already kind of moved my family to Austin, so I didn't -- he wasn't willing to negotiate any part of it, but he did assure me it wouldn't prevent me from getting a job after I left ES3.

And then I remember I talked to ES3's general counsel, Robert Mongole, at a bar.  And Rob told me that -- that the noncompete -- that agreement was essentially garbage and not enforceable.

Q    And you testified just a moment ago that you weren't sure what the term "ES3 buyers" meant.  Can you explain why you can't identify what an ES3 buyer is?

A    Yeah.  Well, it's because these buyers are -- are everybody's buyers.  They buy from a slew of -- of mineral companies, individuals.  Just -- they'll -- they'll buy anything and everything that makes sense for -- for what they have going on.

Q    And I believe we talked about the names Hatch and Mesa.  Do you recall how many deals Hatch has done with ES3, from your knowledge?

A    I believe it was five deals.

Q    And do you know, based on any records that you've reviewed and your role as landman, how many deals Hatch has done in the state of Texas since -- since ES3 has been in operation?

A    I can't recall the exact number, but I believe it was 300.

Q    And those other approximately 295 deals, were those all with LMP?

A    No.

Q    Were they with a number of other buyers across the state?

A    Yes, that's correct.

Q    Likewise, do you -- do you know how many deals ES3 has done with Mesa?

A    I believe it was the same number, five.

Q    Do you recall how many deals Mesa has done with ES3?

A    I think it's five total.

Q    Sorry.  Do you recall how many deals Mesa has done across the state of Texas?

A    It was over 200.

THE COURT:  Wait.  Is this Mesa or ES3 across the state?

MS. SMITH:  This is Mesa.

THE COURT: Mesa. Okay. Just making sure.

Q (BY MS. SMITH) And do you -- and those other deals, those -- other than those five, were those done with different companies, or were those LMP exclusively?

A Different companies.

Q Okay. And those documents in green that Plaintiff's counsel showed you, were you aware before you saw this list today that those were on your computer?

A No.

Q Do you use Dropbox in your work with LMP?

A No.

Q And it looks like the file path is a little bit cut off. Do you know what Dropbox folder this would have come from?

A No.

Q And if the plaintiff asks you to delete these today, would you do so?

A Absolutely.

Q And you said that you haven't done a deal with any buyer who hasn't reached out. How do buyers make themselves known to you?

A A lot of different ways. I mean, to me, call, text, came up to me at NAPE, a lot of different happy

hours at NAPE. I ran into several. But also, you know, public -- publicize themselves in different journals where they like to buy, what they like to buy, contact information, everything. And then there's Pulse reports saying who are the top buyers in certain areas. Or there's Delaware, Midland, different parts of those. So they'll -- they'll pay money to get their contact information out there.

Q    Publicly.

A    Correct.

MS. SMITH:  No further questions, Your Honor.  Pass the witness.

THE COURT:  All right.  Thank you, Ms. Smith.

Mr. Marin, do you have any questions?

MR. MARIN:  Just very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. MARIN:

Q    Mr. Kreines, I'm showing you Deposition -- or Plaintiff's Exhibit Number 137.  You see this is a text exchange, a Cellbrite report between you and Ms. Jettie Rangel?

A    Correct.

Q    There is a page here.  You're in the green on the right, and Ms. Jettie's the blue on the left.  On

of appeals, that's one thing. If you need your record for this judge, no. I've listened to the -- this is why I don't let exhibits in without being sponsored by a witness, for this reason, guys. Because I don't have anything to connect this to; right?

So that's kind of a bit of an issue. I'm going to go on and let them get it in. I -- I can very well tell you if it's not good evidence because you weren't there. All right. So all the deposition experts are allowed in. That's better. That's safer that way. Make sure to number them and get them to my court reporter. All right. Very good.

(Unmarked deposition excerpts admitted)

(Reporter clarification)

THE COURT: They're going to get those to you. They don't have them right now. They're going to have to get them -- because it's getting close to 5:00, they're going to have to number those tonight and get those to you in the morning.

(Reporter clarification)

MR. MARIN: For us they will start at 2- -- 2- -- 265 for Hatcher, 266 for Ryan, and 267 for Kreines. And we will add those to the list.

And, Your Honor, what we would propose to do with the last -- the other pieces of evidence that I

# TAB H

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis® > Business and Commerce Code > Title 2 Competition and Trade Practices (Chs. 15 — 22) > Chapter 15 Monopolies, Trusts and Conspiracies in Restraint of Trade (Subchs. A — E) > Subchapter E Covenants Not to Compete (§§ 15.50 — 15.52)**

## Sec. 15.50. Criteria for Enforceability of Covenants Not to Compete.

**(a)** Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

**(b)** A covenant not to compete relating to the practice of medicine is enforceable against a person licensed as a physician by the Texas Medical Board if such covenant complies with the following requirements:

  **(1)** the covenant must:

    **(A)** not deny the physician access to a list of his patients whom he had seen or treated within one year of termination of the contract or employment;

    **(B)** provide access to medical records of the physician's patients upon authorization of the patient and any copies of medical records for a reasonable fee as established by the Texas Medical Board under Section 159.008, Occupations Code; and

    **(C)** provide that any access to a list of patients or to patients' medical records after termination of the contract or employment shall not require such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to the contract;

  **(2)** the covenant must provide for a buy out of the covenant by the physician at a reasonable price or, at the option of either party, as determined by a mutually agreed upon arbitrator or, in the case of an inability to agree, an arbitrator of the court whose decision shall be binding on the parties; and

  **(3)** the covenant must provide that the physician will not be prohibited from providing continuing care and treatment to a specific patient or patients during the course of an acute illness even after the contract or employment has been terminated.

**(c)** Subsection (b) does not apply to a physician's business ownership interest in a licensed hospital or licensed ambulatory surgical center.

## History

Enacted by Acts 1989, 71st Leg., ch. 1193 (S.B. 946), § 1, effective August 28, 1989; am. Acts 1993, 73rd Leg., ch. 965 (H.B. 7), § 1, effective September 1, 1993; am. Acts 1999, 76th Leg., ch. 1574 (H.B. 3285), § 1, effective September 1, 1999; am. Acts 2001, 77th Leg., ch. 1420 (H.B. 2812), § 14.729, effective September 1, 2001; am. Acts 2009, 81st Leg., ch. 971 (H.B. 3623), § 1, effective September 1, 2009.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# TAB I

# Tex. Gov't Code § 25A.004

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis® > Government Code > Title 2 Judicial Branch (Subts. A — M) > Subtitle A Courts (Chs. 21 — 30) > Chapter 25A Business Court (§§ 25A.001 — 25A.020)**

## Sec. 25A.004. Jurisdiction and Powers.

**(a)** Subject to Subsections (b), (c), (d), (e), and (f), the business court has the powers provided to district courts by Chapter 24, including the power to:

**(1)** issue writs of injunction, mandamus, sequestration, attachment, garnishment, and supersedeas; and

**(2)** grant any relief that may be granted by a district court.

**(b)** Subject to Subsection (c), the business court has civil jurisdiction concurrent with district courts in the following actions in which the amount in controversy exceeds $5 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

**(1)** a derivative proceeding;

**(2)** an action regarding the governance, governing documents, or internal affairs of an organization;

**(3)** an action in which a claim under a state or federal securities or trade regulation law is asserted against:

**(A)** an organization;

**(B)** a controlling person or managerial official of an organization for an act or omission by the organization or by the person in the person's capacity as a controlling person or managerial official;

**(C)** an underwriter of securities issued by the organization; or

**(D)** the auditor of an organization;

**(4)** an action by an organization, or an owner of an organization, if the action:

**(A)** is brought against an owner, controlling person, or managerial official of the organization; and

**(B)** alleges an act or omission by the person in the person's capacity as an owner, controlling person, or managerial official of the organization;

**(5)** an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith;

**(6)** an action seeking to hold an owner or governing person of an organization liable for an obligation of the organization, other than on account of a written contract signed by the person to be held liable in a capacity other than as an owner or governing person; and

**(7)** an action arising out of the Business Organizations Code.

**(c)** The business court has civil jurisdiction concurrent with district courts in an action described by Subsection (b) regardless of the amount in controversy if a party to the action is a publicly traded company.

**(d)** The business court has civil jurisdiction concurrent with district courts in the following actions in which the amount in controversy exceeds $10 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

**(1)** an action arising out of a qualified transaction;

**(2)** an action that arises out of a contract or commercial transaction in which the parties to the contract or transaction agreed in the contract or a subsequent agreement that the business court has jurisdiction of the action, except an action that arises out of an insurance contract; and

**(3)** subject to Subsection (g), an action that arises out of a violation of the Finance Code or Business & Commerce Code by an organization or an officer or governing person acting on behalf of an organization other than a bank, credit union, or savings and loan association.

**(e)** The business court has civil jurisdiction concurrent with district courts in an action seeking injunctive relief or a declaratory judgment under Chapter 37, Civil Practice and Remedies Code, involving a dispute based on a claim within the court's jurisdiction under Subsection (b), (c), or (d).

**(f)** Except as provided by Subsection (h), the business court has supplemental jurisdiction over any other claim related to a case or controversy within the court's jurisdiction that forms part of the same case or controversy. A claim within the business court's supplemental jurisdiction may proceed in the business court only on the agreement of all parties to the claim and a judge of the division of the court before which the action is pending. If the parties involved in a claim within the business court's supplemental jurisdiction do not agree on the claim proceeding in the business court, the claim may proceed in a court of original jurisdiction concurrently with any related claims proceeding in the business court.

**(g)** Unless the claim falls within the business court's supplemental jurisdiction, the business court does not have jurisdiction of:

**(1)** a civil action:

**(A)** brought by or against a governmental entity; or

**(B)** to foreclose on a lien on real or personal property;

**(2)** a claim arising out of:

**(A)** Subchapter E, Chapter 15, and Chapter 17, Business & Commerce Code;

**(B)** the Estates Code;

**(C)** the Family Code;

**(D)** the Insurance Code; or

**(E)** Chapter 53 and Title 9, Property Code;

**(3)** a claim arising out of the production or sale of a farm product, as that term is defined by Section 9.102, Business & Commerce Code;

**(4)** a claim related to a consumer transaction, as that term is defined by Section 601.001, Business & Commerce Code, to which a consumer in this state is a party, arising out of a violation of federal or state law; or

**(5)** a claim related to the duties and obligations under an insurance policy.

**(h)** The business court does not have jurisdiction of the following claims regardless of whether the claim is otherwise within the court's supplemental jurisdiction under Subsection (f):

**(1)** a claim arising under Chapter 74, Civil Practice and Remedies Code;

**(2)** a claim in which a party seeks recovery of monetary damages for bodily injury or death; or

**(3)** a claim of legal malpractice.

# History

Acts 2023, 88th Leg., ch. 380 (H.B. 19), § 1, effective September 1, 2023.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

# TAB J

# Tex. Gov't Code § 25A.006

\*\*\* This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. \*\*\*

**Texas Statutes & Codes Annotated by LexisNexis®  >  Government Code  >  Title 2 Judicial Branch (Subts. A — M)  >  Subtitle A Courts (Chs. 21 — 30)  >  Chapter 25A  Business Court  (§§ 25A.001 — 25A.020)**

## Sec. 25A.006. Initial Filing; Removal and Remand.

**(a)**  An action within the jurisdiction of the business court may be filed in the business court. The party filing the action must plead facts to establish venue in a county in a division of the business court, and the business court shall assign the action to that division. Venue may be established as provided by law or, if a written contract specifies a county as venue for the action, as provided by the contract.

**(b)**  If the business court does not have jurisdiction of the action, the court shall, at the option of the party filing the action:

**(1)**  transfer the action to a district court or county court at law in a county of proper venue; or

**(2)**  dismiss the action without prejudice to the party's rights.

**(c)**  If, after an action is assigned to a division of the business court, the court determines that the division's geographic territory does not include a county of proper venue for the action, the court shall:

**(1)**  if an operating division of the court includes a county of proper venue, transfer the action to that division; or

**(2)**  if there is not an operating division of the court that includes a county of proper venue, at the option of the party filing the action, transfer the action to a district court or county court at law in a county of proper venue.

**(d)**  A party to an action filed in a district court or county court at law that is within the jurisdiction of the business court may remove the action to the business court. If the business court does not have jurisdiction of the action, the business court shall remand the action to the court in which the action was originally filed.

**(e)**  A party to an action filed in a district court or county court at law in a county of proper venue that is not within an operating division of the business court or the judge of the court in which the action is filed may not remove or transfer the action to the business court.

**(f)** A party may file an agreed notice of removal at any time during the pendency of the action. If all parties to the action have not agreed to remove the action, the notice of removal must be filed:

**(1)** not later than the 30th day after the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action; or

**(2)** if an application for temporary injunction is pending on the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the action, not later than the 30th day after the date the application is granted, denied, or denied as a matter of law.

**(g)** The notice of removal must be filed with the business court and the court in which the action was originally filed. On receipt of the notice, the clerk of the court in which the action was originally filed shall immediately transfer the action to the business court in accordance with rules adopted by the supreme court, and the business court clerk shall assign the action to the appropriate division of the business court.

**(h)** The filing of an action or a notice of removal in the business court is subject to Section 10.001, Civil Practice and Remedies Code.

**(i)** Removal of a case to the business court is not subject to the statutes or rules governing the due order of pleading.

**(j)** Removal of a case does not waive a defect in venue or constitute an appearance to determine personal jurisdiction.

**(k)** The judge of a court in which an action is filed may request the presiding judge for the court's administrative region to transfer the action to the business court if the action is within the business court's jurisdiction. The judge shall notify all parties of the transfer request and request a hearing on the transfer request. After a hearing on the request, the presiding judge may transfer the action to the business court if the presiding judge finds the transfer will facilitate the fair and efficient administration of justice. The business court clerk shall assign an action transferred under this subsection to the appropriate division of the business court.

**(l)** The business court judge on establishment of jurisdiction and venue over an action shall by order declare the county in which any jury trial for the action will be held as determined under Section 25A.015.

# History

Acts 2023, 88th Leg., ch. 380 (H.B. 19), § 1, effective September 1, 2023.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

Tex. Gov't Code § 25A.006

**End of Document**

# TAB K

## Tex. R. Civ. P. 355

The State and Federal rules are current through March 25, 2025.  Local District rules are updated periodically throughout the year.

**TX - Texas Local, State & Federal Court Rules  >  TEXAS RULES OF CIVIL PROCEDURE  >  PART III. RULES OF PRACTICE IN THE BUSINESS COURT**

## Rule 355. Action Removed to the Business Court.

**(a) Notice of Removal Required.**   A party to an action originally filed in a district court or county court at law may remove the action to the business court by filing a notice of removal with:

**(1)**  the court from which removal is sought; and

**(2)**  the business court.

**(b) Notice Contents.**   The notice must:

**(1)**  state whether all parties agree to the removal;

**(2)**  plead facts to establish:

**(A)**  the business court's authority to hear the action; and

**(B)**  venue in a county in an operating division of the business court; and

**(3)**  contain a copy of the district court's or county court at law's docket sheet and all process, pleadings, and orders in the action.

**(c) Notice Deadline.**

**(1)**  When Agreed. A party may file a notice of removal reflecting the agreement of all parties at any time during the pendency of the action.

**(2)**  When Not Agreed. If all parties have not agreed to remove the action, the notice of removal must be filed:

**(A)**  within 30 days after the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's authority to hear the action; or

**(B)**  if an application for temporary injunction is pending on the date the party requesting removal of the action discovered, or reasonably should have discovered, facts establishing the business court's authority to hear the action, within 30 days after the date the application is granted, denied, or denied by operation of law.

**(d) Effect of Notice.**   A notice of removal to the business court is not subject to due order of pleading rules. Filing a notice of removal does not waive a defect in venue or constitute an appearance waiving a challenge to personal jurisdiction.

**(e) Clerk Duties.**   On receipt of a notice of removal, the clerk of the court from which removal is sought must immediately transfer the action to the business court. The business court clerk must assign the action to the appropriate operating division of the business court. If the division has more than one judge, then the clerk must randomly assign the action to a specific judge within that division.

**(f) Remand.**

**(1)**  When Required. If the business court determines, on motion or its own initiative, that removal was improper, the business court must remand the action to the court from which the action was removed.

**(2)**  Motion to Remand.

**(A)**  A party may file a motion to remand the action in the business court based on improper removal. Except as provided in (B), the motion must be filed within 30 days after the notice of removal is filed.

**(B)**  If a party is served with process after the notice of removal is filed, the party seeking remand must file a motion to remand within 30 days after the party enters an appearance.

**(3)**  On Business Court's Own Initiative. The business court must provide the parties 10 days' notice of its intent to remand on its own initiative and an opportunity to be heard on any objection.

# History

Added by Texas Supreme Court, Misc. Docket No. 24-9037, effective September 1, 2024.

Texas Local, State & Federal Court Rules
Copyright © 2025 All rights reserved.

# TAB L

# Tex. R. Civ. P. 683

The State and Federal rules are current through March 25, 2025.  Local District rules are updated periodically throughout the year.

**TX - Texas Local, State & Federal Court Rules  >  TEXAS RULES OF CIVIL PROCEDURE  >  PART VI. RULES RELATING TO ANCILLARY PROCEEDINGS  >  SECTION 5. Injunctions**

## Rule 683. Form and Scope of Injunction or Restraining Order.

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

Texas Local, State & Federal Court Rules
Copyright © 2025 All rights reserved.

**End of Document**

# TAB M

# Tex. R. Civ. P. 684

The State and Federal rules are current through March 25, 2025. Local District rules are updated periodically throughout the year.

**TX - Texas Local, State & Federal Court Rules > TEXAS RULES OF CIVIL PROCEDURE > PART VI. RULES RELATING TO ANCILLARY PROCEEDINGS > SECTION 5. Injunctions**

## Rule 684. Applicant's Bond.

In the order granting any temporary restraining order or temporary injunction, the court shall fix the amount of security to be given by the applicant. Before the issuance of the temporary restraining order or temporary injunction the applicant shall execute and file with the clerk a bond to the adverse party, with two or more good and sufficient sureties, to be approved by the clerk, in the sum fixed by the judge, conditioned that the applicant will abide the decision which may be made in the cause, and that he will pay all sums of money and costs that may be adjudged against him if the restraining order or temporary injunction shall be dissolved in whole or in part.

Where the temporary restraining order or temporary injunction is against the State, a municipality, a State agency, or a subdivision of the State in its governmental capacity, and is such that the State, municipality, State agency, or subdivision of the State in its governmental capacity, has no pecuniary interest in the suit and no monetary damages can be shown, the bond shall be allowed in the sum fixed by the judge, and the liability of the applicant shall be for its face amount if the restraining order or temporary injunction shall be dissolved in whole or in part. The discretion of the trial court in fixing the amount of the bond shall be subject to review. Provided that under equitable circumstances and for good cause shown by affidavit or otherwise the court rendering judgment on the bond may allow recovery for less than its full face amount, the action of the court to be subject to review.

Texas Local, State & Federal Court Rules
Copyright © 2025 All rights reserved.

**End of Document**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Daniels on behalf of James Parker
Bar No. 24027591
cdaniels@lglawfirm.com
Envelope ID: 99825851
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief for Appellants
Status as of 4/18/2025 7:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| James F.Parker | | jparker@lglawfirm.com | 4/17/2025 6:48:12 PM | SENT |
| Gabrielle C.Smith | | gsmith@lglawfirm.com | 4/17/2025 6:48:12 PM | SENT |
| Sydney P.Sadler | | ssadler@lglawfirm.com | 4/17/2025 6:48:12 PM | SENT |
| Michael D.Marin | | mmarin@boulettegolden.com | 4/17/2025 6:48:12 PM | SENT |
| Tori B.Bell | | tori@boulettegolden.com | 4/17/2025 6:48:12 PM | SENT |
| Steven Garrett | | steven@boulettegolden.com | 4/17/2025 6:48:12 PM | SENT |